## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

STEPHANIE THOMAS, in her official capacity as Secretary of the State of Connecticut,

*Defendant*,

SEIU DISTRICT 1199NE, CONNECTICUT ALLIANCE FOR RETIRED AMERICANS, CONNECTICUT CITIZEN ACTION GROUP, and BETTE MARAFINO,

*Intervenor-Defendants*,

and

COMMON CAUSE, and CLAIRE EWING,

*Intervenor-Defendants*.

Case No. 3:26-CV-00021-KAD

February 27, 2026

---

### COMBINED MEMORANDUM IN SUPPORT OF MOTION TO DISMISS, IN OPPOSITION TO MOTION TO COMPEL, AND IN RESPONSE TO ORDER TO SHOW CAUSE BY INTERVENOR-DEFENDANTS SEIU DISTRICT 1199NE, CONNECTICUT ALLIANCE FOR RETIRED AMERICANS, CONNECTICUT CITIZEN ACTION GROUP, AND BETTE MARAFINO

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

I.    Federal law has long made voter list maintenance a state responsibility,
      consistent with principles of federalism. ................................................... 3

II.   The Department of Justice has embarked on an unprecedented campaign
      to amass personal voter registration data held by the States................... 4

III.  The Department of Justice sues Secretary Thomas to obtain Connecticut's
      voter registration list. .............................................................................. 9

ARGUMENT ................................................................................................... 11

I.    DOJ's demand for Connecticut's voter registration list fails on the merits..................... 12

      A.    DOJ did not state an adequate, truthful basis and purpose for its
            demand as Title III requires. ........................................................... 12

            1.    DOJ's purported purpose is legally inadequate. ....................... 12

            2.    DOJ did not provide any statement of the basis for its demand. ............. 16

            3.    DOJ's stated purpose is contrived and mere pretext to its
                  true aims.................................................................................. 18

      B.    Title III does not prohibit redacting sensitive voter information......................... 19

      C.    DOJ has failed to comply with the Privacy Act.................................... 23

II.   The Court should deny DOJ's motion to compel and hold that the Secretary
      need not produce Connecticut's voter registration list. .................................. 27

      A.    As parallel courts have found, the Federal Rules of Civil Procedure
            govern DOJ's claim. ........................................................................ 27

      B.    The Court must conduct meaningful review of DOJ's demand. ......................... 30

      C.    The proper procedural course is to resolve the motion to dismiss and
            then, if needed, to proceed to discovery. ............................................. 33

CONCLUSION................................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama ex rel. Gallion v. Rogers*,
   187 F. Supp. 848 (M.D. Ala. 1960) ................................................................ 14, 31

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
   570 U.S. 1 (2013) .............................................................................................. 3, 21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................................. 33

*Ass'n of Car Wash Owners v. City of New York*,
   911 F.3d 74 (2d Cir. 2018) ................................................................................... 33

*CFPB v. Accrediting Council for Indep. Colls. & Schs.*,
   854 F.3d 683, 689-90 (D.C. Cir. 2017) ........................................................... 12, 31

*CFPB v. Source for Pub. Data, L.P.*,
   903 F.3d 456, 458-60 (5th Cir. 2018) .................................................................. 30

*Comm. to Stop Airport Expansion v. FAA*,
   320 F.3d 285 (2d Cir. 2003) ................................................................................. 16

*Davis v. Mich. Dep't of Treasury*,
   489 U.S. 803 (1989) .............................................................................................. 13

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014) .............................................................................................. 33

*Foster v. Love*,
   522 U.S. 67 (1997) .................................................................................................. 3

*Gahagan v. USCIS*,
   911 F.3d 298 (5th Cir. 2018) ................................................................................ 29

*Gonzales v. Thaler*,
   623 F.3d 222 (5th Cir. 2010) ................................................................................ 29

*Haber v. United States*,
   823 F.3d 746 (2d Cir. 2016) .................................................................... 30, 34, 35

*Harris v. Mills*,
   572 F.3d 66 (2d Cir. 2009) ................................................................................... 33

*Home Depot U.S.A., Inc. v. Jackson*,
  587 U.S. 435 (2019) ............................................................................................. 13

*Husted v. A. Philip Randolph Inst.*,
  584 U.S. 756 (2018) ........................................................................................... 3, 4

*In re Admin. Subpoena, No. 25-1431-019*,
  800 F. Supp. 3d 229 (D. Mass. 2025) ............................................................. 15, 31

*In re Coleman*,
  208 F. Supp. 199 (S.D. Miss. 1962) ................................................................ 12, 15

*In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412 (D.C. Cir. 1994) ....................... 31

*In re Subpoena, No. 25-1431-014*,
  No. MC 25-39, 2025 WL 3252648 (E.D. Pa. Nov. 21, 2025) ................................. 14

*Ind. Prot. & Advoc. Servs. Comm'n v. Ind. Fam. & Soc. Servs. Admin.*,
  149 F.4th 917 (7th Cir. 2025) ............................................................................. 26

*Kennedy v. Bruce*,
  298 F.2d 860 (5th Cir. 1962) ............................................................................ 12, 13

*Kennedy v. Lynd*,
  306 F.2d 222 (5th Cir. 1962) ........................................................................ *passim*

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
  No. 25-cv-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) ...................... 23, 24, 26

*Project Vote, Inc. v. Kemp*,
  208 F. Supp. 3d 1320 (N.D. Ga. 2016) ................................................................ 20

*Project Vote/Voting for Am., Inc. v. Long*,
  682 F.3d 331 (4th Cir. 2012) .............................................................................. 20

*Project Vote/Voting For Am., Inc. v. Long*,
  752 F. Supp. 2d 697 (E.D. Va. 2010) .................................................................. 21

*Pub. Int. Legal Found. v. N.C. State Bd. of Elections*,
  996 F.3d 257 (4th Cir. 2021) .............................................................................. 20

*Pub. Int. Legal Found., Inc. v. Bellows*,
  (*PILF*), 92 F.4th 36 (1st Cir. 2024) ................................................................. 1, 22

*Pub. Int. Legal Found., Inc. v. Matthews*,
  589 F. Supp. 3d 932 (C.D. Ill. 2022) .................................................................. 20

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
  120 F.4th 390 (4th Cir. 2024) .............................................................................. 4

*Robinson v. Shell Oil Co.*,
   519 U.S. 337 (1997) ................................................................................... 13

*Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*,
   584 F.3d 340 (1st Cir. 2009) ...................................................................... 30

*True the Vote v. Hosemann*,
   43 F. Supp. 3d 693 (S.D. Miss. 2014) ......................................................... 20

*United States v. Adams*,
   777 F. Supp. 3d 185 (S.D.N.Y. 2025) ......................................................... 35

*United States v. Benson*,
   --- F. Supp. 3d ---, No. 25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) ................ 2

*United States v. Clarke*,
   573 U.S. 248 (2014) ............................................................................. 30, 34

*United States v. Lynd*,
   301 F.2d 818 (5th Cir. 1962) ...................................................................... 31

*United States v. Millman*,
   765 F.2d 27 (2d Cir. 1985) ......................................................................... 34

*United States v. Oregon*,
   No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) ................................ *passim*

*United States v. Powell*,
   379 U.S. 48 (1964) ................................................................... 3, 28, 29, 30

*United States v. Weber*,
   --- F. Supp. 3d ---, No. 2:25-cv-9149-DOC-ADS,
   2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ................................................ *passim*

*United States v. Zack*,
   521 F.2d 1366 (9th Cir. 1975) ..................................................................... 31

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302, 321 (2014) ............................................................................ 13

*Voter Reference Found., LLC v. Torrez*,
   160 F.4th 1068 (10th Cir. 2025) ............................................................. 20, 22

*Watt v. W. Nuclear, Inc.*,
   462 U.S. 36 (1983) ....................................................................................... 22

**Constitution**

U.S. Const. art. I, § 4, cl. 1 ............................................................................................ 2, 3

**Statutes**

5 U.S.C. § 552a .................................................................................... 21, 23, 24, 26

18 U.S.C. § 2721 ........................................................................................................ 21

26 U.S.C. § 7604 ........................................................................................................ 28

28 U.S.C. § 1782 ............................................................................................. 2, 29, 30

29 U.S.C. § 161 .......................................................................................................... 28

42 U.S.C. § 1974b ...................................................................................................... 15

52 U.S.C. § 20507 ................................................................................................... 3, 19

52 U.S.C. § 20703 ................................................................................................ *passim*

52 U.S.C. § 20705 ................................................................................................. 28, 30

52 U.S.C. § 21083 ............................................................................................. 4, 16, 22

52 U.S.C. § 21085 ...................................................................................................... 16

Conn. Gen. Stat. § 9-50d ..................................................................................... 1, 5, 21

**Rules**

Fed. R. Civ. P. 1 ........................................................................................................ 27

Fed. R. Civ. P. 81(a) .................................................................................................. 27

**Regulations**

Privacy Act of 1974; System of Records, 70 Fed. Reg. 43904 (July 29, 2005) ........................... 25

Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147 (May 25, 2017) ......................... 25

Privacy Act of 1974; Systems of Records, 68 Fed. Reg. 47610 (Aug. 11, 2003) ....................... 25

**Other Authorities**

H.R. Rep. No. 86-956 (1959) ........................................................................ 10, 13, 14

H.R. Rep. No. 107-32 (2001) ..................................................................................... 2

AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 ET),
  https://x.com/AAGDhillon/status/2001659823335616795..........................................................5

Devlin Barrett & Nick Corasaniti, Trump Administration Quietly Seeks to Build
  National Voter Roll, N.Y. Times (Sep. 9, 2025),
  https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html..............4

Eileen Sullivan, DOGE Employees Shared Social Security Data, Court Filing Shows,
  N.Y. Times (Jan. 20, 2026), https://www.nytimes.com/2026/01/20/us/politics/doge-
  employees-social-security-data.html.........................................................................................26

Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls,
  U.S. Dep't of Just. (Jan. 6, 2026), https://perma.cc/PCE6-DHYA ...........................................9

Justice Department Sues Four Additional States and One Locality for Failure to
  Comply with Federal Elections Laws, U.S. Dep't of Just. (Dec. 12, 2025),
  https://perma.cc/Y8VL-QBDP.....................................................................................................9

Justice Department Sues Four States for Failure to Produce Voter Rolls,
  U.S. Dep't of Just. (Dec. 18, 2025), https://perma.cc/7WMZ-FSQR .......................................9

Justice Department Sues Five Additional States for Failure to Produce Voter Rolls,
  U.S. Dep't of Just. (Feb. 26, 2026), https://perma.cc/D5D3-Q72U...........................................9

Justice Department Sues Oregon and Maine for Failure to Provide Voter
  Registration Rolls, U.S. Dep't of Just. (Sep. 16, 2025),
  https://perma.cc/9HZQ-CFCG .....................................................................................................8

Justice Department Sues Six Additional States for Failure to Provide Voter Registration
  Rolls, U.S. Dep't of Just. (Dec. 2, 2025), https://perma.cc/SCJ6-7GW4 ..................................9

Justice Department Sues Six States for Failure to Provide Voter Registration Rolls,
  U.S. Dep't of Just. (Sep. 25, 2025), https://perma.cc/J2Z3-C4NY ............................................9

Justice Department Sues Virginia for Failure to Produce Voter Rolls,
  U.S. Dep't of Just. (Jan. 16, 2026), https://perma.cc/5MNZ-7SKQ ..........................................9

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, Tracker of Justice
  Department Requests for Voter Information, Brennan Ctr. for Just. (Jan. 9, 2025),
  https://perma.cc/N4E9-2QC8 .......................................................................................................4

Nick Corasaniti, Why Is the Trump Administration Demanding Minnesota's Voter
  Rolls?, N.Y. Times (Jan. 26, 2026),
  https://www.nytimes.com/2026/01/26/us/politics/minnesota-trump-voter-rolls.html...............5

The National Voter Registration Act of 1993 (NVRA),
  U.S. Dep't of Justice (Nov. 1, 2024), https://perma.cc/CQ9U-GVGA......................................16

Reid J. Epstein & Nick Corasaniti, Trump, in an Escalation, Calls for Republicans to
    'Nationalize' Elections, N.Y. Times (Feb. 2, 2026),
    https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html ................ 5

# INTRODUCTION

The United States Department of Justice ("DOJ") seeks to build a nationwide voter registration list, a scheme not authorized by Congress and contrary to federal laws assigning States the responsibility for overseeing voter registration. To build this unauthorized and unprecedented federal list, DOJ has demanded that Connecticut—along with at least forty-seven other States— turn over its full, unredacted voter registration list, even though it has no actual authority to make such a demand and despite the fact that Connecticut law does not allow disclosure of sensitive voter information like driver's license numbers and social security numbers. *See* Conn. Gen. Stat. § 9-50d.

Nothing in federal law authorizes the relief that DOJ seeks. DOJ relies solely on Title III of the Civil Rights Act of 1960 ("CRA" or "Title III") but demands under that statute must state "the basis and the purpose" for which they are issued, and that basis and purpose must be legally valid. 52 U.S.C. § 20703. DOJ's demand fails that test. DOJ claims to be investigating compliance with the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"), but the CRA is concerned with protecting the constitutional right to vote—not with enforcing election administration rules—and DOJ's demands and actions in other States make clear that DOJ's true purpose is not assessing NVRA or HAVA enforcement in any event. Moreover, even if there were a valid demand, neither the CRA nor any other provision of federal law preempts Connecticut's privacy protections or precludes Connecticut from withholding sensitive voter data. *See, e.g.*, *Pub. Int. Legal Found., Inc. v. Bellows* (*PILF*), 92 F.4th 36, 56 (1st Cir. 2024) (concluding that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in" voter files). And DOJ has not complied with the requirements that the federal Privacy Act imposes before the collection of the private data it seeks.

1

Ultimately, DOJ's demand runs directly contrary to the decentralized structure of the federal electoral system. *See, e.g.*, U.S. Const. art. I, § 4, cl. 1 (giving the States principal authority over congressional elections). When enacting HAVA after the contested 2000 elections, Congress stressed that the "dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome." H.R. Rep. No. 107-329, pt. 1, at 31-32 (2001). DOJ's suit asserts an unprecedented federal authority over the management of federal elections, yet it cites no federal law that supplies such sweeping authority.

Recently, two courts dismissed DOJ's parallel suits in California and Oregon. *United States v. Weber*, --- F. Supp. 3d ---, No. 2:25-cv-9149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026). Both courts dismissed DOJ's CRA claim for the reasons argued here, holding that (1) DOJ's proffered basis and purpose do not suffice under Title III of the CRA, *Weber*, 2026 WL 118807, at *8; *Oregon*, 2026 WL 318402, at *9-10, and (2) federal law does not preempt state privacy laws protecting sensitive voter data, *Weber*, 2026 WL 118807, at *13, *17; *Oregon*, 2026 WL 318402, at *12. The California court also held that DOJ's data request violates the Privacy Act, *Weber*, 2026 WL 118807, at *17-19. This Court similarly should dismiss the complaint.[1]

This Court should also follow the California and Oregon courts in rejecting DOJ's suggestion that the CRA displaces the Federal Rules of Civil Procedure. Contrary to DOJ's contention—and unlike 28 U.S.C. § 1782—nothing in the CRA authorizes a "special statutory proceeding." Rather, as the Supreme Court held when construing a statute with identical, relevant

---

[1] A third federal court dismissed another equivalent suit on the alternative ground that DOJ's demand did not comport with the plain text of Title III. *See United States v. Benson*, --- F. Supp. 3d ---, No. 25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026).

language, "the Federal Rules of Civil Procedure apply." *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). Accordingly, the motion to dismiss is properly before the Court, and the Court should grant it.

If, however, the Court were to decline to grant the motion to dismiss, the Court still should not order Secretary Thomas to produce Connecticut's unredacted voter registration list to DOJ. Doing so would be far premature, particularly given that there is a strong basis to believe that DOJ's stated purpose for its request for Connecticut's voter registration list is pretextual. In light of this showing, Intervenors are entitled to discovery into DOJ's true motivation under any plausible procedural framework.

## BACKGROUND

### I.    Federal law has long made voter list maintenance a state responsibility, consistent with principles of federalism.

The U.S. Constitution "invests the States with responsibility for the mechanics" of elections, subject to any decision by Congress to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also* U.S. Const. art. I, § 4, cl. 1. It is therefore *States*, not the federal government, that are primarily responsible for determining voter eligibility and maintaining lists of eligible voters. Congress may preempt state law, but that power extends only "so far as it is exercised, and no farther." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). Where Congress has not spoken on an issue, state law controls. *See id.*

Existing federal law sits "atop state voter-registration systems"; it does not displace them. *Id.* at 5. The NVRA charges States—not the federal government—with the "administration of voter registration for elections for Federal office." 52 U.S.C. § 20507(a). It makes States responsible for maintaining voter lists (subject to strict procedural safeguards). *Id.* § 20507(c)-(g). And it makes States the custodians of voter registration data. *See Husted v. A. Philip Randolph Inst.*, 584 U.S.

3

756, 761 (2018).

HAVA, enacted "to improve voting systems and voter access" after the 2000 election, similarly involves voter registration systems, and puts the responsibility for such systems on the States. *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). Thus, it requires States to create a "computerized statewide voter registration list" and to "perform list maintenance," 52 U.S.C. § 21083(a)(1)(A), (a)(2)(A), and it is abundantly clear that this list is to be "defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A).

Neither the NVRA nor HAVA tasks the federal government with compiling a federal voter registration list. Instead, Congress has "left it up to the States to maintain accurate lists of those eligible to vote in federal elections," *Husted*, 584 U.S. at 761, subject only to the specific requirements of the NVRA and HAVA, which purposefully operate through the States themselves.

## II.    The Department of Justice has embarked on an unprecedented campaign to amass personal voter registration data held by the States.

In the spring of 2025, DOJ launched an unprecedented campaign to demand broad access to state voter files, which include sensitive and personal information about each registered voter such as dates of birth, driver's license numbers, and social security numbers. DOJ has reportedly sent demands to at least 47 States, with plans to make similar demands on all 50.[2] It seeks to use the data to create a national voter database that will be used to attempt to substantiate President Trump's unfounded accusations that millions of non-citizens have voted illegally in recent elections.[3] In recent public statements, moreover, Assistant Attorney General Harmeet Dhillon has made clear that DOJ also intends to use the data it is demanding from the States to attempt to

---

[2] Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Jan. 9, 2025), https://perma.cc/N4E9-2QC8; Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

[3] Barrett & Corasaniti, *supra* note 2.

compel the removal of *hundreds of thousands* of voters from the rolls.[4] And further undermining DOJ's claims that this is all about simply investigating the States' compliance with federal law's highly deferential list maintenance statutes, Attorney General Pam Bondi sent a letter to Minnesota implying that ICE would stop its operations in that State if Minnesota turned over the same type of private voter data that DOJ seeks here.[5] The Administration is only escalating its efforts in this area. This month, President Trump has publicly "thanked" FBI officials for recently seizing state election records, called for the federal government to "take over" and "nationalize" voting, and lamented that he did not deploy the National Guard to seize voting machinery following the 2020 election.[6]

According to many of the States subject to these demands, DOJ has sought not simply read-only access, but "materials that define or explain how" the voter information is coded into the registration database, "potentially because additional information about the database coding would assist in transferring data . . . into other federal databases." Br. of Amici Curiae Maryland et al. in Supp. of Mot. to Dismiss at 6, *United States v. Bd. of Elections of N.Y.*, No. 1:25-CV-01338-MAD (N.D.N.Y. Jan. 6, 2026), ECF No. 79-1. The vast majority of States have appropriately rejected DOJ's demand, declining to turn over sensitive personal information that is typically protected by privacy laws.[7] Connecticut law, for example, includes confidentiality protections for sensitive personal information provided in the context of voter registration. *See, e.g.*, Conn. Gen. Stat. § 9-

---

[4] *See* AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 ET), https://x.com/AAGDhillon/status/2001659823335616795 (stating in video discussing these lawsuits: "You're going to see hundreds of thousands of people in some States being removed from the voter rolls.").

[5] Nick Corasaniti, *Why Is the Trump Administration Demanding Minnesota's Voter Rolls?*, N.Y. Times (Jan. 26, 2026), https://www.nytimes.com/2026/01/26/us/politics/minnesota-trump-voter-rolls.html. Minnesota is similarly currently involved in litigation in which it has declined to turn over its voters' private data in response to a similar demand from DOJ. *See United States v. Simon*, No. 0:25-cv-03761-KMM-EMB (D. Minn. Sep. 25, 2025).

[6] *See* Reid J. Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. Times (Feb. 2, 2026), https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html.

[7] *See* Martinez-Ochoa, O'Connor & Berry, *supra* note 2.

50d (providing that "[w]henever voter registration information maintained under this title" is disclosed, a voter's date of birth shall generally be "limited to only the month and year of birth" and any Social Security number "shall be confidential and shall not be disclosed to any person").

As part of its broader pressure campaign, DOJ first turned its sights on Connecticut last summer. On August 6, 2025, DOJ sent a letter to Secretary Thomas requesting various information about the State's compliance with the list maintenance provisions of the NVRA. Mem. in Supp. of Mot. to Compel, Ex. 1, ECF No. 9-2 (Aug. 6, 2025 Ltr.). In that letter, DOJ cited certain data regarding Connecticut that had been reported in the most recent iteration of the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). *Id.* Specifically, DOJ requested information related to some of the data contained in the EAVS survey, as well as Connecticut's process for removing deceased individuals from the voter rolls, its process in sending out notices to confirm a voter's address, the process by which it identifies duplicate registrants, and the process by which it identifies and removes ineligible voters. *Id.* The August 6 letter nowhere cites or references Title III or the Civil Rights Act. *See id.* Moreover, while the complaint states that this letter contained a request for "a copy of Connecticut's statewide voter registration list," Compl. ¶ 21, that is not correct. The letter requests "registration information . . . including . . . vote history" from the statewide voter list, but only for certain individuals, specifically those that Connecticut had identified as non-citizens, as having been adjudicated incompetent, or as having felony convictions. Mem. in Supp. of Mot. to Compel, Ex. 1 at 2, ECF No. 9-2.

Connecticut replied on August 20, 2025 with a detailed letter that responded to DOJ's questions regarding the State's list maintenance procedures and the data contained in the EAVS survey. Mem. in Supp. of Mot. to Compel, Ex. 2, ECF No. 9-3; *see* Compl. ¶ 23. As stated in later

correspondence between the Secretary and DOJ, after the Secretary sent its August 20, 2025 letter, DOJ "sought no further assurances of Connecticut's compliance with any VRL [voter registration list] maintenance laws, and did not claim that any of the provided responses were inadequate." Mem. in Supp. of Mot. to Compel, Ex. 4 at 2, ECF No. 9-5 (Dec. 24, 2025 Ltr.). Moreover, representatives from the Secretary's office then voluntarily met with DOJ counsel "to discuss issues related to Connecticut's VRL," during which DOJ counsel "raised no concerns." *Id.*

DOJ next corresponded with the Secretary's office on December 12, 2025. Mem. in Supp. of Mot. to Compel, Ex. 3, ECF No. 9-4 (Dec. 12, 2025 Ltr.); *see* Compl. ¶ 24. This letter was markedly different than DOJ's earlier letter. It did not refer to the EAVS data referenced in the August 6 letter, nor the Secretary's response to that letter, nor did it identify any deficiencies or concerns with the Secretary's response. *See* Mem. in Supp. of Mot. to Compel, Ex. 3 at 1-3, ECF No. 9-4. The letter also did not contain any suggestion that Connecticut might not be complying with its list maintenance obligations under federal law, nor did it request any other information besides the then-existing, static iteration of Connecticut's voter registration list. *See id.* But DOJ nevertheless demanded "a copy of Connecticut's statewide voter registration list" within 14 days— the day after Christmas. *Id.* at 1. DOJ insisted that the voter registration list "should contain *all fields*" and "must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." *Id.* (emphasis in original). It asserted that DOJ had authority to request the unredacted voter list under the NVRA, HAVA, and Title III of the Civil Rights Act, and stated that the purpose of this request was "to ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 1-2.

The Secretary's office responded on Christmas Eve.[8] *See* Mem. in Supp. of Mot. to Compel, Ex. 4, ECF No. 9-5. The Secretary explained that the NVRA, HAVA, and Title III did not provide a lawful basis for DOJ to demand Connecticut's voter list. *Id.* With respect to DOJ's invocation of Title III, the Secretary noted that DOJ had not provided a "basis" for seeking Connecticut's list and noted that DOJ's stated "purpose" in the letter (ascertaining Connecticut's compliance with the NVRA and HAVA) fell outside the scope of Title III. *Id.* at 2. The Secretary also observed that federal privacy laws prohibited DOJ's collection of the voter list. *Id.* at 3. Finally, the letter noted that "Connecticut law also prohibits the Secretary from producing much of the information [DOJ] seek[s]," specifically noting protections for social security numbers, driver's license numbers, and full dates of birth, among other categories of sensitive information. *Id.* at 1-2. Accordingly, the letter informed DOJ that while the Secretary "remains prepared to cooperate with the federal government to ensure that our elections are conducted in a manner consistent with federal law—as she has consistently done in the past—the Secretary simply cannot turn over voter information unless permitted to so by law." *Id.* at 1. The Secretary therefore declined to produce Connecticut's voter registration list. *Id.*

Around the same time as DOJ was making these demands of Connecticut, it made similar demands to scores of other States, the vast majority of which similarly refused to turn over highly sensitive personal voter information. Beginning in September 2025, DOJ began filing lawsuits against some of these States; as of the time of this filing, it has filed 30 such suits. On September 16, DOJ brought actions against Oregon and Maine, alleging in both cases that DOJ was entitled to the voter information it sought under three statutes: the NVRA, HAVA, and the CRA.[9] On

---

[8] The Secretary had requested an additional seven days to account for staffing issues stemming from pre-scheduled vacations around the holidays, but DOJ ignored that request. ECF No. 9-5 at 1 n.1.

[9] *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls*, U.S. Dep't of Just. (Sep. 16, 2025), https://perma.cc/9HZQ-CFCG.

September 25, DOJ filed lawsuits against California, Michigan, Minnesota, New York, New Hampshire, and Pennsylvania.[10] Again, DOJ brought its claims under all of these same three statutes, excepting only the NVRA claim in States that are exempt from the NVRA. In early December, DOJ sued a third group of States—Delaware, Maryland, New Mexico, Rhode Island, Vermont, and Washington.[11] Notably, beginning with the lawsuits filed in early December 2025, DOJ asserted only a single claim under the CRA, implicitly acknowledging the weakness of its NVRA and HAVA claims filed in the earlier actions. The lawsuits are otherwise essentially identical to the first few waves. Similarly, in mid-December, DOJ filed fourth and fifth waves of suits against Colorado, Hawaii, Massachusetts, Nevada, the District of Columbia, Georgia, Illinois, and Wisconsin, alleging claims under the CRA only.[12] On January 6, 2026, DOJ brought suit against Arizona and Connecticut, again alleging only one claim under the CRA.[13] Days later, DOJ sued Virginia, again alleging only one claim under the CRA.[14] Most recently, on February 26, 2026, DOJ brought suit against Utah, Oklahoma, Kentucky, West Virginia, and New Jersey, alleging only one claim under the CRA.[15]

## III.    The Department of Justice sues Secretary Thomas to obtain Connecticut's voter registration list.

DOJ filed this suit on January 6, 2026, seeking to compel Secretary Thomas to turn over Connecticut's full, unredacted statewide voter registration list. *See generally* Compl. DOJ brings

---

[10] *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls*, U.S. Dep't of Just. (Sep. 25, 2025), https://perma.cc/J2Z3-C4NY.

[11] *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls*, U.S. Dep't of Just. (Dec. 2, 2025), https://perma.cc/SCJ6-7GW4.

[12] *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws*, U.S. Dep't of Just. (Dec. 12, 2025), https://perma.cc/Y8VL-QBDP; *Justice Department Sues Four States for Failure to Produce Voter Rolls*, U.S. Dep't of Just. (Dec. 18, 2025), https://perma.cc/7WMZ-FSQR.

[13] *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls*, U.S. Dep't of Just. (Jan. 6, 2026), https://perma.cc/PCE6-DHYA.

[14] *Justice Department Sues Virginia for Failure to Produce Voter Rolls*, U.S. Dep't of Just. (Jan. 16, 2026), https://perma.cc/5MNZ-7SKQ.

[15] *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls*, U.S. Dep't of Just. (Feb. 26, 2026), https://perma.cc/D5D3-Q72U.

only a single claim, alleging a violation of Title III of the CRA. *See id.* ¶¶ 29-31. Title III is a Civil Rights-era law that permits DOJ to review certain voting records to investigate "question[s] concerning infringement or denial of . . . constitutional voting rights." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962). Congress enacted the law to preserve "the right of all qualified citizens to vote without discrimination on account of race," and specifically to facilitate "investigation[s] authorized under the Civil Rights Act of 1957. H.R. Rep. No. 86-956, at 7 (1959).

DOJ, however, admits that it is not seeking to enforce these laws or investigate the unconstitutional denial of the right to vote. Rather, DOJ's stated purpose in making the request as conveyed to the Secretary was "to ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA." Mem. in Supp. of Mot. to Compel, Ex. 3, ECF No. 9-4. These are laws with their *own* procedures and enforcement mechanisms, which DOJ has not invoked in its Complaint here.

The day after DOJ filed its complaint, it also filed a motion for an order to compel records. ECF No. 9. In its briefing for that motion, DOJ contends that Title III displaces the Federal Rules of Civil Procedure and allows it to seek an order compelling the immediate production of the full set of information that DOJ demands, including large swaths of sensitive, personal data. *See* Mem. in Support of Mot. to Compel at 5, ECF No. 9-1.

On January 8, 2026, the day after DOJ's motion to compel was filed, the Court entered an Order to Show Cause why the Secretary should not be ordered to produce Connecticut's voter registration list and other documents to DOJ.[16] ECF No. 10. At that time, Secretary Thomas had

---

[16] In addition to Connecticut's voter registration list, DOJ's proposed order asks that the Secretary be required to produce "the other documents demanded by the Attorney General." ECF No. 9-8, at 1. The Court's Order to Show Cause also referred to this request. ECF No. 10. But no other records can be fairly understood to be at issue in this litigation. DOJ's complaint asks for an order to produce the voter registration list only. Compl. at 7, ¶ B. Moreover, the complaint asserts a single claim under the CRA, *see* Compl., and DOJ's only CRA demand occurred in its December 12 letter, which asked the Secretary to produce the voter registration list and no other record, *see* ECF No. 9-4.

not yet been served or appeared, nor had Intervenors moved to intervene. Later, the Court granted the State's motion for an extension of the briefing schedule. ECF No. 30. In the order granting the extension, the Court noted that it recognized the "parties disagree as to the appropriate procedural posture of the case," and invited the parties to brief their views as to the appropriate "procedural path forward in this litigation." *Id.*

## ARGUMENT

DOJ's request for Connecticut's voter registration list is deficient because it did not include a valid statement of "the basis and the purpose" for the demand, as Title III requires; because federal law does not preempt Connecticut's state-law privacy protections for the sensitive data Connecticut has withheld; and because DOJ has not complied with the federal privacy restrictions on the sensitive data it seeks. Accordingly, there is no cognizable legal theory for DOJ's requested relief.

Therefore, the Court should grant the motion to dismiss. The motion is the proper vehicle to decide this case, since the Federal Rules of Civil Procedure govern this civil action, like any other. Nothing in the CRA supports DOJ's contention that the CRA "displaces" the Federal Rules or authorizes a "special statutory proceeding." Mem. in Support of Mot. to Compel. at 13, ECF No. 9-1. But if the Court declines to grant the motion to dismiss at this time, the proper next step under any plausible procedural framework is to proceed to discovery. Intervenors have made a substantial showing that DOJ's stated "purpose" for requesting Connecticut's voter registration list is pretextual, and the Secretary and Intervenors are entitled to discovery to test the true purpose of DOJ's demand.

## I.    DOJ's demand for Connecticut's voter registration list fails on the merits.

### A.    DOJ did not state an adequate, truthful basis and purpose for its demand as Title III requires.

A demand for records under Title III must state "the basis and the purpose therefor." 52 U.S.C. § 20703. DOJ has previously understood this dual requirement, and, in *Lynd*, provided an explicit statement of *both* the "basis" *and* "purpose" of its demand, as required by Title III:

> This demand is *based* upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction. The *purpose* of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred.

306 F.2d at 229 n.6 (internal quotation marks omitted) (emphases added). Other Title III cases from that period likewise discuss—consistent with Title III's express requirements—an explicit statement of both "the basis and the purpose" for DOJ's demand. *See Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

"The requirement that the Attorney General state their purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 2026 WL 118807, at *9. But here, DOJ's demand fails to adequately allege *either* a basis or a lawful purpose, and thus its claim must be dismissed.

### 1.    DOJ's purported purpose is legally inadequate.

DOJ's stated purpose for issuing the demand to Secretary Thomas—"to ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA," Mem. in Supp. of Mot. to Compel, Ex. 3, ECF No. 9-4—is not sufficient under Title III. *See CFPB v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 689-90 (D.C. Cir. 2017) (rejecting "perfunctory" statement of purpose in issuing civil investigative demand, reasoning agencies "are . . . not afforded unfettered authority to cast about for potential wrongdoing" (citation modified));

12

*see also Weber*, 2026 WL 118807, at *9-10 (finding that "DOJ has not complied with Title III of the CRA and has provided an inadequate statement of basis and purpose" and holding that "[t]he requirement that the Attorney General state their purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute"). Title III permits DOJ to review voting records for "question[s] concerning infringement or denial of . . . constitutional voting rights." *Lynd*, 306 F.2d at 228. Its "purpose is to enable the Attorney General to determine whether" a suit to enforce the CRA is appropriate, *id.*, not to ascertain compliance with distinct laws serving separate purposes with their own enforcement mechanisms and—in the NVRA's case—disclosure provisions. *See Weber*, 2026 WL 118807, at *8-9 (concluding the "purpose of Title III is to detect voting-related racial discrimination" and that "Title III was not passed as a tool for NVRA compliance"). The NVRA and HAVA are concerned with things like a "failure[] to purge voters who have moved or away or died," which, as one early court applying Title III noted, "do[] not bear any particular importance" to the Title III inquiry. *Bruce*, 298 F.2d at 863 n.2.

In interpreting the "purpose" requirement, the Court should "account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (alteration in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)); *see also Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 441 (2019) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989))). And Congress enacted Title III to buttress protections of the constitutional right to vote in the Civil Rights Act of 1957. *See* H.R. Rep. No. 86-956, at 3 (finding that while "some progress" had been made since the 1957

13

Act, there was a "need for additional legislation to implement the enforcement of civil rights"); *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) ("The legislative history leaves no doubt but that [Title III] is designed to secure a more effective protection of the right to vote."), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961) (per curiam).

In the Civil Rights Act of 1957, Congress had tasked DOJ with protecting the "right of all qualified citizens to vote without discrimination on account of race." H.R. Rep. No. 86-956, at 7. Despite this charge, DOJ's efforts were stymied by "the refusal of some state and local authority to permit" inspection of certain voter records, *id.*, not to mention the intentional destruction of others, *Gallion*, 187 F. Supp. at 856 n.4 ("State action such as taken by the Alabama legislature authorizing registrars to destroy their records is an excellent example."). DOJ had "no existing power in civil proceedings to require the production of [voter registration] records during any investigation" concerning "complaints of a denial to vote because of race." H.R. Rep. No. 86-956, at 7. Congress found that, without granting DOJ a "suitable provision for access to voting records during the course of an investigation," its ability to protect the right to vote was "rendered relatively ineffective." *Id.* Congress thus enacted Title III of the Civil Rights Act of 1960 to assist DOJ in those investigations. Title III had nothing to do with investigating the administrative voter registration list requirements enacted in the NVRA and HAVA decades later.

The Court should reject DOJ's efforts to justify its demands with a purpose disconnected from the statutory scheme. *See Weber*, 2026 WL 118807, at *9 (holding that assessing NVRA compliance was an improper purpose for DOJ's Title III request); *In re Subpoena No. 25-1431-014*, No. MC 25-39, 2025 WL 3252648, at *17 (E.D. Pa. Nov. 21, 2025) (rejecting subpoena seeking private health information when DOJ "invoke[d] sweeping needs" for the information "far

removed from those claimed purposes granted by Congress"); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 236-39 (D. Mass. 2025) (similar). Prior enforcement of Title III confirms that it is meant to be used only for investigating the denial of voting rights. Shortly after the law's enactment, courts upheld DOJ demand letters that stated they were "based upon information in the possession of the Attorney General tending to show that discriminations on the basis of race and color have been made with respect to registration and voting within your jurisdiction." *In re Coleman*, 208 F. Supp. at 199-200; *see also Lynd*, 306 F.2d at 229 n.6 (same). DOJ has yet to cite a single instance in which a court has upheld a demand for records made under Title III to assess state compliance with the NVRA or HAVA.[17] And, as previously stated, federal courts have recently rejected DOJ's demand for records made under Title III to assess compliance with the NVRA and HAVA. *Weber*, 2026 WL 118807, at *9 ("Title III was not passed as a tool for NVRA compliance."); *Oregon*, 2026 WL 318402, at *10 ("Plaintiff's state[d] purpose lacked any reference or relation to the purposes for which Title III was enacted.").[18]

In fact, DOJ's stated purpose is not just divorced from Title III's scope—it is antithetical to Title III's purpose. *See Weber*, 2026 WL 118807, at *8-10. DOJ has publicly stated that it wants to use the records it is demanding to attempt to compel States to remove hundreds of thousands of

---

[17] While some of the 1960s-era cases that interpreted Title III included language indicating broad deference to the Attorney General's statement of a "basis and . . . purpose" for requesting records, *see Lynd*, 306 F.2d at 226 (quoting 42 U.S.C. § 1974b, recodified at 52 U.S.C. § 20703), those cases involved circumstances where Title III was unquestionably being used for its intended purpose: investigations into the potential denial of voting rights on account of race. Those prior cases are thus fundamentally different from the circumstances here, where DOJ has not even tried to assert that it seeks to investigate any possible denial of the constitutional right to vote. Nor has it even offered any justifiable basis to support the need for records to evaluate compliance with the two *other* statutes it has invoked.

[18] In parallel cases, DOJ has referred to a complaint against the State of Georgia requesting a copy of the State's voter registration list, including social security numbers, and a subsequent consent decree between the State and DOJ granting access to that voter registration list, as well as a memorandum of understanding with Texas granting DOJ access to the State's voter registration list. *See, e.g.*, Notice of Suppl. Auth., *United States v. Oregon*, 6:25-cv-01666 (D. Or. Jan. 26, 2026), ECF No. 67. In both cases, the DOJ asserted that its demand was for the purpose of assessing compliance with voter registration laws and list maintenance provisions of the NVRA. However, those cases were not litigated, and the adequacy of the stated basis and purpose of DOJ's demands were therefore not probed by a federal court. Nor did those settlements involve DOJ using Title III demands to gain access to voter registration data for the purpose of demanding the removal of voters from the rolls or as political leverage. *See supra* notes 4-5.

voters from the rolls. *Supra* note 4. Far from protecting constitutional voting rights, DOJ seeks to undermine them.

### 2. DOJ did not provide any statement of the basis for its demand.

DOJ's demand letter entirely failed to articulate "the basis" for its request. *See* Mem. in Supp. of Mot. to Compel, Ex. 3, ECF No. 9-4. Not only does it fail to even assert that Connecticut has infringed anyone's voting rights; it even fails to assert any basis for investigating Connecticut's list maintenance practices for compliance with the NVRA and HAVA. DOJ's December 12 letter demanding Connecticut's voter registration list with all fields did not articulate any specific concerns with Connecticut's list maintenance efforts, much less provide a factual basis to conclude that its efforts might not be "reasonable," which is all that the NVRA and HAVA require. 52 U.S.C. § 20507(a)(4); *id.* § 21083(a)(4) *see also id.* § 21085 (committing "specific choices on the methods of complying with" HAVA "to the discretion of the State"); Mem. in Supp. of Mot. to Compel, Ex. 3, ECF No. 9-4.[19]

The lack of a stated basis is fatal—Congress expressly required DOJ to state "the basis *and* the purpose" of its request, 52 U.S.C. § 20703 (emphasis added), and the Court must give meaning to both requirements. *See Weber*, 2026 WL 118807, at *8-9 (holding a proper demand under Title III requires DOJ to put forward "specific, articulable facts pointing to the violation of federal law"); *Oregon*, 2026 WL 318402, at *8-9 (similar); *see also Comm. to Stop Airport Expansion v. FAA*, 320 F.3d 285, 288 (2d Cir. 2003) ("We disfavor an interpretation of a statute that renders statutory language superfluous."). Even if Title III could be used to investigate matters unrelated to denial of the right to vote, *but see infra* Section I.A.2, doing so would require that both the purpose *and*

---

[19] DOJ's own website acknowledges that States "have discretion under the NVRA and HAVA" to design voter registration list-maintenance programs, and that "States currently undertake a variety of approaches" to this process. *The National Voter Registration Act of 1993 (NVRA)*, U.S. Dep't of Justice (Nov. 1, 2024), https://perma.cc/CQ9U-GVGA.

*the basis* of DOJ's request be contained in the demand itself. *See* 52 U.S.C. § 20703 ("*This demand* shall contain a statement of the basis and the purpose therefor." (emphasis added)).

It is irrelevant that the complaint states that DOJ's earlier letter (sent on August 6) was "[b]ased on a review of the 2024 EAVS Report." Compl. ¶ 20. The text of Title III is clear that the basis and purpose of DOJ's demand must be contained within the communication that demands the production of specified records or papers. *See* 52 U.S.C. § 20703. The August 6 letter was not a Title III demand: it nowhere mentions the CRA, nor does it request a copy of Connecticut's voter registration list. *See* Mem. in Supp. of Mot. to Compel, Ex. 1, ECF No. 9-2. DOJ did not make a written demand for Connecticut's voter registration list pursuant to the CRA until its December 12 letter. But while that letter contained an express statement of DOJ's purported *purpose*, it does not contain any statement of DOJ's *basis* for its request. Mem. in Supp. of Mot. to Compel, Ex. 3, ECF No. 9-4. The December 12 letter also did not refer to Connecticut's EAVS data, DOJ's prior letter to Connecticut, or the Secretary's response. *See id.* In any event, the August 6 letter's reference to EAVS data would be an insufficient "basis" under Title III, as DOJ did not state that it believed the EAVS data suggested Connecticut may be failing to comply with federal law, nor did it explain why DOJ would need a copy of Connecticut's voter registration list to assess that issue. *See infra* Argument § 1(A)(3) (explaining that receiving a static copy of Connecticut's voter list would not assist DOJ in determining whether Connecticut was complying with its list maintenance obligations). Moreover, DOJ's December 12 demand did not even try to explain why the Secretary's response to the August 9 letter was inadequate to resolve any concerns.

As in California and Oregon, DOJ's failure to include a "basis" in its demand letter independently warrants dismissal. *See Weber*, 2026 WL 118807, at *9 (dismissing DOJ's complaint and finding that DOJ failed to "establish[] the basis for its request" because DOJ failed

to explain why it believed California had violated the NVRA or why voter data was necessary for its investigation); *Oregon*, 2026 WL 318402, at *8-9 (dismissing DOJ's complaint and finding that DOJ's demand "contain[ed] no statement of a factual basis for believing Oregon violated the NVRA or HAVA").

### 3.    DOJ's stated purpose is contrived and mere pretext to its true aims.

Context shows that "the basis and the purpose" that DOJ included in its demands to Connecticut were not the true basis and purpose for its request. *See Weber*, 2026 WL 118807, at *10-12 (holding that the court is "not obliged to accept a contrived statement and purpose"). Neither DOJ's letter on December 12, 2025, demanding Connecticut's voter registration list nor its subsequent complaint identified any deficiencies with Connecticut's list maintenance procedures. *See generally* Mem. in Supp. of Mot. to Compel, Ex. 3, ECF No. 9-4; Compl. Nor did its prior correspondence. When DOJ asked Connecticut in its August 6, 2025 letter for information regarding the State's list maintenance procedures and data provided to the EAVS survey, the State promptly provided a detailed response explaining its procedures for complying with federal law. Mem. in Supp. of Mot. to Compel, Ex. 2, ECF No. 9-3.  DOJ did not express concerns with that response, nor did DOJ raise any concerns when members of the Secretary's office discussed Connecticut's list maintenance procedures with DOJ counsel. Mem. in Supp. of Mot. to Compel, Ex. 4, ECF No. 9-5. And as explained above, DOJ's demand letter requesting the State's voter registration list pursuant to Title III contained no basis at all for the demand.

The lack of any stated basis for DOJ's investigation of Connecticut is further highlighted by the fact that DOJ has made carbon copy demands to at least 40 States and has sued more than 20 based on nearly identical boilerplate claims and allegations. *See supra* Background § II. This nationwide effort to collect state voter registration lists undermines any notion that DOJ has a "basis" for investigating Connecticut specifically.

In addition, Connecticut's full and unredacted statewide voter file is simply not helpful or necessary to determine whether Connecticut "conduct[ed] a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," 52 U.S.C. § 20507(a)(4); Compl. ¶ 20. The unredacted voter file cannot tell DOJ anything about the list maintenance procedures that Connecticut undertook within its discretion under the NVRA and HAVA. If DOJ were to obtain the unredacted voter file, the data would be outdated almost immediately, and even if DOJ were able to use the data to identify voters who have moved or died since that single snapshot in time, it would not mean that Connecticut did not make a "reasonable" list maintenance effort under the NVRA or HAVA.

Although DOJ's actions are inconsistent with the claim that it is investigating any one of the States whose data it has demanded specifically, they are entirely consistent with the purpose of amassing a nationwide voter registry and—as its own senior official has stated publicly—to attempt to compel the removal of countless individuals from the voting rolls. *See* Background § II; *Weber*, 2026 WL 118807, at *10-12 ("It appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database."); *see also Oregon*, 2026 WL 318402, at *11 (observing that DOJ's conduct "rais[es] suspicion" and "serious doubt as to the true purposes for which [it] is seeking voter registration lists in this and other cases, and what it intends to do with that data").

### B.    Title III does not prohibit redacting sensitive voter information.

Even if DOJ met Title III's requirements, nothing in that provision or any other federal law preempts Connecticut's state-law privacy protections of sensitive voter data and requires the production of the unredacted voter file. Connecticut law protects the information at issue in this case under multiple statutory provisions, none of which is preempted by federal law.

19

Connecticut law expressly limits the information that may be disclosed from the state's voter file. It excludes driver's license and social security numbers, and it requires that only the voter's month and year of birth, and not the day, be disclosed. Conn. Gen. Stat. § 9-50d(a), (b). Nothing in Title III or any other federal law preempts this state-law protection of uniquely sensitive information. Thus, even if DOJ were entitled to some of the information contained in Connecticut's statewide registration list, Connecticut law prohibits DOJ from obtaining (as DOJ demands) the complete, unredacted voter file.

Recently, two courts of appeals have squarely held that the NVRA does not prohibit the redaction of sensitive personal data contained in state voter registration lists. *See PILF*, 92 F.4th at 56 ("[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File."); *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025) ("To the extent the State wishes to redact appropriate personal information before providing the voter data, the NVRA does not prohibit that limitation."). These are no outliers—many other courts have reached the same conclusion. *See Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) (affirming district court order to redact social security numbers before disclosure under NVRA); *Pub. Int. Legal Found. v. N.C. State Bd. of Elections*, 996 F.3d 257, 268 (4th Cir. 2021) (recognizing that the NVRA permits redactions to "protect sensitive information"); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022) (holding the NVRA permits "proper redaction of highly sensitive information"); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016) (holding the NVRA "does not require the disclosure of sensitive information that implicates special privacy concerns," including telephone numbers, partial social security numbers, partial email addresses, and birth dates); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693,

739 (S.D. Miss. 2014) (holding the NVRA "does not require the disclosure of unredacted voter registration documents, including voter registrant birthdates"); *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711 (E.D. Va. 2010) (holding the NVRA permits redacting social security numbers). And the California and Oregon courts considering parallel lawsuits requesting those States' unredacted voter registration lists likewise concluded that "states are entitled to redact sensitive voter information, like social security numbers and birthdates, under the NVRA." *Weber*, 2026 WL 118807, at *12; *see also id.* at *13 (observing that DOJ conceded this in amicus briefs as recently as 2023); *Oregon*, 2026 WL 318402, at *6 (holding that the federal government "does not enjoy any intrinsic authority to compel disclosure" of unredacted voter files under the NVRA).

Nothing in the text of Title III prohibits the redaction of private information that courts have repeatedly held may be redacted under the NVRA or preempts Connecticut's state-law protections. Congress's authority to preempt state laws governing elections extends only "so far as it is exercised, and no farther." *Inter Tribal Council*, 570 U.S. at 9 (citation omitted). And as *Lynd*—the central case DOJ relies on—recognizes, Congress seems to have contemplated the production of public records, not private data. That court concluded that Title III is intended to reach only "public records which ought ordinarily to be open to legitimate reasonable inspection," not "confidential, private papers and effects." *Lynd*, 306 F.2d at 231. In contrast, the information DOJ demands here is safeguarded under both federal and state privacy laws. *See, e.g.*, 5 U.S.C. § 552a; 18 U.S.C. § 2721; Conn. Gen. Stat. § 9-50d. Moreover, driver's license numbers and partial social security numbers were not required to be provided on registration forms until 2002, *see* 52 U.S.C. § 21083(a)(5)(A)(i), so the Congress that enacted Title III could not have possibly intended it to require disclosure of such information (or concluded that doing so was necessary to conduct

the investigations that Title III was enacted to support). *See Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 47 (1983) (interpreting statute to avoid result that "Congress could not have expected").

The conclusion that Title III does not entitle DOJ to the sensitive data it seeks is reinforced by the choices Congress made when it enacted the NVRA and HAVA. If Congress had thought that it was necessary or desirable for DOJ to have access to highly sensitive information about every voter in a State to ensure that the State was complying with its list maintenance obligations under those statutes, it would have said so in the NVRA and HAVA themselves. But Congress created a *different* mechanism meant to ascertain States' compliance with list maintenance obligations: the NVRA inspection provision, located at 52 U.S.C. § 20507(i). Congress "envisioned" this inspection to allow for "critical scrutiny and public audits of voter data"—but nonetheless permitted the redaction of sensitive voter data. *Voter Reference Found.*, 160 F.4th at 1082 & 1073 n.14. Congress specified that records subject to inspection under that provision must include the "names and addresses" of certain voters, 52 U.S.C. § 20507(i)(2), but stopped short of requiring States to go beyond that and disclose sensitive voter information. As for HAVA, it contains no disclosure provision at all, and explicitly confirms that voter registration lists must be "maintained" and "administered at the State level"—not by the federal government. *Id.* § 21083(a)(1)(A). In short, it simply makes no sense to say that Congress intended Title III to preempt state privacy laws protecting highly sensitive information so that the federal government could assess compliance with voter list maintenance under the NVRA and HAVA—statutes passed decades later that reflect a congressional judgment not to preempt such laws. Thus, just as with the NVRA, nothing in Title III prohibits the "redaction of uniquely or highly sensitive personal information in the Voter File." *PILF*, 92 F.4th at 56; *accord Voter Reference Found.*, 160 F.4th at 1083 n.14.

Consequently, Secretary Thomas properly refused to share an unredacted copy of Connecticut's statewide voter registration list with DOJ, and DOJ's complaint should be dismissed.

### C.    DOJ has failed to comply with the Privacy Act.

The Privacy Act, codified at 5 U.S.C. § 552a *et seq.*, "offers substantial protections regarding governmental use and retention of identifiable personal information." *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 25-cv-3501, 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025). It does so in part by "adopt[ing] procedural safeguards when the records maintained by a federal agency, *i.e.*, a 'system of records,' are changed or used in a new way." *Id.* at *2 (quoting 5 U.S.C. § 552a(a)(5), (e)). But DOJ overlooked the Privacy Act's basic procedural requirements in its rushed effort to sweep up the sensitive information of every registered voter in Connecticut. As a result, the Privacy Act independently prohibits DOJ from obtaining Connecticut's statewide voter registration list.

The Privacy Act imposes obligations on any agency that "maintains" a "system of records." *See* 5 U.S.C. § 552a(e). Both of those terms are given specific definitions by the statute. A "system of records" is defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.* § 552a(a)(5); *see also id.* § 552a(a)(4) (defining "record" to include "any item, collection, or grouping of information about an individual that is maintained by an agency . . . that contains his *name*, *or the identifying number* . . . or other identifying particular assigned to the individual" (emphasis added)). Connecticut's statewide voter registration list, which contains the names and other unique identifying information of all registered voters in Connecticut, plainly qualifies as a "system of records" under the Privacy Act.

23

*Cf.* Compl. at 7-8 (demanding statewide voter registration list including "each registrant's full name, date of birth, residential address, and either their state driver's license number, the last four digits of their Social Security number, or HAVA unique identifier"). The term "maintain" is defined to include "maintain, collect, use, or disseminate." 5 U.S.C. § 552a(a)(3). Accordingly, if DOJ were to "collect," "use," or "maintain" Connecticut's statewide voter registration list, the obligations imposed by subsection (e) of the Privacy Act are triggered. *See id.* § 552a(e)(4); *see also Weber*, 2026 WL 118807, at *17 (holding that "[t]he Privacy Act applies to the voter records request[ed] by the DOJ"). And that is precisely the relief DOJ seeks here: an order from this Court to collect Connecticut's statewide voter list. Compl. at 7-8.

As DOJ attempts to amass state voter registration data onto its own servers, the Privacy Act imposes specific obligations. Most relevant here, "when an agency '*establish*[*es*] or revis[es]' any 'system of records,' it must 'publish in the Federal Register . . . a notice of the existence and character of the system of records,' *i.e.*, a System of Records Notice (SORN)." *League of Women Voters*, 2025 WL 3198970, at *2 (alterations in original) (emphasis added) (quoting 5 U.S.C. § 552a(e)(4)). A SORN must include, among other things, the name and location of the system, the categories of individuals on whom records are maintained in the system, the categories of records maintained in the system, and all "routine use[s]" to which the system can be put as well as the "categories of users and the purpose of such use." *Id.*

DOJ does not appear to dispute that the Privacy Act is applicable here. In fact, DOJ stated in its December 12 letter that DOJ "would comply with federal privacy laws," Mem. in Supp. of Mot. to Compel at 9, ECF No. 9-1, and in parallel litigation DOJ has conceded that the Privacy Act is relevant here, *see, e.g.*, Opp'n to Mot. to Dismiss at 12, *United States v. Toulouse Oliver*, No. 25-cv-1193 (D.N.M. Jan. 27, 2026), ECF No. 51 (stating in case seeking New Mexico's

24

statewide voter registration list, "[t]he United States does not dispute that the requirements of the Privacy Act . . . apply here"). Nor does DOJ appear to dispute it must publish a SORN that would apply to voter registration lists. In its parallel litigation seeking other states' voter registration lists, DOJ has alleged that a SORN identified as "JUSTICE/CRT – 001," the "Central Civil Rights Division Index File and Associated Records," supplies the requisite authority. *E.g.*, Compl. ¶ 23, *United States v. Copeland Hanzas*, No. 25-cv-903 (D. Vt. Dec. 1, 2025); Compl. ¶ 23, *United States v. Toulouse Oliver*, No. 25-cv-1193 (D.N.M. Dec. 2, 2025). The complaint in this case, however, fails to allege at all that an applicable SORN has been published. *See generally* Compl.

Even if DOJ had tried to rely here on JUSTICE/CRT – 001, that attempt would fail because that SORN does not extend to a system of records such as a statewide voter registration list. *See Weber*, 2026 WL 118807, at *18. That SORN notifies the public that the categories of individuals covered by the system may include "[s]ubjects of investigations, victims, [and] potential witnesses," in addition to other categories not relevant here. Privacy Act of 1974; Systems of Records, 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003). Applied here, this would implausibly mean *every* registered voter in Connecticut is a subject under investigation, victim, or witness in some unnamed case. Similarly, the SORN describes the categories of records in this system to "consist of case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." *Id.* While this language would seemingly cover run-of-the-mill files maintained for specific civil rights investigations and litigation matters, it would be a startling construction of these terms to find that they extend to a statewide (or, if DOJ gets its way, a nationwide) voter registration list that has never before been compiled by the federal government.[20]

---

[20] In other parallel cases, DOJ briefly mentions two other notices in the Federal Register, but they also are irrelevant. The first adds an additional "routine use" to JUSTICE/CRT – 001 that is not applicable here. *See* Privacy

To allow DOJ to collate sensitive information about every registered voter in Connecticut (and the country) without complying with the Privacy Act's requirements would nullify the Act's "procedural safeguards," which "Congress enacted to . . . permit an individual to determine which records pertaining to him are collected, maintained, used, or disseminated by federal agencies" and to "ensure adequate safeguards are provided to prevent misuse of such information."[21] *League of Women Voters*, 2025 WL 3198970, at *2 (citation modified); *see also Weber*, 2026 WL 118807, at *18. If DOJ wishes to take such a radical step and compile a federal database of the registered voters in the United States, the Privacy Act requires (at a minimum) that DOJ first provide "adequate advance notice" to two congressional committees and the Office of Management and Budget to evaluate the effects on privacy and other rights and then publish a SORN in the Federal Register that accurately discloses the system of records it intends to create and the uses to which it will put that information with the opportunity for written data, views, and arguments from interested persons. 5 U.S.C. § 552a(e)(4); *see also id.* § 552a(r); *id.* § 552a(e)(11) (requiring a 30-day notice period "of any new use or intended use of the information in the system," to "provide an opportunity for interested persons to submit written data, views, or arguments to the agency").

In short, because DOJ identifies no SORN that covers the system of records it intends to maintain, the Privacy Act prohibits DOJ from collecting Connecticut's statewide voter registration list, and the Court therefore should not order Secretary Thomas to produce the list to DOJ. *See Ind.*

---

Act of 1974; System of Records, 70 Fed. Reg. 43904, 43904 (July 29, 2005). The second adds a blanket routine use to all DOJ SORNs that is relevant in the event of a data breach. *See* Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147, 24147 (May 25, 2017). *See Weber*, 2026 WL 118807, at *18 (rejecting DOJ's argument that these notices could satisfy its Privacy Act obligations).

[21] These concerns have only become more significant given DOJ's recent disclosure that members of DOGE shared sensitive data with a political advocacy group in connection with that organization's attempt to analyze state voter rolls. *See* Notice of Corrections to the Record, *Am. Fed. of State, Cnty., & Mun. Emps. v. Soc. Sec. Admin.*, No. 1:25-cv-00596-ELH (Jan. 16, 2026), ECF No. 197; *see also* Eileen Sullivan, *DOGE Employees Shared Social Security Data, Court Filing Shows*, N.Y. Times (Jan. 20, 2026), https://www.nytimes.com/2026/01/20/us/politics/doge-employees-social-security-data.html.

*Prot. & Advoc. Servs. Comm'n v. Ind. Fam. & Soc. Servs. Admin.*, 149 F.4th 917, 939 (7th Cir. 2025) ("Needless to say, courts are not authorized to issue injunctions that authorize or direct people to violate valid federal statutes[.]" (citation modified)).

**II.    The Court should deny DOJ's motion to compel and hold that the Secretary need not produce Connecticut's voter registration list.**

The Court has recognized that "the parties disagree as to the appropriate procedural posture of this case," and has invited the parties to brief their positions regarding the "procedural path forward in this litigation." Order Granting Mot. for Extension of Time, ECF No. 30. For the reasons that follow, Intervenors respectfully submit that the Federal Rules of Civil Procedure govern this litigation, and that the Court should resolve this case via the motion to dismiss. However, if the Court declines to grant the motion to dismiss, the appropriate next step would be to proceed to discovery.

**A.    As parallel courts have found, the Federal Rules of Civil Procedure govern DOJ's claim.**

This Court should reject DOJ's request to short-circuit the Federal Rules in this case. Those Rules "govern the procedure in *all civil actions and proceedings* in the United States district courts, except as stated in Rule 81." Fed. R. Civ. P. 1 (emphasis added). This case is just such an action. While Rule 81 sets out a narrow set of prescribed cases that are exempt from the ordinary rules— such as certain admiralty or bankruptcy actions—none involves the CRA. *See* Fed. R. Civ. P. 81(a). Just the opposite. Rule 81(a)(5) expressly provides that "proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute" are subject to the Rules, "except as otherwise provided by statute, by local rule, or by court order in the proceedings." As a result, even if Title III document requests could be characterized as a subpoena, they would still be subject to the Rules, as none of the sources listed in Rule 81(a)(5) provide an exception for document requests under Title III. Congress knows how

to prescribe streamlined proceedings for that circumstance, *see, e.g.*, 29 U.S.C. § 161(2), and it did not do so in the CRA.

"Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures." *Weber*, 2026 WL 118807, at *8; *accord Oregon*, 2026 WL 318402, at *8. DOJ identifies not a word to support its demand for an immediate grant of the final relief it seeks in this case. The statute says only that district courts "shall have jurisdiction by *appropriate process* to compel the production" of the documents sought. 52 U.S.C. § 20705 (emphasis added). Nothing in that language suggests that the "appropriate process" should be something other than that which federal courts ordinarily use to resolve contested cases. *Weber*, 2026 WL 118807, at *8 (exercising "appropriate process" by applying the Federal Rules of Civil Procedure); *Oregon*, 2026 WL 318402, at *8 (same). And as the Supreme Court has held, where a statute of this type "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, *the Federal Rules of Civil Procedure apply*." *Powell*, 379 U.S. at 58 n.18 (emphasis added). *Powell* is directly on point, because the relevant text of the statute in *Powell* was identical to the relevant text of Section 20705, providing that the federal courts "shall have jurisdiction by appropriate process to compel" the production sought. 26 U.S.C. § 7604(a).

DOJ's contrary argument relies on a Fifth Circuit decision from 1962, *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962). But *Lynd* is entirely irreconcilable with *Powell*, which the Supreme Court decided two years later. Where *Lynd* says that enforcement proceedings under Title III "do[] not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure," 306 F.2d at 225-26, *Powell* explains—again, construing a statute with identical text to that found in Title III—that "the Federal Rules of Civil Procedure apply," and that "proceedings are instituted by filing a complaint, followed by answer and hearing," 379 U.S. at 58 n.18. After

28

*Powell*, *Lynd*—which was never binding on this Court—would not control even in the Fifth Circuit. *E.g.*, *Gahagan v. USCIS*, 911 F.3d 298, 302 (5th Cir. 2018) ("Fifth Circuit precedent is implicitly overruled if a subsequent Supreme Court opinion 'establishes a rule of law inconsistent with' that precedent." (quoting *Gonzales v. Thaler*, 623 F.3d 222, 226 (5th Cir. 2010))). This Court should follow *Powell*. *See Oregon*, 2026 WL 318402, at *8 ("The Supreme Court's holding in *Powell* squarely rejects [DOJ's] contention and reliance on *Lynd*.").

In its order granting the Secretary's motion for an extension of time, the Court indicated that it viewed the Civil Rights Act to be "akin, for example, to 28 U.S.C. Section 1782, which authorizes the district court to adjudicate disputes over discovery sought in aid of foreign and international tribunals." ECF No. 30. Intervenors respectfully submit that 28 U.S.C. § 1782 differs in multiple critical ways from Title III and the statute construed by the Supreme Court in *Powell*. Most importantly, Section 1782 explicitly specifies and details the procedure to be followed. It expressly allows a court to compel testimony or the production of evidence for use in a foreign tribunal, with the process beginning when a foreign tribunal makes a request or when "any interested person" submits an "application" to the court. 28 U.S.C. § 1782(a). The district court then may "direct" testimony to be given or materials to be produced "before a person appointed by the court," specifying that "the person appointed has power to administer any necessary oath and take the testimony or statement." *Id.* Section 1782 also authorizes the district court to specify the "practice and procedure" to be used for taking the testimony or for producing the documents, which "may be in whole or part the practice and procedure of the foreign country or the international tribunal." *Id.* And finally, Section 1782 specifies that the taking of testimony or the production of documents shall (as a default matter) be performed pursuant to the Federal Rules, but it allows the Court to "prescribe otherwise." *Id.*

29

Title III contains nothing remotely similar. It specifies no procedure at all, instead simply stating that the district court "shall have jurisdiction by appropriate process" to order production of covered voting records. 52 U.S.C. § 20705. When the Supreme Court construed a statute containing *identical* language, it was precisely the fact that the statute "contain[ed] no provision specifying the procedure to be followed" that led the Court to hold that "the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 58 n.18. Because Title III (unlike 28 U.S.C. § 1782) also does not "specify the procedure to be followed," the Federal Rules apply.

**B.    The Court must conduct meaningful review of DOJ's demand.**

DOJ is also wrong to minimize the Court's role in reviewing the legality of DOJ's demand. To invoke the powers of a federal court to enforce a subpoena, the government must show its investigation "will be conducted pursuant to a legitimate purpose" and that "the inquiry may be relevant to the purpose." *Powell*, 379 U.S. at 57. After all, "[i]t is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused." *Id.* at 58. And "an abuse would take place if the summons had been issued for an improper purpose." *Id.*

Unsurprisingly, then, courts—including the same circuit court that issued *Lynd*—regularly engage in meaningful judicial review of government document requests issued under a variety of statutory schemes. *E.g.*, *Haber v. United States*, 823 F.3d 746, 753-54 (2d Cir. 2016) (recognizing that a recipient of a government document request is entitled to seek evidence regarding the government's motive upon the "showing of facts that give rise to a plausible inference of improper motive" (quoting *United States v. Clarke*, 573 U.S. 248, 254 (2014) (emphasis omitted)); *Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 347-50 (1st Cir. 2009) (allowing summons recipient opportunity to rebut government's prima facie case); *CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 458-60 (5th Cir. 2018) (reversing order to enforce civil investigative

demand after inquiry into the sufficiency of the purpose and basis of demand); *Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d at 690 (rejecting "perfunctory" statement of purpose in issuing civil investigative demand, reasoning agencies are "not afforded unfettered authority to cast about for potential wrongdoing" (internal quotation marks omitted) (quoting *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994)); *United States v. Zack*, 521 F.2d 1366, 1368-69 (9th Cir. 1975) (considering whether government agency issued administrative summons for an improper purpose); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 237 (quashing subpoena when DOJ "failed to show proper purpose" under the statutory scheme, rejecting notion that "the Government's self-proclaimed say-so" is sufficient to "preclude any form of judicial review"). Nothing in Title III justifies any different treatment.

In arguing otherwise, DOJ relies on *Lynd* and some other cases from the deep South in the early 1960s. But the context in which those cases were decided was vastly different. *Lynd* involved demands for voter records from counties in Mississippi and parishes in Louisiana "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." 306 F.2d at 229 n.6. That was undeniably a valid "purpose" under 52 U.S.C. § 20703, as eliminating racial discrimination in voting was the explicit purpose of Title III, *see Gallion*, 187 F. Supp. at 853 ("The legislative history leaves no doubt but that [Title III of the CRA] is designed to secure a more effective protection of the right to vote."). And there could be no serious question that DOJ had a valid "basis" to suspect racial discrimination in voting in localities where Black residents had overwhelmingly been excluded from the voter rolls. *See, e.g.*, *United States v. Lynd*, 301 F.2d 818, 821 (5th Cir. 1962) (explaining that "[n]o Negro had been registered in Forrest County during defendant Lynd's term of office," while "none of the defendants nor their deputies

were able to testify to any individual white person who had been rejected"). Moreover, *Lynd* emphasized that it was "of great importance" that the records DOJ sought there were "public records which ought ordinarily to be open to legitimate reasonable inspection," not "confidential, private papers." 306 F.2d at 231. Here, in contrast, DOJ seeks sensitive and private information that is regularly protected from disclosure. And even *Lynd* emphasized that if there were a "genuine dispute" whether the records sought fell within the scope of Title III, the court would need to adjudicate that issue. *Id.* at 226.

None of the factors that made *Lynd* such an easy case are present here. The avowed purpose of DOJ's request falls outside of Title III, because—even by DOJ's own telling—the demand relates, not to the protection of constitutional voting rights, but merely administrative requirements imposed by other statutes with their own enforcement and investigatory mechanisms (specifically, the NVRA and HAVA). *See supra* Argument § 1(A)(1). There is therefore at least a "genuine dispute" whether the records are subject to production under Title III. *Lynd*, 306 F.3d at 226. Moreover, public reporting and statements by DOJ officials themselves strongly indicate that DOJ's real purpose is to impede voting rights, not protect them. *See supra* Background § II; *see also Weber*, 2026 118807, at *10-12; *Oregon*, 2026 WL 318402, at *11 (expressing "serious doubt as to the true purposes for which Plaintiff is seeking voter registration lists in this and other cases").

Although *Lynd*'s approach may have made sense for requests for public voter registration forms in 1960s Mississippi, it is entirely inappropriate for the brave new world ushered in by DOJ's wave of extraordinary document demands targeting quintessential private information about all registered voters in the entire State of Connecticut, and nearly every other State, too.

**C.**    **The proper procedural course is to resolve the motion to dismiss and then, if needed, to proceed to discovery.**

Consistent with the above, the Court should resolve this case via the pending motion to dismiss, rather than through a "motion for order to compel records" that is not sanctioned by the Federal Rules or any other authority. *See Weber*, 2026 WL 118807, at *8 ("Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause."); *Oregon*, 2026 WL 318402, at *8. The Federal Rules provide for motions to dismiss for a simple and sound reason: to test "the legal sufficiency" of the complaint. *Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Accordingly, Rule 12(b)(6) motions are meant to "weed[] out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

If the Court denies the motion to dismiss in whole or in part, however, then the next step would be to permit discovery. Even at this early stage, it is apparent that there are disputes of material fact that may bear on the resolution of this case. For example, even assuming DOJ could seek records under Title III to assess Connecticut's compliance with the NVRA and HAVA (and there is good reason to find that it cannot), there is a genuine dispute of fact as to whether that is in fact DOJ's purpose. Public reporting and public statements from senior DOJ officials indicate that DOJ intends to create a nationwide voter list—an unprecedented scheme not authorized by any source of law—and to use the information to attempt to compel removal of hundreds of thousands of voters from the rolls. *See supra* Background § II. Similarly, there is at best a dispute of fact over whether DOJ has any "basis" for its unprecedented demands. Granting DOJ the final relief it seeks before the Secretary and Intervenors have the opportunity to conduct discovery relevant to these and other factual disputes would be premature and contrary to the well-established practices that govern civil litigation. *See, e.g.*, *Ass'n of Car Wash Owners v. City of New York*, 911

33

F.3d 74, 83 (2d Cir. 2018) ("Since summary judgment is a drastic device, it should not be granted when there are major factual contentions in dispute. This is particularly so, when, as here, one party has yet to exercise its opportunities for pretrial discovery." (cleaned up)).

Moreover, even if the Court concludes that full application of the Federal Rules is not warranted, Second Circuit precedent makes clear that Defendants are at least entitled to develop evidence regarding the government's motives before the Court could order the Secretary to produce Connecticut's voter registration list. When a recipient of a government document request contends that the request was made in bad faith, the recipient must be given the opportunity to develop evidence if it can make a "showing of facts that give rise to a plausible inference of improper motive." *Haber*, 823 F.3d at 754 (quoting *Clarke*, 573 U.S. at 254) (emphasis omitted); *see also United States v. Millman*, 765 F.2d 27, 29 (2d Cir. 1985) (per curiam) (a recipient of a tax summons that makes a "substantial preliminary showing" of an abuse of the court's process "is entitled to an opportunity to substantiate his allegations by way of an evidentiary hearing"). Here, Intervenors have (among other things): (1) identified public reporting that explicitly reports that DOJ's stated purpose for these demands is pretextual, (2) shown that DOJ has made carbon copy demands for the voter registration lists of almost every State, (3) explained why obtaining a copy of Connecticut's voter registration list would not aid DOJ in accomplishing its stated purpose of ascertaining the State's compliance with the NVRA and HAVA, and (4) shown that DOJ has not (and apparently cannot) articulate any "basis" for its demand for Connecticut's voter registration list.

Intervenors have thus made a strong showing that DOJ's stated purpose for its demand is pretextual, a concern that has been echoed by two federal courts. *See Oregon*, 2026 WL 318402, at *11 (observing that DOJ's conduct "rais[es] suspicion" and "serious doubt as to the true

34

purposes for which [it] is seeking voter registration lists in this and other cases, and what it intends to do with that data"); *see also Weber*, 2026 WL 118807, at \*10-12 ("It appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database."). Because "a request grounded in pretext cannot be made in good faith," *United States v. Adams*, 777 F. Supp. 3d 185, 232 (S.D.N.Y. 2025), Intervenors have identified "specific facts . . . plausibly raising an inference of bad faith," which entitles them to test DOJ's actual purpose in discovery. *Haber*, 823 F.3d at 753-54; *see also Millman*, 765 F.2d at 30 (finding district court abused discretion in declining to allow discovery as to whether a government document request had been issued for an improper purpose).

In sum, the Court should grant the motion to dismiss, but if the Court does not do so, the next step in this litigation (under any plausible procedural framework) would be to proceed to discovery.

## CONCLUSION

For the foregoing reasons, Intervenors respectfully request that the Court grant their motion to dismiss, deny the motion to compel, and hold that the Secretary need not produce Connecticut's voter list to DOJ.

Dated: February 27, 2026                    Respectfully submitted,

                                            */s/ William Bloss*
                                            William Bloss
                                            CT Fed. Bar No. CT01008
                                            **KOSKOFF KOSKOFF & BIEDER P.C.**
                                            350 Fairfield Avenue, Suite 501
                                            Bridgeport, CT 06604
                                            T: (475) 766-4317
                                            BBloss@koskoff.com

David R. Fox*
Joshua C. Abbuhl**
Tori Shaw*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
F: (202) 968-4498
dfox@elias.law
jabbuhl@elias.law
tshaw@elias.law

\* Admitted *Pro Hac Vice*
\*\* *Pro Hac Vice* Application Pending

*Counsel for Intervenor-Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ William Bloss*