**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

THE UNITED STATES OF AMERICA:                     3:26-CV-00021-KAD
     *Plaintiff*                  :
                                :
     v.                          :
                                :
STEPHANIE THOMAS:            :
     *Defendant.*          :        FEBRUARY 27, 2026

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF DEFENDANT SECRETARY THOMAS

ARGUMENT REQUESTED

## I.    INTRODUCTION

"It is not the purpose of title III [of the Civil Rights Act of 1960 ("CRA")] to supervise State elections."[1]  Yet that is precisely what the Department of Justice ("DOJ") says it wants to do with Title III of the CRA.

Here, DOJ claims a "sweeping power," effectively immune from judicial review, to demand the voter registration list ("VRL") from all fifty states.  ECF No. 1 ¶ 2; Mot. to Compel (ECF 9-1) at 5.  And DOJ's purpose for these requests is (quite literally) to "supervise State elections."  According to its own statements, DOJ wants to conduct a nationwide audit, assessing each state's compliance with two federal election administration laws, the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA").[2]  Those laws require states to maintain a VRL and, critically, have their own strictly limited enforcement schemes designed by Congress. The Executive Branch, through DOJ, is transparently trying to evade Congress' scheme of limited oversight by misusing and misinterpreting the CRA.  The CRA has nothing to do with NVRA and HAVA, and has never been used to enforce them.  There is no suggestion—much less an allegation in the Complaint—that Connecticut is violating either law.  So, even under DOJ's own stated theory, the Court must dismiss this case for its plainly improper use of the CRA.

---

[1] *Miscellaneous Bills Regarding the Civil Rights of Persons within the Jurisdiction of the United States: Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong. 700 (1959) (statement of Rep. William M. McCulloch, drafter of Title III).

[2] *See, e.g.*, ECF No. 9-4 at 3 ("The purpose of this request is to ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA.").

But there is reason not to take DOJ at its word. According to at least two other federal courts, DOJ's use of the CRA, HAVA, and NVRA to audit state list maintenance practices is a pretext for darker purposes. *See United States v. Weber*, Docket No. 2:25-cv-09149-DOC-ADS, 2026 U.S. Dist. LEXIS 8545, at *29–30 (C.D. Cal. Jan. 15, 2026) ("The Court is not required to accept pretextual, formalistic explanations untethered to the reality of what the government has said outside of the courtroom."); *United States v. Oregon*, Docket No. 6:25-cv-01666-MTK, 2026 U.S. Dist. LEXIS 25259, at *33–34 (D. Or. Feb. 5, 2026) ("Plaintiff has continued to engage in conduct raising suspicion about the purposes for which it seeks statewide unredacted voter registration lists. . . . The presumption of regularity that has been previously extended to Plaintiff that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds."). The Executive Branch apparently seeks to amass a trove of personal data from more than 210 million of the country's registered voters, including their names, dates of birth, home addresses, social security numbers, and driver's license numbers. Even if such a goal were permitted under our system of federalism, Congress has certainly never allowed it.

Indeed, Congress passed laws to prevent this exact type of dragnet. But DOJ brazenly ignores these procedural and substantive safeguards, which are meant to ensure that Americans' personal information is not mismanaged or misused by the federal government. Misuse, in particular, seems likely here. Beyond national NVRA and HAVA audits, DOJ apparently intends to use states' voter data for other purposes, such as criminal and immigration enforcement.

This is contrary to the limited role that the federal government takes in voter registration—a domain that belonged exclusively to the states for the vast majority of our Nation's history.  More recently, Congress has allowed federal agencies to intervene, but only in targeted ways for specific reasons.  At no point, however, has Congress ever authorized anything like the nationwide audit or the mass collection of data that DOJ proposes here.

The Court should grant the Secretary's Motion to Dismiss.  Alternatively, the Court should reserve ruling to allow discovery as set forth in the accompanying Response to the Order to Show Cause.

## II.    FACTUAL BACKGROUND

Connecticut is not unique in being targeted by the DOJ under a pretext of "list maintenance" inquiries.  In carrying out an Executive Order, DOJ has followed the same basic template across the country.  First, it seeks information about a state's VRL maintenance; next, it demands the state's unredacted VRL; and then, if a state refuses to fully comply, it sues.  To date, DOJ has requested voter data from at least 47 states and Washington, D.C.[3]  In every case, DOJ's correspondence with these other jurisdictions is nearly identical.[4]  Eleven jurisdictions have reportedly

---

[3] *See* Brennan Ctr. for Just., "Tracker of Justice Department Requests for Voter Information" (updated Feb. 25, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information (hereinafter, "DOJ Demand Tracker").

[4] *Compare* ECF No. 9-4 (letter from DOJ to Secretary demanding statewide VRL under NVRA, HAVA, and the CRA) *with, e.g.*, *United States v. Hanzas, et al.*, 2:25-cv-00903-mkl, ECF No. 2-3 (D. Vt.) *and United States v. Bd. Of Elections of N.Y.*, 1:25-cv-01338-MAD-PJE, ECF No. 81-2, pp. 14–16 (N.D.N.Y.).

complied, and DOJ has sued 25 others that raised concerns about blindly handing their voter data to DOJ under the guise of the CRA and in apparent violation of federal privacy law.[5]  This context frames Plaintiff's allegations.

### A.    Federal Attempts to Collect State VRLs

In March 2025, President Trump issued Executive Order 14248 ("Elections E.O.").  In relevant part, it instructs the Attorney General to take several actions related to criminal enforcement of federal voting laws.  For example, she is to use "databases or information maintained by [the Department of Homeland Security ('DHS')]" and "State-issued identification records" for purposes of criminal enforcement.[6]  And in a section titled "Prosecuting Election Crimes," the Attorney General is instructed to "enter into information-sharing agreements . . . with the chief State election official."[7]  If a state declines, she must "prioritize enforcement of Federal election integrity laws in such States."[8]  Relatedly, the E.O. also directs DHS and Department of Governmental Efficiency to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by [NVRA], alongside Federal immigration databases."[9]

---

[5] *See* DOJ Demand Tracker.
[6] E.O. 14248 § 2(e).
[7] *Id.* § 5(a).
[8] *Id.* § 5(b).
[9] *Id.* § 2(b)(iii).

Courts have already enjoined other portions of the Elections E.O.  *E.g.*, *California v. Trump*, 786 F. Supp. 3d 359, 396 (D. Mass. June 13, 2025), *appeal filed* (Aug. 1, 2025), Docket No. 25-1726 (1st Cir. 2025) (preliminarily enjoining §§ 2(a), 2(d), 3(d), 7(a), and 7(b) as to nineteen plaintiff states, including Connecticut); *LULAC v. Executive Office of the President*, Civil Action No. 25-0946 (CKK), 2026 U.S. Dist. LEXIS 20358, at *167 (D.D.C. Jan. 30, 2026) (permanently enjoining §§ 2(d) and 3(d)).

Implementation began quickly.  By April, DHS started to roll out changes to its immigration database, known as Systematic Alien Verification for Entitlements ("SAVE").[10]  Originally, SAVE had a limited mission (it was intended to verify the immigration and citizenship status of an individual applying for or receiving public benefits) and limited capacity (officials queried the system one name at a time).[11]  But the changes, informed by the Elections E.O., dramatically increased SAVE's functionality.  Now, SAVE can store data on millions of individuals, handle bulk queries, and collect Social Security numbers and driver's license numbers.  With these enhancements, DHS soon started encouraging election officials to use SAVE for voter verification.[12]  But SAVE's reliability and security have been seriously questioned.[13]  Critics—most notably, a group of Secretaries of State, including Secretary Thomas—have remarked that it is "likely to produce unreliable results and subject eligible voters to unnecessary burdens, intrusive investigations, and even disenfranchisement."  *Id.*

Undeterred, data collection followed.  In May, the Attorney General began to demand voter data from states.  Some of these demands included a proposed

---

[10]  *See* Jude Joffe-Block & Miles Parks, The Trump administration is building a national citizenship data system, NPR.org (Jun. 29, 2025), https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database.

[11]  *See* Rosenberg Aff., Ex. C (Secretaries of State, Comment in Opposition to Modifications to and Reissuance of "DHS/USCIS-004 Systematic Alien Verification for Entitlements Program System of Records" (USCIS-2025-0337) (Dec. 1, 2025)).

[12]  *See* News Releases, USCIS, USCIS Deploys Common Sense Tools to Verify Voters (May 22, 2025), https://www.uscis.gov/newsroom/news-releases/uscis-deploys-common-sense-tools-to-verify-voters.

[13]  *See* Rosenberg Aff., Ex. C.

memorandum of understanding ("MOU"), which appeared to illustrate how DOJ intended to use the states' voter data.[14]  According to the MOU, a state would submit its VRL to DOJ, which would then analyze the data using unspecified methods over an unspecified amount of time.[15]  After analysis, DOJ would broadly notify the state "of any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns."[16]  The state would then have 45 days to "clean its VRL" and resubmit the data to DOJ, which would then "verify proper list maintenance has occurred" after an unstated amount of time; there is no procedure for a state to question DOJ's conclusions.[17]  In addition, the MOU assures states that it will comply with federal privacy law, namely, the Privacy Act of 1974.[18]  But it cites a system of records notice ("SORN"), one of the Privacy Act's requirements, that does not appear to apply.[19]  And it does not cite other relevant privacy laws, such as the e-Government Act or the Driver Privacy Protection Act, at all.  Other provisions appear to contemplate sharing with nongovernmental entities, like contractors, as well.[20] Despite the unprecedented federal intrusion into election administration and lack of

---

[14]  *See* Eileen O'Connor, "Confidential" Agreements Show Trump Administration's Plans for States' Voter Data, Brennan Center for Justice (Feb. 5, 2026),  https://www.brennancenter.org/our-work/analysis-opinion/confidential-agreements-show-trump-administrations-plans-states-voter.

[15] DOJ, Confidential Memorandum of Understanding, at 5 (last accessed Feb. 26, 2026),  https://www.brennancenter.org/media/14806/download/2025-12-01-doj-mou-to-colorado.pdf?inline=1

[16] *Id.*

[17] *Id.*

[18] *Id.* at 4.

[19] *Id.*; *see also infra* Part V.B.1 (discussing issues with the cited SORN).

[20] *Id.* at 7.

safeguards to ensure that DOJ's analysis is accurate, timely, and secure, at least eleven states have reportedly agreed to give DOJ its VRL.[21]

By late summer, DOJ acknowledged that its voter data collection efforts were nationwide and involved running the information through a database. In August, Deputy Attorney General Michael Gates met with Secretaries of State, including Secretary Thomas, to discuss DOJ's voter data requests.[22] Gates indicated that DOJ would request data from all fifty states. He also confirmed that DOJ planned to analyze the data, including by running it through SAVE and/or other DHS databases.

Soon after, DOJ publicly confirmed that it was sharing the voter data it collected with DHS.[23] But reports suggested that it would be used for purposes beyond what the MOUs and Gates had stated. Data would be used not only to check a voter's citizenship, but also for criminal- and immigration-related investigations.[24] According to one former attorney in DOJ's Voting Section:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. . . . The idea was, [w]e want to identify undocumented immigrants that have registered to vote. There was no pre-existing evidence this is a problem.

---

[21] *See* DOJ Demand Tracker.

[22] *See* Devlin Barrett & Nick Corasaniti, Trump Administration Quietly Seeks to Build National Voter Roll, N.Y. Times (Sept. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html; Rosenberg Aff. ¶ 40.

[23] *See* Jonathan Shortman, DOJ is sharing state voter roll lists with Homeland Security, Stateline (Sept. 12, 2025), https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security/.

[24] *See* Sarah N. Lynch, US Justice Dept considers handing over voter roll data for criminal probes, documents show, Reuters (Sept. 9, 2025), https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09/.

> I had a concern that the data would be used not for purging
> voter rolls of people who aren't eligible to vote but for
> broader immigration enforcement.  I had never before told
> an opposing party, ["]Hey, I want this information and I'm
> saying I want it for this reason,["] but I actually know it's
> going to be used for these other reasons.  That was
> dishonest.  It felt like a perversion of the role of the Civil
> Rights Division.[25]

Data collection and litigation both ramped up through the fall and winter.  By December, DOJ had run more than 47 million voter records through SAVE[26] and had sued more than 20 jurisdictions for their voter data.[27]

## B.  DOJ Demands Connecticut's VRL

Just as it has from almost every other state, DOJ demanded voter data from Connecticut.  In July 2025, Senior Counsel from DOJ's Criminal Division contacted the Secretary's office via email "to discuss a potential information-sharing agreement."[28]  The email's subject line was "Executive Order Implementation" and it sought information on ineligible voters, fraudulent registration statements, and other unlawful conduct connected to voting.[29]  The Secretary's representatives responded

---

[25] Emily Bazelon & Rachel Poser, The Unraveling of the Justice Department: Sixty Attorneys Describe a Year of Chaos and Suspicion, N.Y. Times Mag. (Nov. 26, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

[26] *See* Jude Joffe-Block, Trump's SAVE tool is looking for noncitizen voters. But it's flagging U.S. citizens too, NPR.org (Dec. 10, 2025), https://www.npr.org/2025/12/10/nx-s1-5588384/save-voting-data-us-citizens.

[27] *See* DOJ Demand Tracker.

[28] Rosenberg Aff., Ex. A (Email from Paul Hayden, Sr. Counsel, Criminal Division, DOJ (Jul. 10, 2025).

[29] *Id.*

and ultimately held a brief phone call with DOJ on August 21.[30]  None of these communications referenced NVRA, HAVA, or the CRA.

In a separate correspondence, on August 6, 2025, DOJ's Civil Rights Division demanded that, within 14 days, the Secretary provide extensive information about the state's voter registration list maintenance based on purported data discrepancies in an Election Administration and Voting Survey ("EAVS") report.[31]  The stated purpose of the letter was to assess Connecticut's NVRA compliance.[32]  It did not cite HAVA or the CRA.  On August 20, 2025, the Secretary timely responded to each of DOJ's demands.  It provided extensive explanations of the policies and procedures Connecticut employs to ensure the accuracy of its VRL.[33]

In the four months following the Secretary's August 20 response, DOJ took no enforcement action, sought no further assurances of Connecticut's compliance, and did not inform the Secretary that any of her responses were inadequate.

DOJ did not respond until its email from Attorney Brittney E. Bennett on December 10, 2025, with an attached demand letter dated December 12, 2025.  That letter demanded that the Secretary produce an electronic copy of Connecticut's VRL within fourteen days, including sensitive information such as registrants' social security numbers, drivers' license numbers, full dates of birth, and residential addresses ("December 12 Demand").[34]  The stated "purpose" for the demand was to

---

[30] *See* Rosenberg Aff. ¶¶ 25, 36.
[31] *See* ECF No. 9-2.
[32] *Id.*
[33] *See* ECF No. 9-3; Rosenberg Aff. ¶¶ 29–35.
[34] *See* ECF No. 9-4.

"ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA."[35]  It also claimed to have authority for the demand under Title III of the CRA, although the letter did not identify any discriminatory conduct that would be actionable under the CRA.[36]  Attorney Bennett asked SOTS to contact her "[s]hould further clarification be required."[37]

On December 24, 2025, the Secretary's office responded that she could not comply with DOJ's demand without more information ("December 24 Response").[38] The letter noted that DOJ failed to identify any legal authority requiring the Secretary to share such sensitive voter information, and state and federal privacy law precluded her from doing so.[39]  The response did, however, invite DOJ to provide additional authority or information that would support its request.[40]

DOJ did not contact the Secretary again until filing the present suit on January 6, 2026, which seeks the same sensitive voter information sought in its December 12 Demand.[41]  On January 7, Plaintiff filed an associated Motion to Compel Production of Records pursuant to the Civil Rights Act of 1960.[42]  The following day, the Court ordered the Secretary to show cause why she should not be ordered to provide Connecticut's VRL to Plaintiff by January 20, 2026.[43]  Later, upon the

---

[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] ECF No. 9-5.
[39] *Id.*
[40] *Id.*
[41] Rosenberg Aff. ¶ 47.
[42] ECF No. 9.
[43] ECF No. 10.

Secretary's motion,[44] the Court extended the time for the Secretary to respond to the show cause order and Plaintiff's complaint to February 27, 2026.[45]

## III.    LEGAL BACKGROUND

Because Plaintiff's claim seeks to audit Connecticut's voter rolls for compliance with NVRA and HAVA, *see, e.g.*, ECF No. 9-4, the Secretary describes what those laws require and how Connecticut follows them.

### A.    Federal Law Requires a State to Maintain a VRL

Overall, federal voter registration laws reflect a careful balancing act between fundamental structural concerns, like federalism and separation of powers, and competing objectives, which can be difficult to reconcile on a practical level.

Structurally, our Constitution gives states the primary responsibility to set the "Times, Places and Manner" of federal elections, including establishing procedures for voter registration.  U.S. Const. Art. I, § 4, cl. 1.  While Congress may set its own rules, *see id.*, it declined to intervene in voter registration for most of our nation's history.  *See Husted v. A. Philip Randolph Institute*, 584 U.S. 756, 761 (2018) (until 1993, "Congress left it up to the States to maintain accurate lists of those eligible to vote in federal elections").  And regardless of whether Congress makes registration laws for states to follow, implementation of those laws remains with the states.  *See ACORN v. Edgar*, 56 F.3d 791, 795 (7th Cir. 1995) (the Elections Clause "authorizes Congress to alter the state's system--but it is still the state's system, manned by state officers and hence paid for by the state").  So does the authority to determine voter

---

[44] ECF No. 27.
[45] ECF No. 30.

qualifications.  *See* U.S. Const. Art. I, § 2.  Equally important, the Framers "assigned no role at all to the President.  Put simply, our Constitution does not allow the President to impose unilateral changes to federal election procedures."  *LULAC v. Executive Office of the President*, Civil Action No. 25-0946 (CKK), 2026 U.S. Dist. LEXIS 20358, at *14–15 (D.D.C. Jan. 30, 2026) (permanently enjoining portions of Elections E.O.).

Practically, federal law imposes two goals for a state's VLR maintenance: "increasing voter registration and removing ineligible persons."  *Husted*, 584 U.S. at 761.  But these can sometimes conflict.  *See Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019) ("These twin objectives -- easing barriers to registration and voting, while at the same time protecting electoral integrity and the maintenance of accurate voter rolls -- naturally create some tension."); *accord ACORN v. Bysiewicz*, 413 F. Supp. 2d 119, 154 (D. Conn. 2005) (Kravitz, J.) (upholding Connecticut's then-existing voting registration deadline as an appropriate "balancing of the interest in increased voter turnout against the practicalities of registering voters on election day itself").

Congress understood the strain between these concepts—state versus Congressional authority over elections; protecting and promoting the right to vote versus limiting opportunities for voting error—and struck a balance.  Accordingly, federal voter registration laws set out a limited number of requirements, but otherwise allow each state to make its own rules.[46]

---

[46] *See Inter Tribal Council*, 570 U.S. at 5 ("Congress has erected a complex superstructure of federal regulation atop state voter-registration systems."); *see also, e.g.*, 52 U.S.C. § 20503(a) (NVRA requires federal procedures for voting registration

### 1.    NVRA

Congress's goals in passing NVRA included "ensur[ing] that accurate and current voter registration rolls are maintained."[47]  A state must, for example, ensure "that any eligible applicant is registered to vote" and that a registrant is not "removed from the official list of eligible voters" except under specified circumstances.[48]

Importantly, a state must also "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of registered voters" due to a registrant's death or change of address.[49]  *See Husted*, 584 U.S. at 761 (the "reasonable effort" requirement is intended "[t]o achieve the . . . goal" of "removing ineligible persons from the States' voter registration rolls").  NVRA provides some ways for a state to comply.  *E.g.*, 52 U.S.C. § 20507(c)(1) (providing a safe-harbor to ensure compliance with the change-of-address requirement).  But states are free to choose others.  *E.g.*, *Husted*, 584 U.S. at 762 (describing "a variety of approaches" States take to meet NVRA requirements); *see also generally* 52 U.S.C. § 20503(a) (federal procedures for voting registration are "in addition to any other method of voter registration provided for under State law").

In addition, a state must maintain "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" for at least two years, and make the records

---

"in addition to any other method of voter registration provided for under State law"); *id*. § 21085 ("The specific choices on the methods of complying with the requirements of [HAVA] shall be left to the discretion of the State.").

[47] 52 U.S.C. § 20501(b).

[48] *Id*. § 20507(a)(1), (3).

[49] *Id*. § 20507(a)(4).

available for public inspection.[50]   The Attorney General may bring an action for declaratory or injunctive relief to enforce NVRA.[51]

### 2.    HAVA

HAVA builds upon NVRA's VRL maintenance requirements.  It requires a state to implement "a single, uniform, official, centralized, interactive computerized statewide voter registration list."[52]   The list must "contain[] the name and registration information of every legally registered voter in the State."[53]

A state may not accept or process an application unless it has a driver's license number, the last four digits of a social security number, or another unique number assigned by the state.[54]   But it is the state—not the federal government—that "determine[s] whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law."[55]

Although the list is "administered at the State level,"[56] HAVA also requires substantial involvement at the local level.   For example, a local election official may "obtain immediate electronic access to the information contained in the computerized list."[57]   And local election officials must update the list upon receipt of any new information: "[a]ll voter registration information obtained by any local election official

---

[50] *Id.* § 20507(i)(1).
[51] *Id.* § 20510(a).
[52] *Id.* § 21083(a)(1)(A).
[53] *Id.* § 21083(a)(1)(A)(i)–(ii).
[54] *Id.* at § 21083(a)(5)(A)(i)–(ii).
[55] *Id.* § 21083(a)(5)(A)(iii).
[56] *Id.* § 21083(a)(1)(A).
[57] *Id.* § 21083(a)(1)(A)(v).

in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official."[58]  Local officials can also conduct regular list maintenance.[59]

Except for requirements like these that are expressly stated, "[t]he specific choices on the methods of complying with the requirements . . . shall be left to the discretion of the State."[60]  The Attorney General may bring a civil enforcement action "to carry out the uniform and nondiscriminatory election technology and administration requirements" of HAVA.[61]

## B.    Connecticut Maintains its VRL Consistent with NVRA and HAVA

Although the Secretary is the state's Chief Election Official,[62] Connecticut's elections are largely administered on the local level by local officials in each of the State's 169 municipalities. Typically, each town has two Registrars of Voters ("ROVs")—one from each major party—and a Registrar of Vital Statistics—typically, a Town Clerk—who together administer elections.[63]

Through the efforts of the Secretary and these local officials, Connecticut complies with NVRA and HAVA.[64]  For instance, as stated above, NVRA requires a state to "conduct a general program that makes a reasonable effort to remove"

---

[58] *Id.* § 21083(a)(1)(A)(vi).
[59] *See id.* § 21083(a)(2).
[60] *Id.* § 21085.
[61] *Id.* § 21111.
[62] *See* Conn. Gen. Stat. § 9-3.
[63] *See id.* §§ 9-189, 9-190; Rosenberg Aff. ¶¶ 9–10.
[64] *See* Rosenberg Aff. ¶¶ 11–22, 58–71.

deceased voters.[65]  Connecticut complies by mandating that ROVs hold a meeting before each election to remove all ineligible electors.[66]  Specific to deceased voters, Connecticut complies by requiring a municipality's Registrar of Vital Statistics to transmit notices of death to an ROV.[67]  Upon receipt, an ROV must timely remove the names of any deceased elector before an election.[68]  In addition, if an ROV learns of the death of an elector independent from notice from the Registrar of Vital Statistics, the ROV can independently remove that elector from the voter rolls.[69]

NVRA also requires a state to maintain a "general program that makes a reasonable effort" to update its voter rolls based on a registrant's change of address.[70]  Connecticut Complies by having an ROV ascertain address changes through annual canvasses, change-of-address forms at voter registration agencies, automatic mechanisms at the DMV, and the National Change of Address System.[71]

Connecticut also complies with HAVA.  Under HAVA, for example, a state may not accept or process any application unless it has a driver's license number, the last four digits of a social security number, or another unique identifying number assigned by the state.[72]  Connecticut complies by requiring this information.[73]

---

[65] 52 U.S.C. § 20507(a)(4).
[66] Conn. Gen. Stat. § 9-35(a), (b).
[67] *Id.* §§ 7-37(a), 7-42.
[68] *Id.* § 9-35(b).
[69] *Id.*
[70] 52 U.S.C. § 20507(a)(4).
[71] Conn. Gen. Stat. §§ 9-19i, 9-23, 9-32.
[72] 52 U.S.C. § 21083(a)(5)(A)(i)–(ii).
[73] *See* Conn. Gen. Stat. § 9-23h.

## IV.    STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (cleaned up). A defendant may raise an affirmative defense "under Rule 12(b)(6) . . . if the defense appears on the face of the complaint." *Iowa Public Employees' Retirement System v. MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010) (cleaned up).

## V.    ARGUMENT

### A.    The Civil Rights Act of 1960

#### 1.    The Attorney General Cannot Compile the Voting Records of 210 Million Individuals or Conduct a Nationwide Audit of Voter Rolls without "Clear Congressional Authorization"

DOJ wants to compile the names, home addresses, dates of birth, social security numbers, and other personal data from more than 210 million registered voters in order to conduct a nationwide audit of voter rolls. It claims that its authority derives from Title III of the CRA of 1960, which was a "[p]erfecting amendment[]" to bolster enforcement of the CRA of 1957. *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). But "context" and "common sense" say otherwise. *Learning Resources Inc. v. Trump*, No. 24-1287, slip op. at 8 (Feb. 20, 2026) (Roberts, J., joined by Gorsuch, J., and Barrett, J.) (quoting *West Virginia v. EPA*, 597 U. S. 697, 723 (2022)).

"It is highly unlikely that Congress authorized such a sweeping . . . program through such a subtle device." *Biden v. Nebraska*, 600 U.S. 477, 496 (2023) (cleaned up). That is because "[w]e expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (cleaned up). Certainly, the creation of an Orwellian database and unprecedented federal oversight over state-run elections qualify as issues of "vast . . . political significance" that demand clear permission from Congress. *Id.* So, under the major questions doctrine, "something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to clear congressional authorization for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (cleaned up).

This is particularly true when an agency claim "to discover in a long-extant statute an unheralded power representing a transformative expansion in [its] . . . authority." *Id.* (cleaned up).[74] Here, DOJ is offering a novel view of its power under the CRA that stands in sharp contrast to its prior use. Over the last sixty-plus years, DOJ has only used the CRA at the local level and only on a handful of occasions. *See*

---

[74] *See also, e.g., Utility Air*, 573 U.S. at 324 ("EPA's interpretation is also unreasonable because it would bring about an enormous and transformative expansion in EPA's regulatory authority"); *Biden v. Nebraska*, 600 U.S. 477, 497 (2023) ("the Secretary's invocation of the waiver power here does not remotely resemble how it has been used on prior occasions"); *National Fed'n of Independent Business (NFIB) v. DOL, OSHA*, 595 U.S. 109, 119 (2022) ("It is telling that OSHA, in its half century of existence, has never before adopted a broad public health regulation of this kind"); *Alabama Assn. of Realtors v. HHS*, 594 U.S. 758, 765 (2021) ("Since that provision's enactment in 1944, no regulation premised on it has even begun to approach the size or scope").

*infra* Part V.A.2.ii.  Now, it wants to use the CRA on a national scale.  Previously, DOJ had also only used the CRA to combat racial discrimination, *see id.*, but DOJ alleges no racial discrimination here.  And certainly, DOJ has never used the CRA to conduct generalized audits or to compile information on hundreds of millions of Americans.  *See West Virginia*, 597 U.S. at 725 ("[T]he want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." (cleaned up)).

Courts are also skeptical of expansive assertions of authority when Congress has said otherwise in related contexts.  Here, DOJ's maximalist reading of its power under the CRA is not filling a gap Congress left open or never addressed.  Through NVRA and HAVA, Congress *did* make federal voter registration laws and provide for their enforcement "in explicit terms, and subject to strict limits."  *Learning Resources*, No. 24-1287, at 8 (Roberts, J., joined by Gorsuch, J., and Barrett, J.).  It imposed such "strict limits," *id.*, precisely because it was concerned about federal overreach into elections, which are traditionally within the domain of states.[75]  Unlike the limited enforcement Congress allows under NVRA and HAVA, DOJ claims to have effectively boundless authority to demand state voter rolls under the CRA.  It claims a "sweeping

---

[75] *See Alabama Assn. of Realtors*, 594 U.S. at 764 ("Our precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power . . . ." (cleaned up)); *Solid Waste Agency v. United States Army Corps of Engineers*, 531 U.S. 159, 173 (2001) ("Unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance"); *see also, e.g.*, *United States v. Weber*, Docket No. 2:25-cv-09149-DOC-ADS, 2026 U.S. Dist. LEXIS 8545, at *42 (C.D. Cal. Jan. 15, 2026) (noting HAVA "lawmakers' reluctance to grant broad federal authority over elections").

power" to demand all manner of voting records. ECF No. 1 ¶ 2. And states—despite a tradition of authority in this area—receive nothing mor than cursory and "severely limited" judicial review. ECF No. 1 ¶ 2; ECF No. 9-1 at 4, 7; *see also, e.g.*, *Alabama Assn. of Realtors*, 594 U.S. at 764–65 ("[T]he Government has identified no limit in §361(a) beyond the requirement that the CDC deem a measure 'necessary.'").

Likewise, "[w]hen [an] agency has no comparative expertise in making certain policy judgments, we have said, Congress presumably would not task it with doing so." *West Virginia*, 597 U.S. at 729 (cleaned up).[76] Here, DOJ has no particular expertise in VRL maintenance—*states* do.

If DOJ contends it has such sweeping powers, it must point to "clear Congressional authorization" for them. *West Virginia*, 597 U.S. at 723. It cannot.

## 2.    The Attorney General's Demand Lacks a Valid "Purpose"

A valid "demand shall contain a statement of the basis and the purpose therefor."[77]    Plaintiff's demand fails to state either.    "The requirement that the Attorney General state their purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute." *United States v. Weber*, Docket No. 2:25-cv-09149-DOC-ADS, 2026 U.S. Dist. LEXIS 8545, at *28 (C.D. Cal. Jan. 15, 2026).

---

[76] *See also, e.g.*, *NFIB*, 595 U.S. at 117–18 ("The Act empowers the Secretary to set *workplace* safety standards, not broad public health measures. . . . [N]o provision of the Act addresses public health more generally, which falls outside of OSHA's sphere of expertise." (emphasis in original)); *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) ("the authority claimed by the Attorney General is both beyond his expertise and incongruous with the statutory purposes and design").

[77] 52 U.S.C. § 20703.

### i. The Attorney General Must State the Reason for the Demand, which Must Be Consistent with the Aims of the CRA

Congress did not require the Attorney General to state "a" purpose for a CRA demand—she must state "the" purpose. "The" is a "definite article," which denotes a reference to one—and only one—thing.[78]  When Congress passed the CRA, "purpose" meant "intention" or "aim."[79]

"[T]he 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights."  *United States v. Oregon*, Docket No. 6:25-cv-01666-MTK, 2026 U.S. Dist. LEXIS 25259, at *30 (D. Or. Feb. 5, 2026).  If not, and the Attorney General was instead vested with unlimited discretion to demand documents for any reason, then Congress's command would be meaningless.[80]  Likewise, a court does not read text in isolation; it considers the entire statutory scheme.[81]  As described below, "[t]he purpose of Title III is to detect voting-related racial discrimination."  *Weber*, 2026 U.S. Dist. LEXIS 8545, at *25.  But no discrimination is alleged here.

---

[78] *See Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 272 (2019) ("use of the definite article . . . indicates that there is generally only one" (cleaned up)).

[79] *See, e.g.*, Ballentine's Law Dictionary (3d ed. 1960) ("An aim. A design or plan. An intention."); *accord United States v. Bailey*, 444 U.S. 394, 405 (1980) ("'purpose' corresponds loosely with the common-law concept of specific intent").

[80] *See Auburn Housing Authority v. Martinez*, 277 F.3d 138, 146 (2d Cir. 2002) ("[T]here is a presumption against construing a statute as containing superfluous or meaningless words or giving it a construction that would render it ineffective." (cleaned up)).

[81] *See Winkelman v. Parma City School Dist.*, 550 U.S. 516, 523 (2007) ("proper interpretation of the Act requires a consideration of the entire statutory scheme").

ii.    **Title III of the CRA Aims to Facilitate Investigation of Voting Discrimination**

Other sections of the CRA overtly address voting discrimination.  Title IV empowered the Commission on Civil Rights to administer oaths in aid of their duties to "investigate allegations . . . that certain citizens of the United States are being deprived of their right to vote and have that vote counted by reason of their color, race, religion, or national origin."[82]  And Title VI created special procedures to restore voting rights "in the event the court finds that any person has been deprived on account of race or color of any right or privileges" to vote.[83]  Since Title III also addresses voting, Congress likely also meant to address the same discrimination concerns that Titles IV and VI discussed.

Similarly, the Court should read the CRA of 1960 in light of the CRA of 1957, which expressly addressed voting discrimination.[84]  The connection is clear:

> In recent years, Congress has repeatedly tried to cope with the problem by facilitating case-by-case litigation against *voting discrimination*.  The Civil Rights Act of 1957 authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds.  *Perfecting amendments in the Civil Rights Act of 1960* permitted the joinder of States as parties defendant, *gave the Attorney General access to local voting records*, and authorized courts to register voters in areas of systematic discrimination.

---

[82] P.L. 86-449, 74 Stat. 86.

[83] *Id.* (codified at 52 U.S.C. § 10101(e)).

[84] *E.g.*, *Hagen v. Utah*, 510 U.S. 399, 415–16 (1994) ("[T]he structure of the statutes requires that the 1905 Act and the 1902 Act be read together. . . . The 1905 Act did not repeat these essential features of the opening, because they were already spelled out in the 1902 Act.  The two statutes -- as well as those that came in between -- must therefore be read together.").

*South Carolina v. Katzenbach*, 383 U.S. 301, 311–13 (1966) (emphasis added).[85]

Even the Fifth Circuit cases Plaintiff relies upon show the CRA's inherent link to voting discrimination. The "purpose [of authorizing demands under 52 U.S.C. § 20703] is to enable the Attorney General to determine whether [42 U.S.C.] § 1971 [currently codified as amended at 52 U.S.C. § 10101] suits or similar actions should be instituted," which concern denials of the right "to vote at all . . . without distinction of race, color, or previous condition of servitude. *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962); 52 U.S.C. § 10101(a)(1).[86]  Modern courts agree.[87]

---

[85] *See also, e.g.*, *Pennsylvania State Conference of NAACP Branches v. Secretary Pennsylvania*, 97 F.4th 120, 148 n.19 (3d Cir. 2024) ("Between 1957 and 1965, Congress engaged in an eight-year effort to research and combat discrimination in elections. In 1957, Congress, 'disturbed by allegations that some American citizens were being denied the right to vote . . . because of their race, color, creed, or national origin[,]' . . . passed the Civil Rights Act of 1957, which, among other things, . . . established the U.S. Commission on Civil Rights ('CCR') . . . . The CCR's initial report detailed the history of persistent, 'ingenious and sometimes violent methods' State actors employed to disenfranchise Black voters . . . . Congress responded by passing the Civil Rights Act of 1960 . . . ." (cleaned up)).

[86] *See also, e.g.*, *Kennedy v. Lewis*, 325 F.2d 210, 212 (5th Cir. 1963) (noting that the Attorney General has "an opportunity to inspect the records as to those who may have been illegally denied the right to qualify" and that "[t]his is really what the investigation is all about"); *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962) (the Attorney General must state "reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights in a given county"); *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U. S.*, 285 F.2d 430 (5th Cir. 1961) (there is "no doubt" the CRA was intended "to secure more effective protection of the right to vote").

[87] *E.g.*, *Georgia v. Clark*, 119 F.4th 1304, 1315 (11th Cir. 2024) (Rosenbaum, J., concurring) ("the [CRA of 1960] focus[es] on civil-rights violations," not "purported voter fraud").

Legislative history also supports the argument. President Eisenhower expressly said as much—first in recommending, and then upon signing, the CRA.[88] So did Representative William McCullough, who drafted Title III:

> It is not the purpose of title III to supervise State elections. The purpose of title III is, first of all, to require that States preserve, for a reasonable length of time, the records upon which is based the decision of whether or not a person is a qualified elector and then to inspect those records, if need be, if reasonable cause is thought to exist that any person qualified to vote has been improperly denied that right.[89]

So did others, like the then-Attorney General William Rogers.[90]

There is a clear intent to prevent voting discrimination. Equally important, nothing suggest that the CRA was intended to facilitate investigations into general VRL maintenance practices. *See Kennedy v. Bruce*, 298 F.2d 860, 863 n.2. (5th Cir.

---

[88] *See* Presidential Special Message to the Congress on Civil Rights (Feb. 5, 1959) ("The right to vote, the keystone of democratic self-government, must be available to all qualified citizens without discrimination. . . . Access to registration records is essential to determine whether the denial of the franchise was in furtherance of a pattern of racial discrimination."); Presidential Statement on Signing the Civil Rights Act of 1960 (May 6, 1960) ("The new Act also deals significantly with that key constitutional right of every American, the right to vote without discrimination on account of race or color.").

[89] *Miscellaneous Bills Regarding the Civil Rights of Persons within the Jurisdiction of the United States: Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong. 700 (1959) (statement of Rep. William M. McCulloch, drafter of Title III) (emphasis added).

[90] *E.g.*, *Miscellaneous Bills Regarding the Civil Rights of Persons within the Jurisdiction of the United States: Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong. 229 (1959) (statement of William P. Rogers, Att'y Gen. of the United States) ("The purpose of the bill is to make possible more effective protection of the right of all qualified citizens to vote without discrimination on account of race. This is also an important purpose of the Civil Rights Act of 1957 . . . . But the Attorney General's authority may be rendered relatively ineffective so long as there is lacking a suitable provision for access to voting records . . . .").

1962) (noting that "failures to purge voters who have moved away or have died" is "a matter which does not bear any particular importance to the present inquiry").

### iii. The Attorney General Did Not State a Reason for the Demand that Is Consistent with the CRA's Goal of Investigating Voting Discrimination

In its letter to the Secretary, DOJ claimed: "The purpose of this request is to ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA." ECF No. 9-4 at 2. This is not a valid "purpose" under the CRA.

Congress could not have specifically intended for the CRA to be used to enforce NVRA and HAVA because those laws did not exist in 1960. *See Weber*, 2026 U.S. Dist. LEXIS 8545, at *27 ("Congress could not have conceived for this highly sensitive information to be at the DOJ's disposal through the passage of Title III four decades prior"). Nor, for most states, did the VRLs that NVRA and HAVA created. As explained above, statewide voting records were rare in 1960 and not required until 1993. Title III was intended for use at the local level, to alleviate incidents of voting discrimination. *Katzenbach*, 383 U.S. at 313 ("[T]he Civil Rights Act of 1960 . . . gave the Attorney General access to local voting records.").

Moreover, Plaintiff should not be allowed to use the CRA as vehicle to get around the well-defined—and, by design, strictly limited—schemes for federal involvement under NVRA and HAVA. If Congress wanted to authorize the Attorney General to conduct a nationwide audit of voter rolls under NVRA or HAVA, it would have said so *in NVRA or HAVA*. The fact that Congress did not is compelling evidence that the Court should not read the CRA to allow it. "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude

25

others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).[91]  Courts have used this same reasoning to conclude that Congress's decision to omit a private right of enforcement under HAVA was intentional, since it expressly provided for a private right of action under NVRA.[92]  And to conclude that a party cannot use NVRA as a basis for a claim under 42 U.S.C. § 1983.[93]  Similarly, Congress did envision that states and the federal government could interact in connection with voter registration, but only in very narrow, defined circumstances.[94]

It is also not clear that an audit of this kind is constitutional.  To the extent DOJ seeks to dictate that a voter must be removed from Connecticut's voter rolls, DOJ would be claiming its own authority to determine whether a voter is qualified to vote.  But that determination, basic as it may be, is reserved to the state.[95]

Even if NVRA and HAVA compliance could theoretically serve as a proper "purpose" under the CRA, it does not here.  It is unclear how access to Connecticut's VRL will help DOJ actually assess Connecticut's compliance in this instance.

---

[91] *See, e.g.*, *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987); *United States v. Kovall*, 857 F.3d 1060, 1070 (9th Cir. 2017).

[92] *See American Civil Rights Union v. Philadelphia City Commissioners*, 872 F.3d 175, 185 (3d Cir. 2017).

[93] *E.g.*, *Assn. of Community Organizations for Reform Now v. Fowler*, 178 F.3d 350, 367 n.11 (5th Cir. 1999); *Isabel v. Reagan*, 394 F. Sup. 3d 966, 975 (D. Ariz. 2019).

[94] *See* 52 U.S.C. § 20507(c)(1)(A) (Postal Service may provide information regarding change of address); *id.* § 20507(g) (United States Attorney may provide information on federal convictions).

[95] *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 17 (2013) ("Prescribing voting qualifications . . . forms no part of the power to be conferred upon the national government by the Elections Clause").

As a threshold matter, Plaintiff does not even allege a NVRA or HAVA violation.  And generally, DOJ is not in the business of auditing election practices. To the contrary, it actively avoids matters concerning election administration: "The Department has long recognized that the States – not the federal government – are responsible for administering elections . . . .  The Department has a limited role in these processes and should generally avoid interfering or appearing to interfere with election administration . . . ." U.S. Dep't of Just., Just. Manual § 9-85.300 (2022).

Although it does not allege a violation, the Complaint cites one substantive provision of NVRA, which requires a state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of registered voters" due to the registrant's death or change in residence.[96]   A line-by-line analysis of CVRS is irrelevant to assessing compliance with this mandate.  If DOJ wishes to evaluate Connecticut's "general program" for removal of ineligible voters, Connecticut's laws and policies provide the evidence—not CVRS.[97]  Likewise, Connecticut need only make a "reasonable effort" at removal—not one that is "perfect, or even optimal, so long as it remains within the bounds of rationality." *Public Int. Legal Foundation v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025).[98]  Plaintiff does not

---

[96] ECF No. 1 ¶ 11 (quoting 52 U.S.C. § 20507(a)(4)).

[97] *See United States v. Weber*, Docket No. 2:25-cv-09149-DOC-ADS, 2026 U.S. Dist. LEXIS 8545, at *37–38 (C.D. Cal. Jan. 15, 2026); *accord United States v. Benson*, Docket No. 1:25-cv-1148, 2026 U.S. Dist. LEXIS 27501, at *13 (W.D. Mich. Feb. 10, 2026) (NVRA's disclosure provision "encompasses only records about the process that a state uses to maintain their voter list—not the underlying list itself").

[98] *See also Bellitto v. Snipes*, 935 F.3d 1192, 1205 (11th Cir. 2019).

even allege that Connecticut's VRL maintenance laws are insufficient or that it fails to comply with them, so a granular, line-by-line analysis is unnecessary.

Plaintiff fares no better under HAVA.  Under this law, Plaintiff also alleges no violation and only cites one substantive provision, which prohibits a state from accepting an application unless it includes the applicant's driver's license number, the last four digits of a social security number, or another unique identifying number assigned by the state.[99]  But the state—not the federal government—gets to determine sufficiency: "The State shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law."[100]  So it is, at best, unclear why Plaintiff needs Connecticut's VRL to determine compliance with this provision either.

Nonetheless, even if some basic information from Connecticut's VRL were relevant, "sensitive voter information, like social security numbers and birthdates, . . . is not." *Weber*, 2026 U.S. Dist. LEXIS 8545, at *35–36.  Even Plaintiff's cases from the Fifth Circuit recognize as much.[101]

### iv.    Outside of this Litigation, the Federal Government Has Stated that It Wants Voter Data for Reasons that Are Clearly Outside the Scope of the CRA

Outside of communications with the Secretary and the pleadings in this action, the Attorney General and others in federal government have conceded that DOJ is

---

[99] 52 U.S.C. § 21083(a)(5)(A)(i)–(ii).

[100] *Id.* § 21083(a)(5)(A)(iii).

[101] *See Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962) ("we are not discussing confidential, private papers and effects").

seeking state VRLs for other purposes beyond NVRA and HAVA audits. These purposes also fall outside the scope of the CRA.

"It appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." *Weber*, 2026 U.S. Dist. LEXIS 8545, at *29. Nothing in NVRA, HAVA, or the CRA permits this. Moreover, DOJ also apparently plans to use the data for purposes far different from those contemplated by NVRA, HAVA, or the CRA, such as immigration and criminal enforcement.[102]

Courts have refused to ignore these overt statements of "purpose" and accept Plaintiff's representations to the contrary. *Weber*, 2026 U.S. Dist. LEXIS 8545, at *29–30 ("The Court is not required to accept pretextual, formalistic explanations untethered to the reality of what the government has said outside of the courtroom."); *Oregon*, 2026 U.S. Dist. LEXIS 25259, at *33–34 ("Plaintiff has continued to engage in conduct raising suspicion about the purposes for which it seeks statewide unredacted voter registration lists. . . . The presumption of regularity that has been previously extended to Plaintiff that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds.").

---

[102] *See supra* Part II.A.

### 3.    The Attorney General's Demand Lacks a "Basis"

Even if DOJ's demand had stated a valid "purpose," it states no "basis" whatsoever, as Title III requires.    "Basis" means factual support.[103]    This interpretation is consistent with definitions and usages of the term "basis" at the time Congress passed the CRA.[104] At the time, "basis" meant "foundation."[105]

The legislative history is in accord.  Representative William McCullough, who drafted Title III, expressly contemplated that the Attorney General would need factual support to support a demand: she could "inspect those records, *if need be, if reasonable cause is thought to exist* that any person qualified to vote has been improperly denied that right."[106]  Historical practice also supports the notion that a "basis" in the CRA means factual support.  In the Fifth Circuit cases Plaintiff relies

---

[103] *See United States v. Oregon*, Docket No. 6:25-cv-01666-MTK, 2026 U.S. Dist. LEXIS 25259, at *26 (D. Or. Feb. 5, 2026); *United States v. Weber*, Docket No. 2:25-cv-09149-DOC-ADS, 2026 U.S. Dist. LEXIS 8545, at *28 (C.D. Cal. Jan. 15, 2026).

[104] *See New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) ("W]ords generally should be interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute.'" (cleaned up)).

[105] *E.g.*, Ballentine's Law Dictionary, "basis" (3d ed. 1969); Webster's New World Dictionary (1960) ("the base, foundation, or chief supporting factor"); The Grosset Webster Dictionary 46 (1966) ("foundation" or "cause").  Courts used the term in the same way, often with specific references to facts supporting an argument. *E.g.*, *McCarthy v. United States*, 394 U.S. 459, 467 (1969) (considering the "factual basis" of a plea under Federal Rule of Criminal Procedure 11 requires "examination of the relation between the law and the acts the defendant admits having committed").

[106] *Miscellaneous Bills Regarding the Civil Rights of Persons within the Jurisdiction of the United States: Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong. 700 (1959) (statement of Rep. William M. McCulloch, drafter of Title III) (emphasis added).

upon, the Attorney General routinely stated a "basis" for the demand by pointing to "information in the possession of the Attorney General."[107]

Here, Plaintiff's December 12 Demand does not even offer a conclusory "basis." There are no factual allegations in the demand at all—much less a plausible foundation to believe that Connecticut was violating federal law.

Nor is any "basis" apparent. Connecticut's list maintenance procedures exceed the "reasonable effort" required by federal law.[108] The Court must presume that Connecticut's officials carried out these duties, absent "clear evidence to the contrary." *NLRB v. County Waste of Ulster, LLC*, 455 F. App'x 32, 35 (2d Cir. 2012) (quoting *Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 174 (2004)).[109] Plaintiff points to nothing that undermines this presumption.

To the extent Plaintiff argues that the August 6 Letter provided a "basis" for the December 12 Demand, that is insufficient.[110] Plaintiff's December 12 Demand made no reference to the August 6 Letter or offered any other connection to the alleged EAVS data discrepancies. In any event, the Secretary has already thoroughly explained why DOJ's alleged concerns were misplaced.[111]

---

[107] *E.g.*, *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962); *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6. (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

[108] *See* Rosenberg Aff. ¶¶ 58–71.

[109] *See also Southerland v. City of New York*, 680 F.3d 127, 154 (2d Cir. 2011); *Hebrard v. Nofziger*, 90 F.4th 1000, 1009 (9th Cir. 2024).

[110] *See Oregon*, 2026 U.S. Dist. LEXIS 25259, at *26–27 (rejecting "Plaintiff's patchwork and post hoc effort to stitch together a legally sufficient 'statement of the basis'" by relying on statements from a prior letter that did not cite the CRA).

[111] *See* ECF No. 9-3.

### 4.    The CRA Does Not Preempt State Privacy Law

As explained above, DOJ cannot compel the Secretary to electronically produce the CVRS.  But even if DOJ could—which it cannot—the production would still be limited by Connecticut's privacy protections for voter registration information.

If individual voter registration information is disclosed for any reason, the Secretary must redact the voter's birth date, social security number, motor vehicle operator's license number, and/or identity card number.[112]   Under certain circumstances, the Secretary cannot even disclose a voter's name or address.[113]

DOJ makes a cursory assertion that Connecticut's voter privacy laws are somehow preempted by the CRA, NVRA, or HAVA.[114]  That is wrong. The Elections Clause does not, standing alone, preempt Connecticut's privacy laws.

Generally, states have "comprehensive" power "to provide a complete code for [federal] elections, including . . . regulations relating to registration." *Inter Tribal Council*, 570 U.S. at 8–9.  The Elections Clause permits Congress to "make or alter such Regulations" with certain limitations, in essence embedding a latent express preemption provision in the Constitution.  *Id.* at 14 n.6.

But the power to expressly preempt belongs to Congress (not an executive agency).  And it is determined by the text of the statute (it does not give a free-ranging authority to displace state law).  Under the Elections Clause, Congress's laws only supersede state laws that "are inconsistent." *Id.* at 9.  "[T]he scope of Congress's pre-

---

[112] *See* Conn. Gen. Stat. § 9-50d.
[113] *See id.* §§ 9-50d(c), 54-240g.
[114] *See* ECF No. 9-1 at 11.

emptive intent" is communicated through its "statutory text." *Id.* at 14. So, the preemptive effect of the Elections Clause enables Congress to displace state regulation when there is a direct, textual conflict between the federal legislation and the state regulation; if so, the state regulation ceases to be operative but only "so far as the conflict extends." *Foster v. Love*, 522 U.S. 67, 69 (1997). Ultimately, it affords Congress preemptive power over some, but not all, aspects of elections, only where Congress claims it, and only where it is supported by the text.

There is no text in the CRA, NVRA or HAVA that conflicts with Connecticut's privacy laws. Those federal statutes do not contain language requiring disclosure of the sensitive voter information that DOJ seeks here. For instance, the "all records" language in NVRA does not "encompass any relevant record from any source whatsoever, but must be read in conjunction with the various statutes enacted by Congress to protect the privacy of individuals and confidential information held by certain governmental agencies." *Pub. Int. Legal Found., Inc. v. North Carolina State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021). Even when NVRA's "records" provision has been read to include a statewide VRL, the scope of disclosure has been limited by "federal statutory frameworks already in place that aim to protect voters from potential invasions of privacy, intimidation, discrimination, and harassment," including the Privacy Act, discussed below. *Bellows*, 92 F.4th at 55. In short, "nothing in the text of the NVRA [or HAVA] prohibits the appropriate redaction of uniquely or highly sensitive personal information." *Id.* at 56 (cleaned up). So there is no conflict with state confidentiality laws. *See Weber*, 2026 U.S. Dist. LEXIS 8545,

at *39 ("Nothing in the NVRA prevents redaction of sensitive voter information as California law requires.  Furthermore, courts have routinely allowed for the redaction of sensitive voter information under the NVRA.").

Even if Congress could permissibly exercise its Elections Clause authority to expressly preempt Connecticut's privacy laws, there is no textual evidence that it did so through the NVRA, HAVA, or the CRA.  To the extent DOJ relies on another type of preemption, it has not identified any theory or explanation of why it would be appropriate.  The Court should give Connecticut's privacy laws full effect here.

## B.    Plaintiff Fails to Comply with Federal Privacy Law

### 1.    DOJ's demand violates the Privacy Act

"Congress enacted the Privacy Act of 1974 for the stated purpose of safeguarding individual privacy against Government invasion." *FAA v. Cooper*, 566 U.S. 284, 304 (2012) (Sotomayor, J., dissenting).  It was designed "[i]n response to fear that 'the secret gathering of information on people or the creation of secret information systems or data banks on Americans by employees of the departments and agencies of the executive branch' could soon make Orwell's vision of 1984 a reality." *Londrigan v. FBI*, 670 F.2d 1164, 1169 (D.C. Cir. 1981) (citing S. Rep. No.1183, 93rd Cong., 2d Sess., 2 (1974) U.S. Code Cong. & Admin. News 1974, pp. 6916, 6917).

The Privacy Act does this by imposing "'safeguards [to protect] . . . against an invasion of personal privacy.'" *Devine v. United States*, 202 F.3d 547, 550 (2d Cir. 2000) (citing Pub. L. No. 93-579, § 2(b), 88 Stat. 1896, 1896 (1974)).  The safeguards relevant here are (1) prohibiting the maintenance of "record[s] describing how any

individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute" and (2) requiring that DOJ "publish in the Federal Register . . . a notice of the existence and character of the system of records."[115]

DOJ's demand violates the Privacy Act because it has not complied with either requirement.   A court cannot grant relief that is "blatantly lawless." *Oestereich v. Selective Serv. Sys. Local Bd.*, 393 U.S. 233, 238 (1968); *see also INS v. Pangilinan*, 486 U.S. 875, 883 (1988) (a court "cannot . . . create a remedy in violation of law").

### i.   Plaintiff's Requested Relief Would Violate the Privacy Act's Prohibition on Collecting Data on Individual's First Amendment Activity

DOJ unlawfully seeks records (each CVRS entry) describing protected First Amendment activity (voting).  Under the Privacy Act, "record" has a "broad meaning encompassing, at the very least, any personal information about an individual that is linked to that individual through an identifying particular." *Bechhoefer v. United States DOJ*, 209 F.3d 57, 62 (2d Cir. 2000) (cleaned up).   Each CVRS entry is a "record" because it contains voters' names and addresses, along with other sensitive "identifying particular[s]," like social security and driver's license numbers. *Id*. Further, each CVRS entry describes activity protected by the First Amendment: party affiliation and history of voting.   The CRA does not permit, *see supra* Part V.A, much less "expressly authorize[]" DOJ's demand.[116]

---

[115] 5 U.S.C. § 552a(e)(4), (7).
[116] *Id*. § 552a(e)(4).

35

### ii.    Plaintiff's Requested Relief Would Violate the Privacy Act's SORN Requirement

DOJ has also failed to comply with the Privacy Act's mandate to "publish in the Federal Register . . . a notice of the existence and character of the system of records," known as a "System of Records Notice" or "SORN."[117] A "system of records" is "a group of records under the control of any agency from which information is retrieved by the name of the individual . . . or other identifying particular assigned to the individual."[118] Here, the voter data DOJ seeks plainly includes "name[s]" and "other identifying particular[s]."[119] So it is a "system of records" requiring a SORN.

A SORN must include "the categories of individuals on whom records are maintained," "the categories of records maintained in the system," "each routine use of the records . . . , including . . . the purpose of such use," "the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal," and notice provisions for affected individuals.[120] But DOJ does not plead that it has established a SORN or that an existing SORN covers the data it now seeks. Therefore, even providing a redacted version of CVRS—data that is less intrusive than the unredacted version that DOJ seeks—would violate the Privacy Act.

Although DOJ has not cited any SORN here, in related cases, DOJ has argued that three other SORNs apply (collectively, "DOJ's Index File SORN).[121] They do not.

---

[117] 5 U.S.C. § 552a(e)(4).

[118] *Id*. § 552a(a)(5).

[119] *Id*.

[120] *Id*. § 552a(e)(4).

[121] They are: (1) "'JUSTICE/CRT – 001,' 'Central Civil Rights Division Index File and Associated Records,' 68 Fed. Reg. 47610, 611 (8-11-2003); (2) 70 Fed. Reg.

For example, a SORN must state "the categories of individuals on whom records are maintained."[122]    DOJ's Index File SORN applies to "[s]ubjects of investigations, victims, [and] potential witnesses"—voters qua voters are none of these.[123]  Likewise, a SORN must identify "the categories of records maintained."[124]  But DOJ's Index File SORN only identifies "case files, matters, memoranda, correspondence, studies, and reports"—nothing that reasonably encompasses a VRL.[125]

Moreover, because of the lack of transparency, it is impossible to know whether DOJ's Index File SORN meets other requirements.  For instance, a SORN must name "each routine use of the records contained in the system, including . . . the purpose of such use."[126]  While DOJ has acknowledged that it is using states' voter data for nationwide NVRA and HAVA audits, it has offered few details.  Moreover, other federal agencies have said it will be used for entirely different purposes (e.g., voter citizenship verification).  And reports suggest there are still more uses (e.g., immigration and criminal law enforcement).  Based on available information, it is— at best—unclear whether DOJ's Index File SORN covers these uses.[127]  Similarly, a SORN must describe "the policies and practices of the agency regarding . . . retrievability."[128]  Under DOJ's Index File SORN, records are only "retrieved by the

---

43904 (7-29-2005); 72 Fed. Reg. 3410 (1-25-2007) (rescinded by 82 FR 24147); and (3) 82 Fed. Reg. 24147 (5-25-2017).

[122] 5 U.S.C. § 552a(e)(4)(B).
[123] 68 FR 47610, 47611.
[124] 5 U.S.C. § 552a(e)(4)(C).
[125] 68 FR 47610, 47611.
[126] 5 U.S.C. § 552a(e)(4)(D).
[127] *See* 68 FR 47610, 47611–12 (listing routine uses).
[128] 5 U.S.C. § 552a(e)(4)(E).

names of individuals or by case numbers."[129]  But DOJ's emphatic request for "*all fields*" of every state's VRL suggests that retrieval will not be limited to names.[130]

Ultimately, DOJ's Index File SORN cannot fairly be read to extend to the "identifying particulars"—names, addresses, dates of birth, social security numbers, and others—of more than 210 million individuals.  DOJ's insistence in its December 12, 2025 letter that "all data received . . . will be kept securely and treated consistently with the Privacy Act" rings hollow.[131]  DOJ cannot "get around the Privacy Act with a bare-bones, unlimited request for access to other people's information." *Ritter v. United States*, 177 Fed. Cl. 84, 87 (2025). This would fly in the face of the Privacy Act's very purpose: "safeguarding individual privacy against Government invasion."  *Cooper*, 566 U.S. at 304 (Sotomayor, J., dissenting).

### 2.    DOJ's demand violates the E-Government Act

The E-Government Act protects "the privacy of personal information."[132]  If a federal agency intends to collect "information that is in an identifiable form" or intends to collect information that "permit[s] the physical or online contacting of a specific individual," then it must conduct, internally review, and publish for public comment a "privacy impact assessment" ("PIA").[133]  Among other things, the PIA must address "what information will be collected," "why the information is being collected," "the intended use of the agency," "with whom the information will be

---

[129] 68 FR 47610, 47612.
[130] ECF No. 9-4 at 1 (emphasis in original).
[131] *Id.* at 2.
[132] Pub. L. No. 107-347, § 208(a), 116 Stat. 2899.
[133] *Id.* § 208(b)(1)(B)(i)–(ii).

shared," and "how the information will be secured." *Id.* § 208(b)(2)(B). Crucially, the agency must complete these steps "before" it collects the information.[134]

DOJ's demand implicates the E-Government Act because each CVRS entry DOJ seeks has personally identifiable information about each registered voter, like names, addresses, dates of birth, social security numbers, and drivers' license numbers. Despite the Secretary's stated concern about compliance,[135] DOJ has neither conducted a PIA nor acknowledged that it is required to do so.[136]

### 3. DOJ's demand violates the Driver's Privacy Protection Act

The Driver's Privacy Protection Act ("DPPA") prohibits a state from "disclosing personal information drawn from motor vehicle records," absent express permission of the individual. *Gordon v. Softech Int'l, Inc.*, 726 F.3d 42, 45 (2d Cir. 2013); 18 U.S.C. § 2721(a), (d). "Personal information" includes an individual's "social security number, driver identification number, name, [and] address." 18 U.S.C. § 2725(3). DPPA's prohibition extends to the "personal information" collected by the Connecticut DMV, which is then transmitted to CVRS.[137]

DOJ argues DPPA's prohibition does not apply here because its demand is allegedly "for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as [DOJ] is now doing."[138] But that

---

[134] *Id.* § 208(b)(1)(A).
[135] *See* ECF No. 9-5.
[136] *See generally* ECF No. 1
[137] Conn. Gen. Stat. §§ 9-19h, 9-20.
[138] ECF No. 1 ¶ 26 (citing exception in 18 U.S.C. § 2721(b)(1)).

exception is not mandatory—it is directed to the Secretary's discretion.[139]  Moreover, DOJ cannot plausibly allege that it is carrying out legitimate NVRA or HAVA enforcement by compiling a nationwide database of voters' sensitive information. Without substantially more detail, its demand violates DPPA.

**CONCLUSION**

The Court should grant the Secretary's Motion to Dismiss.  Alternatively, it should reserve to allow discovery, as set forth in the accompanying Response to the Order to Show Cause.

Respectfully submitted,

DEFENDANT
STEPHANIE THOMAS,

WILLIAM TONG
ATTORNEY GENERAL

By:___ /s/ *Michael Rondon*___
Michael Rondon (ct31022)
Blake Sullivan (ct30289)
Assistant Attorneys General
Attorney General's Office, Special Litigation
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Tel:  (860) 808-5020
Fax: (860) 808-5347
Michael.Rondon@ct.gov
Blake.Sullivan@ct.gov

---

[139] *See* 18 U.S.C. § 2721(b) ("*may* be disclosed" (emphasis added)).

## CERTIFICATION

I hereby certify that on February 27, 2026, a copy of the foregoing was electronically filed and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's system.

U.S. DOJ-Civil Rights Dept.
Brttany E. Bennett
950 Pennsylvania Ave, NW
Washington, DC 20579
Brittany.bennett@usdoj.gov

William M. Bloss
Koskoff, Koskoff & Bieder, P.C.
350 Fairfield Ave.
Bridgeport, CT 06604
bbloss@koskoff.com

Elias Law Group LLP
David Robert Fox, Marisa O'Gara, and Tori Shaw
250 Massachusetts Ave NW
Suite 400
Washington, DC 20001
dfox@elias.law
mogara@elias.law
tshaw@elias.law

ACLU Foundation of Connecticut
Dan Barrett and Jaclyn Marie Blickley
P.O. Box #320647
Hartford, CT 06132
dbarrett@acluct.org
jblickley@acluct.org

ACLU Foundation of Connecticut
Joseph Purpura Gaylin

80 State House Square
PO Box 230178
Hartford, CT 06123
jgaylin@acluct.org

American Civil Liberties Union Foundation
Patricia Jia Yan
915 15th Street NW
Washington, DC 20005
pyan@aclu.org

American Civil Liberties Union Foundation
Sophie Lin Lakin, Theresa J. Lee, and William Hughes
125 Broad Street
New York, NY 1004
slakin@aclu.org
tlee@aclu.org
WHughes@aclu.org

/s/ *Michael Rondon*
Michael Rondon (ct31022)
Assistant Attorney General