| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 3:26-CV-00021 |
| STEPHANIE THOMAS, in her Official Capacity as Secretary of the State of Connecticut, | |
| Defendant. | |

**AFFIDAVIT OF CHIEF OF STAFF & GENERAL COUNSEL**
**IN THE OFFICE OF THE SECRETARY OF THE STATE**
**GABE ROSENBERG**

I, Gabe Rosenberg, aver as follows:

1.     I am a resident of the State of Connecticut. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional Experience**

2.     I am the Chief of Staff and General Counsel in the Office of the Connecticut Secretary of the State ("SOTS"). As Chief of Staff and General Counsel, I work for the Connecticut Secretary of the State, the Honorable Stephanie Thomas, and support her in her official capacity as the Commissioner of Elections for the State of Connecticut. *See* Conn. Gen. Stat. § 9-3. I am responsible for overseeing overall

1

management of the agency, including legislative and policy programs, legal and Freedom of Information Act ("FOIA") office operations, and election processes.

3. I have worked at SOTS since 2017 when I began as Communications Director. I became General Counsel to the Secretary in May 2020, and Chief of Staff and General Counsel in March 2022.

## Connecticut's Centralized Voter Registration System

4. My team and I are responsible for, among other things, overseeing Connecticut's statewide centralized voter registration system known as "CVRS," Conn. Gen. Stat. §§ 9-50b, 9-50c, complying with state confidentiality laws regarding voter registration information, *id.* §§ 9-19h(b)(1), 9-23h, 9-26, 9-32, 9-35, 9-50d, 54-240 *et seq.*, and complying with state and federal voter registration laws, including the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*; Conn. Gen. Stat. § 9-23k, and the Help America Vote Act ("HAVA"). 52 U.S.C. § 20901 *et seq.*; Conn. Gen. Stat. §§ 9-23r(c), 9-35(d).

5. Connecticut maintains the following information about voters in CVRS: (1) name and name history; (2) bona fide residence; (3) mailing address, if any; (4) telephone number, if any; (5) date of birth; (6) previous voting residence in Connecticut, if any; (7) age; (8) party affiliation, if any; (9) previous party affiliation, if any; (10) date of initial voter registration; (11) date of changes to voter registration information, if any; (12) Connecticut motor vehicle operator's license number; and (13) the last twenty voting history records, including polling places, manner of voting, and manner of registration.

6.      CVRS is, in part, a public record that is generally available for purchase for $300 pursuant to the Connecticut Freedom of Information Act. *See* Conn. Gen. Stat. § 1-200, *et seq.*

7.      The publicly available information about a voter's birth date is limited to the month and year of birth; the day of birth is excluded unless the information is requested and used for a governmental purpose, as determined by the Secretary. *See id.* § 9-50d.

8.      The publicly available information does not include social security numbers, drivers' license numbers, or the names and addresses of individuals who have opted into the Voter Registry Privacy Program or who participate in the Address Confidentiality Program. *Id.* §§ 9-50d(c), 54-240g.

9.      All 169 towns in Connecticut use CVRS. *See id.* § 9-50b(a).

10.     Although the Connecticut Secretary of the State is the state's Chief Election Official, *see id.* § 9-3, Connecticut's elections are largely administered on the local level by local officials. Typically, each town has two Registrars of Voters ("ROVs")—one from each major party—and a Town Clerk who together administer elections. *See id.* §§ 9-189, 9-190; *see also, e.g.*, *id.* § 9-17a.

### Connecticut's List Maintenance Processes & Procedures

11.     Local officials continuously update CVRS throughout the year to maintain accuracy.

12.     For example, not later than sixty days after an election, an ROV must update CVRS, report who voted, and report whether the individual voted in-person

on the day of the election, in-person during early voting, or by absentee ballot. *Id.* §
9-50b(c).

13.     Connecticut also maintains a regular process for removing electors from CVRS who are no longer eligible to vote. Common reasons for ineligibility include death, felony conviction, and change-of-address. *Id.* § 9-35(b). Prior to each election, ROVs from each town must convene "for the purpose of completing a correct list of all electors who will be entitled to vote at such election." *Id.* § 9-35(a). After that session, ROVs must post a list of names removed from the list "in a place readily accessible to the public," along with "privileges and remedies of those whose names were removed" to further ensure list accuracy. *Id.* § 9-35a.

14.     With respect to removing deceased electors from CVRS, a municipality's Registrar of Vital Statistics—typically, a Town Clerk—must transmit notices of death to an ROV. *Id.* §§ 7-37(a), 7-42. Upon receipt, an ROV must timely remove the names of any deceased elector before an election. *Id.* § 9-35(b). In addition, if an ROV learns of the death of an elector independent from notice from the Registrar of Vital Statistics, because, for example, an ROV knew the deceased elector or learns of the death in a publication, the ROV can independently remove that elector from the voter rolls. *Id.*

15.     With respect to removing electors with felony convictions from CVRS, SOTS coordinates with the Connecticut Department of Corrections ("DOC") to identify those electors. *Id.* § 9-45. Every month, DOC must transmit to SOTS a list of persons who are no longer eligible to vote due to felony convictions. *Id.* Similarly,

pursuant to NVRA, the local U.S. attorney must provide SOTS with the names of those convicted of felonies in federal courts. 52 U.S.C. § 20507(g). SOTS must then transmit to each municipality's ROVs a list of electors from their town who are no longer eligible to vote due to felony convictions. Conn. Gen. Stat. § 9-45. An ROV must compare that list with the municipal registry list, and "erase such names from the registry lists in their respective towns or voting districts" after sending a written notice by certified mail to an individual's last known address. *Id.* An ROV must update CVRS with that information. *See id.* §§ 9-50b(a)(3), 9-35(b).

16. With respect to removing any elector who has moved out-of-state, an ROV may ascertain address changes by conducting the annual canvas of all electors in the municipality in-person, by mail, and/or by phone. *Id.* § 9-32. An ROV may also learn an elector has moved out-of-state through change-of-address forms at voter registration agencies, and change-of-address forms submitted when an individual updates his or her drivers' license information. *Id.* §§ 9-19i, 9-23. An ROV may also use the National Change of Address System of the United States Postal Service to learn of out-of-state moves. *Id.* § 9-32(a)(2). If an ROV determines that an elector has moved out-of-state through any of the above processes, that ROV removes the name of the elector from the voting list once the elector either confirms the change of address in writing or has been sent, by forwardable mail, a Confirmation of Voting Residence notice with a prepaid, preaddressed return card in accordance with NVRA. *Id.* § 9-32(b). If the individual returns the NVRA card and confirms in writing that he or she no longer resides in the municipality, the ROV must remove the name from

the registry list. If the ROV does not receive the return card within thirty days after mailing it, or if it is returned as undeliverable, the ROV does not remove the individual, but instead put the individual's name on the inactive voter list. That individual is then not permitted to vote in the town's elections unless and until they submit a "new application for voter registration signed . . . under penalties of false statement." *Id.* § 9-42. If the individual successfully demonstrates that he or she is eligible to vote, he or she is returned to the active voter list. If the individual submits a voter registration application on election day, both ROVs must consent to restoring that individual to the active voter list for that individual to vote in that election.

17.     SOTS also maintains a regular process for removing duplicate voter registrations. SOTS, "at least annually," must search CVRS "to identify electors who may be registered in more than one town or registered more than once in the same town." *Id.* § 9-21a. SOTS must then submit the resulting list of that search to the ROVs in each applicable town. *Id.* Upon receipt of that list, an ROV must send a notice of duplicate registration to each elector identified in the search. *Id.* That notice must state that the elector is no longer eligible to remain on the registry list in the previous town, and unless the elector contacts the applicable ROV within thirty days, his or her name will be removed from the list in the previous town. *Id.* The same process applies to individuals with more than one registration in a municipality. ROVs send a notice of duplicate registration to each elector identified with multiple registrations in one town, and, unless the elector responds to the notice within thirty days, the duplicate registrations will be merged to reflect only one registration.

18.     Connecticut law prohibits registration of noncitizens via the Connecticut Department of Motor Vehicles ("DMV"). If DMV determines that an individual applying for a license or identity card is not a citizen, DMV "shall not provide such person an opportunity to apply for" voter registration and "shall not transmit any application for such admission" to SOTS. *Id*. § 9-19h(b)(2)(B)(ii).

19.     Connecticut is also a member of the Electronic Registration Information Center ("ERIC"), a nonprofit, nonpartisan, multistate organization that helps election officials maintain accurate voting rolls and detect possibly illegal voting. *See About Eric*, ERIC, Inc., https://ericstates.org/about/ (last visited February 27, 2026).

20.     SOTS may enter, and has entered, into agreements with ERIC for purposes of CVRS maintenance.  *See* Conn. Gen. Stat. § 9-50c(a).

21.     SOTS currently pays ERIC an annual membership fee for multiple services, including annual "list maintenance reports" that identify deceased registered voters, voters who have moved within the state, voters who have moved to another ERIC state, and voters who have multiple registrations within the same state. S*ee FAQ*, ERIC, Inc., https://ericstates.org/faq/ (last visited February 27, 2026). These reports further secure Connecticut's existing statutory safeguards to maintain the accuracy of CVRS.

22.     Any sensitive data that SOTS transmits to ERIC is not text-readable and instead is sent through "a cryptographic one-way hash." *Id*. For security purposes, ERIC will not accept voter registration or drivers' license data if that data

has not been hashed. *Id.* Also for security purposes, ERIC is never connected to CVRS. *Id.*

23.     Because CVRS is continuously updated by hundreds of local officials across the state, it is not technically feasible for SOTS to maintain timestamped historical versions of CVRS every time there is a change to a voter file. However, our office generates at least one timestamped version of CVRS per year, typically in the month before each general election. *See infra* ¶ 33.

### The Federal Government's Demands for Connecticut's Voter Data & the Secretary's Responses

24.     On July 10, 2025, Attorney Paul Hayden from the Criminal Division of the United States Department of Justice ("DOJ" or "Plaintiff") contacted SOTS via email "to discuss a potential information-sharing agreement" regarding Executive Order 14248. Email from Paul Hayden, Sr. Counsel, Criminal Division, DOJ (Jul. 10, 2025) (Ex. A).

25.     SOTS responded and ultimately scheduled a phone call with DOJ for August 21. *See* Email from Gabe Rosenberg to Paul Hayden and Scott Laragy (Jul. 24, 2025) (Ex. B). On that call, Attorney Scott Laragy attended on behalf of DOJ and myself and Deputy Associate Attorney General Maura Murphy attended on behalf of SOTS.

26.     In a separate correspondence, on August 6, 2025, a different section of DOJ, the Civil Rights Division, demanded that, within 14 days, SOTS provide extensive information about the state's voter registration list maintenance based on purported data discrepancies in an Election Administration and Voting Survey

("EAVS") report. *See* ECF No. 9-2 ("August 6 Information Demand" or "August 6 Demand").

27.     DOJ's August 6 Demand asked that SOTS: (1) explain the steps taken to ensure that Connecticut's list maintenance program complied with NVRA and provide a list of election officials responsible for list maintenance; (2) explain the process for removing deceased persons from CVRS and state whether there have been adjustments to the number of removed deceased persons reported in the EAVS report; (3) explain the process for sending confirmation notices and recording outcomes and explain the alleged discrepancy between the number of confirmation notices mailed to electors and the number of confirmation notices sent by Connecticut; (4) explain the process for identifying and removing duplicate registrations from CVRS and provide data on duplicate registrations; (5) explain the procedures used to identify and remove ineligible registrants from CVRS and provide the number and registration information of those registrants identified as ineligible based on lack of citizenship, incompetence, or felony conviction. *Id*.

28.     Contrary to its allegation in the Complaint, ECF No. 1 ¶ 21, DOJ's August 6 Information Demand did not demand that SOTS produce its voter registration list. This allegation in the Complaint is false.

29.     On August 20, 2025, SOTS timely responded to each of DOJ's five demands. *See* ECF No. 9-3 ("August 20 Response").

30.     First, regarding compliance with NVRA, SOTS detailed the steps that Connecticut takes to ensure proper list maintenance, namely, that ROVs conduct

annual canvasses to ascertain address changes. *Id*. at 2. It noted that a voter registration application requires the applicant to provide the street address at which they were last registered and that the ROV processing the application must send a notice of cancellation to the appropriate registration official of the prior admitting jurisdiction within 48 hours. *Id*. It noted that if the prior admitting jurisdiction is in Connecticut, the ROVs from the prior admitting jurisdiction must remove the applicant from their registry. *Id*.

31. Second, regarding DOJ's articulated concern with removal of deceased persons from CVRS, SOTS explained that it processed such removal by receiving and distributing lists of deceased persons from the Connecticut Department of Public Health and ERIC to the ROVs in applicable municipalities, who then performed list maintenance. *Id*. at 3.

32. Third, regarding DOJ's articulated concern about confirmation notices, SOTS explained that the State of Connecticut does not send confirmation notices and confirmation notices are solely mailed by the ROVs. *Id*. It further noted that some municipalities did not provide the total number of confirmation notices sent out by their offices, explaining any minor discrepancies. *Id*.

33. Fourth, regarding DOJ's articulated concern about duplicate voter registrations, SOTS explained that each year, a contractor extracts a list of current voters from CVRS; that list is then sent to ERIC. *Id*. ERIC then produces its own list of duplicate registrations and transmits that list to SOTS, which in turn transmits the list to ROVs in applicable towns. *Id*. Each ROV is then responsible for reconciling

any duplicate registration identified by ERIC. *Id*. In addition, each ROV is required to reconcile duplicate registrations by conducting a statewide search in CVRS whenever the ROV receives a voter registration application to ensure that the new application is not a duplicate registration within the State. *Id*. If an application indicates a name change, the ROV must include the individual's previous name in the statewide search. *Id*. Also, SOTS noted that although CVRS has no automated method to detect duplicate registrations, it is contracting for development of a new version of CVRS that will be designed to automatically detect duplicate registrations. *Id*. at 4.

34.     Fifth, regarding DOJ's articulated concern with the removal of ineligible voters on the basis of citizenship, incompetency, and felony conviction, SOTS explained that it receives monthly lists of the names of individuals sentenced following a felony conviction from the Connecticut Department of Correction ("DOC") which it in turn distributes to applicable municipalities. *Id*. ROVs in each applicable municipality are then required to remove those individuals from the active voter list. *Id*. SOTS next explained that, although it does not have a formal role in determining the citizenship of voters, it does refer cases for investigation to the State Elections Enforcement Commission ("SEEC") when SOTS is notified that a non-citizen may be registered to vote or may have a voting history. *Id*. It then explained that Connecticut does not categorically exclude protected persons—Connecticut's term for those adjudicated incompetent—from voting. *Id*. Under state law, only a Court may remove an elector's right to vote after holding a hearing following a guardian or conservator

filing a petition to determine an elector's competency to vote. *Id*. It clarified that SOTS has no formal role regarding protected persons voting. *Id.*

35.     With its August 20 Response, SOTS provided lists of the election officials responsible for maintaining CVRS and indicated that it would gather and provide other data on duplicate registrations, felony convictions, and ineligible persons as soon as practical. *Id.* at 5.

36.     DOJ did not discuss SOTS's August 20 Response, or its correspondence with SOTS more generally, on the August 21 phone call regarding Executive Order 14248. *See supra* ¶ 25.

37.     On or about August 22, 2025, SOTS gathered hundreds of individual files, each comprising hundreds of lines of data, that related to the data requested by DOJ. It began manually redacting sensitive information from those files pursuant to state law. *See* Conn. Gen. Stat. §§ 9-50c(a), 9-50d(a), 9-50d(b).

38.     SOTS processed DOJ's request amidst other responsibilities and similar, voluminous requests. DOJ did not express any exigency, indicate that SOTS's written responses were inadequate, or otherwise claim that it needed the data on an expedited basis.

39.     Had DOJ inquired, SOTS would have explained why these and other practical considerations had prevented it from completing the redaction process sooner.

40.     On August 28, 2025, the Secretary attended a private meeting with Deputy Attorney General Michael Gates and several other Secretaries of States. In

that meeting, Gates indicated that DOJ would request voter data from all fifty states and litigate against states that refused to share such data.

41.     SOTS did not hear from DOJ again until December 1, 2025, when DOJ left a voicemail indicating that it had requested an unredacted statewide voter registration list in its August 6 Demand. This claim was false. *See supra* ¶ 28. SOTS referenced the August 6 Demand and internally cross-referenced FOIA requests to confirm that no such request was made.

42.     On December 3, 2025, DOJ, through Attorney David Vandenburg, left another voicemail inquiring about the status of the August 6 Demand, again incorrectly asserting that it had requested an unredacted statewide voter registration list.

43.     On December 10, 2025, SOTS, through two agency attorneys, called Attorney Vandenberg. Attorney Vandenberg orally requested an unredacted, statewide voter registration list and reiterated, incorrectly, that DOJ had requested that list in its August 6 Demand. He then threatened litigation if SOTS failed to produce that list.

44.     On December 10, 2025, DOJ, through Attorney Brittney E. Bennett, sent an email that demanded, in an attached letter dated two days later, December 12, 2025, that SOTS produce an electronic unredacted statewide voter registration list within fourteen days, including sensitive information such as registrants' social security numbers, drivers' license numbers, full dates of birth, and residential addresses. ECF No. 9-4 ("December 12 Document Demand" or "December 12

Demand"). Its stated "purpose" for the demand was "to ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA." *Id*. It stated that it had the authority for its demand based on the enforcement provisions of NRVA and HAVA, as well as Title III of the Civil Rights Act of 1960 ("CRA"). *Id*. It stated that, to the extent that SOTS had privacy concerns about sharing such sensitive information with DOJ, that information would be "subject to federal privacy protections" and that, absent a court order, DOJ would not "disclose any record . . . except to Congress . . . governmental agencies, and in the presentation of any case or proceeding before any court or grand jury." *Id*.

45. Following that communication, SOTS paused processing data related to DOJ's August 6 Demand. It did so because that process required redaction pursuant to state law, and the outcome of DOJ's imminent litigation against SOTS would determine whether such redaction was in fact required. *See supra* ¶ 37.

46. On December 24, 2025, I responded that SOTS could not comply with DOJ's December 12 Demand because that Demand failed to identify any legal authority requiring SOTS to share such sensitive voter information, and state and federal privacy law precluded SOTS from doing so. ECF No. 9-5 ("December 24 Response"). I explained that NVRA, HAVA, and the CRA do not require such production to the federal government, and that DOJ's Demand failed to identify any authority demonstrating otherwise. *Id*. I further explained that DOJ's Demand under the CRA was insufficient because it failed to identify a "basis" and "purpose," as required. *Id*. I then explained that DOJ's assurance that it would comply with federal

privacy law was lacking based on requirements under the Privacy Act and the E-Government Act. *Id*.

47.     I am aware that DOJ filed the present suit against SOTS on January 6, 2026, seeking the same sensitive voter information sought in its December 12 Document Demand.

48.     I am aware that DOJ has filed similar suits against state election officials across the country.

49.     Connecticut takes CVRS maintenance seriously and goes beyond what is required by NVRA and HAVA to ensure accuracy. If SOTS were forced to provide DOJ an unredacted CVRS, such information would not help DOJ assess its articulated concerns in its August 6 Information Demand or the Complaint regarding Connecticut's compliance with NVRA and HAVA. *See infra* ¶¶ 59-71.

50.     Moreover, if DOJ were to prevail in its suit, SOTS would be required to violate state confidentiality laws. The only way that SOTS could abide by state confidentiality laws would be to maintain two separate voter registration lists to accommodate voters who do not want to share sensitive personal information with DOJ. However, maintaining separate lists would require SOTS to violate HAVA's mandate to maintain only a "*single*, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. § 21083 (a)(1)(A) (emphasis added).

51.     Further, there is a substantial likelihood that voter data will be misused based on DOJ's noncompliance with federal privacy law, public statements that it

intends to share the requested information for immigration enforcement and other unauthorized purposes,[1] and previous incidents of sharing such data with unauthorized private entities such as PACs.[2] That imminent misuse chills Connecticut voter registration and falsely impugns the integrity of our voting lists, undermining public confidence in election outcomes. It also places into question whether the federal government will, as it has done historically, provide critical cyber security measures to ensure orderly mail-ballot delivery and prevent voter intimidation, and support our elections. Moreover, the Executive Order that apparently directed DOJ to file this lawsuit also suggests that DOJ will withhold funds from Connecticut.[3]

52.    I am deeply concerned that, with this baseless lawsuit against the Secretary, DOJ jeopardizes what has long been an apolitical, collaborative effort to maintain public confidence in electoral outcomes and keep our elections safe, free, and fair. I can only speak to the experience of election officials here in Connecticut, but from what I see going on across the country with more than twenty similar lawsuits pending, other jurisdictions may be experiencing the same concerns. It

---

[1] *See* Jim Saksa, *The Trump administration is building a 'national voter roll', former DOJ lawyers warn*, Jan. 5, 2026, https://www.democracydocket.com/news-alerts/the-trump-administration-is-building-a-national-voter-roll-former-doj-lawyers-warn/; Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, Stateline, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security/.

[2] *See* Amna Nawaz and Matt Loffman, *Whistleblower responds after DOJ confirms DOGE mishandled Social Security data*, Jan. 27, 2026, https://www.pbs.org/newshour/show/whistleblower-responds-after-doj-confirms-doge-mishandled-social-security-data.

[3] E.O. 14248 § 5(b)(ii).

makes our job more difficult because we will have to consider how to rebut any false claims that our voting lists are not accurate in our public messaging and potentially revisit our election protection planning if we will not have the full support of the federal government. This lawsuit and the motivations that seem to underlie it are very concerning from the perspective of election administration planning, training, and public messaging.

53.    SOTS, along with Secretaries of State of California, Massachusetts, Maine, Michigan, Minnesota, New Jersey, New Mexico, Oregon, Rhode Island, Vermont and Washington, recently relayed many of these concerns to the Department of Homeland Security. *See* Secretaries of State, Comment in Opposition to Modifications to and Reissuance of "DHS/USCIS-004 Systematic Alien Verification for Entitlements Program System of Records" (USCIS-2025-0337) (Dec. 1, 2025) (Ex. C).

### State Law Requires Sensitive Voter Registration Information to be Kept Confidential

54.    As a matter of state law, SOTS cannot disclose a registrant's driver's license number, identity card number, or Social Security number. Conn. Gen. Stat. § 9-50d(b). Such information is confidential and "shall not be disclosed to any person." *Id*; *see also id.* §§ 9-19h(b)(1), 9-20 (b), 9-23h, 9-26, 9-32 (prohibiting disclosure of certain voters' social security numbers to "any governmental agency").

55.    SOTS cannot disclose the address of an elector who participates in the Address Confidentiality Program, which ensures the safety of victims of serious crimes like sex trafficking, family violence, or child abuse. *Id*. § 54-240g.

56. SOTS cannot disclose the name or address of an elector who opts into the State's Voter Registry Privacy Program. *Id.* § 9-50d(c).

57. SOTS cannot disclose an elector's full date of birth, unless she determines that such information is being requested and used for a governmental purpose. *Id.* § 9-50d(a).

## Connecticut Complies with NVRA

58. NVRA generally protects the integrity of the electoral process by ensuring that accurate and current voter registration rolls are maintained. 52 U.S.C. § 20501(b). SOTS coordinates state responsibilities under NVRA. Conn. Gen. Stat. § 9-23k. It does not require, and DOJ does not allege otherwise, that SOTS produce an unredacted voter registration list.

59. As it relates to DOJ's articulated concerns in its August 6 Information Demand and the Complaint, ECF No. 1 ¶¶ 11, 12, NVRA mandates that (1) Connecticut conduct a general program that makes reasonable efforts to remove the names of ineligible voters following death, incarceration for a felony conviction, address changes, or failure to respond to a confirmation notice and failing to vote in two or more consecutive general elections for Federal office, (2) send "confirmation notices" following voter registration applications and changes of address, and (3) maintain for at least two years and "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters. 52 U.S.C. §§ 20507(a)–(i).

60.     Connecticut complies with NVRA's requirement for a general program that makes reasonable efforts to remove the names of ineligible voters by mandating that ROVs hold a meeting before each election to remove ineligible electors. Conn. Gen. Stat. §§ 9-35(a), (b). An ROV ascertains address changes through annual canvasses, change-of-address forms at voter registration agencies, automatic mechanisms at the DMV, and the National Change of Address System. *Id.* §§ 9-19i, 9-23, 9-32. An ROV is notified of elector deaths regularly by the Registrar of Vital Statistics. *Id.* § 7-42.

61.     Connecticut complies with NVRA's requirement to send a confirmation notice following receipt of a voter registration application by requiring an ROV to send an applicant a notice of acceptance or rejection. *Id.* §§ 9-19b(b), 9-23g(c), 9-23h. It complies with NVRA's requirement to send a confirmation notice following an address change by requiring that, when an ROV is notified of an address change, the ROV must either confirm in writing that the elector has moved from the municipality or send "a notice and postage prepaid addressed return card in accordance with [NVRA]" prior to removing an elector from CVRS. *Id.* § 9-32(b).

62.     Connecticut complies with NVRA's requirement to maintain and make available for public inspection "all records concerning the implementation of" list maintenance programs. Subject to the confidentiality requirements discussed above, *see id.* §§ 9-19h(b)(1), 9-23h, 9-26, 9-32, 9-35, 9-50d, 54-240 *et seq.*, CVRS is a public record that is generally available for purchase for $300 pursuant to the Connecticut Freedom of Information Act. *See id.* § 1-200, *et seq. See also id* § 9-50b

(CVRS includes "[v]oter registration information," "information contained in applications for admission as electors," "information needed to compile registry lists and enrollment lists," and "other information for use in complying with [state law].").

63.     Given Connecticut's existing list maintenance procedures and longstanding compliance with NVRA, producing an unredacted CVRS list is not appropriate to address DOJ's concern regarding removal of deceased voters from CVRS within a reasonable time period or confirmation notice discrepancies.

64.     Moreover, it *could not* address DOJ's concerns. DOJ's concern about removing deceased voters turns on alleged discrepancies between Center for Disease Control ("CDC") death data, which Connecticut does not use to remove deceased voters, and Connecticut Department of Health and ERIC death data, which Connecticut does use to remove deceased voters. An unredacted CVRS would not resolve the discrepancies between CDC data and the Connecticut Department of Health and ERIC data.

65.     Nor is CVRS capable of producing reports for confirmation notices which have been sent by ROVs. This means that an unredacted CVRS would not address DOJ's concern regarding confirmation notices.

**Connecticut Complies with HAVA**

66.     HAVA generally requires a state to develop a "single . . . computerized statewide voter registration list" and adopt a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 52 U.S.C. § 21083(a)(1)(A), (a)(4)(A). CVRS fulfills this

requirement. *See* Conn. Gen. Stat. § 9-50b. It does not require, and DOJ does not allege otherwise, that SOTS produce an unredacted voter registration list.

67.     As it relates to DOJ's articulated concerns in its August 6 Demand and the Complaint, ECF No. 1 ¶ 14, HAVA mandates that (1) the "system of file maintenance" ensures that "duplicate names are eliminated from the computerized list." (2) Connecticut coordinate removing deceased voters from CVRS with "State agency records on death," and (3) requires States to refrain from processing voter registration applications that do not include either driver's license information, the last four digits of a social security number, or another unique identifier assigned by the State. 52 U.S.C. §§ 21083(a)(2)(B), 21083(a)(2)(A), 21083(a)(5)(A).

68.     Connecticut complies with HAVA's requirement that it make a "reasonable effort to remove [ineligible] registrants" by mandating that SOTS coordinate a CVRS search at least once per year to identify duplicate registrations. Conn. Gen. Stat. § 9-21a. An ROV is then required, after notifying registrants of their duplicate registrations, to remove one of the duplicate registrations from CVRS. *Id.*

69.     Connecticut complies with HAVA's requirement to coordinate with "State agency records" for removing deceased voters by coordinating with the Registrar of Vital Statistics to identify deceased voters. *Id.* § 7-42. Moreover, the Department of Health shares an updated list of deceased persons every month with SOTS. SOTS then transmits the relevant information to ROVs, and an ROV then must remove a deceased voter from CVRS. *Id.* § 9-35(b).

70.     Connecticut complies with HAVA's requirement to refrain from processing voter registration applications without sufficient identifying information by requiring that individuals completing voter registration applications include either a "Connecticut motor vehicle operator's license number, or, if none, the last four digits of the applicant's Social Security number." *Id.* § 9-23h.

71.     Given Connecticut's existing list maintenance procedures and longstanding compliance with HAVA, producing an unredacted CVRS list is not appropriate to address DOJ's concerns from its August 6 Demand regarding duplicate and deceased voters. As explained, an unredacted CVRS would not resolve the discrepancies between CDC data and the Connecticut Department of Health and ERIC data. Moreover, Connecticut's combined use of ERIC and Department of Health data, along with its voter registration application requirements, complies with HAVA's list maintenance requirements. There are existing systems by statute and through coordination with ERIC for identifying and removing duplicate voter registrations that abide by confidentiality law.

**Discovery is Necessary to Safeguard Connecticut Voters' Sensitive Data**

72.     DOJ has not presented us with evidence of voting discrimination, violations of NVRA or HAVA, or any other indicia of problems with Connecticut's voter list maintenance practices.

73.     DOJ's stated purpose for its December 12 Demand is to conduct an audit to determine compliance with NVRA and HAVA.

74. But DOJ's actions and public statements, as well as credible media reports, suggest that the true purpose behind the December 12 Demand is not to conduct an audit to determine compliance with NVRA and HAVA.

75. DOJ's former practices also suggest that DOJ's true purpose is not conducting an audit to determine compliance with NVRA and HAVA. In the past, if DOJ had a concern with Connecticut's compliance with NVRA or HAVA, it would communicate with us about specific concerns. It would not request millions of records with sensitive and largely irrelevant information, and reflexively sue if it did not get an immediate resolution on its own terms.

76. Connecticut's election administration practices have also been unfairly targeted by President Trump, who cites zero evidence to support his baseless claim of corruption. *See* Kaitlin McCallum, Trump attacks: 'Connecticut is a very corrupt voting place," Hartford Courant (Feb. 12, 2026), https://www.courant.com/2026/02/12/trump-attacks-connecticut-is-a-very-corrupt-voting-place/ (relaying President Trump's unsupported comment that Connecticut is "a very corrupt voting place"). This suggests that DOJ is pursuing Connecticut's voting records in bad faith and/or to conduct a fishing expedition to find evidence to support President Trump's claim.

77. Instead, it appears reasonably likely that the purpose of DOJ's December 12 Demand is to compile a national voter database and/or to share sensitive data with unauthorized government and private entities. *See, e.g., supra* ¶ 51; Sec'y's Mot. to Dismiss Part II.A.

78.     These are invalid purposes for NVRA or HAVA enforcement.

79.     Accordingly, discovery is necessary to prove that DOJ intends to use CVRS, per the December 12 Demand, for unauthorized purposes under NVRA and HAVA.

80.     Further, DOJ has not presented us with any evidence that it will comply with federal privacy laws, such as the Privacy Act of 1974, the E-Government Act of 2022, or the Driver's Privacy Protection Act of 1994.

81.     Because the Secretary is the custodian of Connecticut voter records, Conn. Const. Art. Fourth § 24, she is obligated to ensure that Connecticut voters' sensitive information is protected.

82.     Discovery is necessary to ascertain DOJ's compliance with federal privacy law. This would include, but not be limited to, information regarding its decision to rely on three ill-fitting "System of Records Notices" ("SORN") rather than issue a new SORN, its intended use of the information requested in the December 12 Demand and associated data retrieval and storage mechanisms, the manner in which DOJ categorizes the individuals and records in CVRS, and to what extent DOJ plans to allow other governmental or private entities to access the data. *See* Sec'y's Resp. to Ord. to Show Cause Part III.B.

83.     These facts are material to this litigation because, to the extent DOJ's requested relief violates federal law, it would be barred.

84.     Discovery regarding the purposes and intended uses of DOJ's demand is also relevant to other facts that may give rise to other affirmative defenses, including,

but not limited to, whether DOJ's proposed uses unconstitutionally infringe on Connecticut's right to set the qualifications of electors, U.S. Const. Art. I, § 2, whether DOJ's demand satisfies the Fourth Amendment's reasonableness requirement, *e.g.*, *Gimbel v. FDIC*, 77 F.3d 593 (2d Cir. 1996), and whether DOJ's demand is overbroad, intended to harass Connecticut, intended to pressure Connecticut into taking other action, or lacks a good-faith basis, *e.g.*, *United States v. Powell*, 379 U.S. 48 (1964).

85.     Facts related to these issues will be obtained through document requests, interrogatories, and, if necessary, depositions of persons likely to have material information.

86.     Potential deponents will be identified after documentary discovery, but could reasonably include, at a minimum, the signatories on DOJ's demands to Connecticut (Deputy Assistant Attorney General Michael E. Gates and Attorney Brittany E. Bennett) and other federal officials involved in the demands to other states that are similarly situated to Connecticut (e.g., Assistant Attorney General Harmeet K. Dhillon, Acting Chief of the Voting Section Eric Neff, former Acting Chief of the Voting Section Maureen Riordan).  Potential deponents could also reasonably include individuals with technical expertise concerning the storage and handling of the data DOJ intends to collect.

87.     SOTS has made reasonable efforts to obtain this information. It has diligently searched all publicly available sources for additional information on these and other relevant topics (e.g., reviewing its own records of communications

with DOJ on these and related matters, conducting legal research, reviewing DOJ's public statements, reviewing filings in related litigation, reviewing relevant media reports).

88.     Outside of publicly available sources, SOTS has been unable to obtain additional information. The December 24 Response emphasized the absence of both a valid "purpose" for DOJ's demand under the CRA and adequate assurances that DOJ would comply with federal privacy law. And in response to Attorney Bennett's offer to contact her "[s]hould further clarification be required," the December 24 Response specifically invited DOJ to submit additional information that could support its claims. DOJ declined to reach out again and instead responded by filing this action. As a result, SOTS has been unable to obtain facts material to its defense.

Gabe Rosenberg
Chief of Staff and General Counsel,
Office of the Connecticut Secretary of the State


Subscribed and sworn before me on this 27ᵗʰ day of February, 2026 at
Hartford          , Connecticut.

Commissioner of the Superior Court/ Notary Public


ANNA M. POSNIAK
*NOTARY PUBLIC*
My Commission Expires June 30, 2026