**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA: | | 3:26-CV-00021-KAD |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| STEPHANIE THOMAS | : | |
| *Defendant.* | : | FEBRUARY 27, 2026 |

**<u>RESPONSE OF DEFENDANT SECRETARY THOMAS
TO SHOW CAUSE ORDER</u>**

ARGUMENT REQUESTED

## I.    INTRODUCTION

The National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA") require states to maintain a voter registration list and, critically, have their own strictly limited enforcement schemes.  Neither act gives the Department of Justice ("DOJ") the power to compel production of a voter registration list ("VRL") to the federal government.

Since those statutes do not give DOJ express authority to get the information it wants, DOJ is relying on a novel theory of Title III of the Civil Rights Act of 1960 ("CRA") for its demand.  It is applying the CRA in a manner not endorsed by any court since the early 1960s and at a never-before-seen scale.  DOJ's reading of the CRA is utterly untethered to the operation of the statute, the Federal Rules of Civil Procedure, and long-recognized constitutional, statutory, judicial, and internal limits on DOJ's enforcement powers.

DOJ's theory has already been rejected by two other federal courts, which recognized that DOJ's use of the CRA, HAVA, and NVRA to purportedly audit state list maintenance practices is unsupported by those statutes and is a blatant pretext for other, more nefarious purposes.  *See United States v. Weber*, Docket No. 2:25-cv-09149-DOC-ADS, 2026 U.S. Dist. LEXIS 8545, at *29–30 (C.D. Cal. Jan. 15, 2026) ("The Court is not required to accept pretextual, formalistic explanations untethered to the reality of what the government has said outside of the courtroom."); *United States v. Oregon*, Docket No. 6:25-cv-01666-MTK, 2026 U.S. Dist. LEXIS 25259, at *33–34 (D. Or. Feb. 5, 2026) ("Plaintiff has continued to engage in conduct raising

suspicion about the purposes for which it seeks statewide unredacted voter registration lists. . . . The presumption of regularity that has been previously extended to Plaintiff that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds.").

There is no basis for this Court to order the Secretary to produce Connecticut's VRL here, especially since the personal information it contains is at serious risk of unlawful use by DOJ, other federal agencies, and unauthorized private entities.[1] Outside of this case, the Executive Branch, through DOJ, is transparently trying to evade Congress' scheme of limited oversight by misusing and misinterpreting the CRA. DOJ should not be allowed use Title III to avoid this Court's supervisory authority and the procedural safeguards the Secretary is entitled to here.

The Court should deny Plaintiff's Motion to Compel[2] because (1) the CRA does not authorize summary proceedings unconstrained by the rules of discovery or without judicial review; (2) DOJ's motion to compel is not a valid exercise of its authority under the CRA; (3) Connecticut's VRL is not subject to the CRA's retention requirement; and (4) the CRA does not require production of records in the manner sought by DOJ. Alternatively, (5) the Court should reserve ruling on the motion to compel to permit discovery into the true purpose for Plaintiff's demand, its intended use of the information, and how it intends to comply with federal privacy law.

---

[1] *See* Sec'y's Mot. to Dismiss Part II.A.
[2] ECF No. 9.

## II.     BACKGROUND

The factual and legal background of this case is described in the Secretary's accompanying motion to dismiss and is adopted here.[3]

## III.     ARGUMENT

### A.     The Court Should Deny DOJ's Motion to Compel

#### 1.     The CRA Does Not Authorize a Summary Proceeding

The Federal Rules provide default procedures for any civil action.[4] To displace them, Congress must give "express statutory authorization." *New Hampshire Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 407 (1960).[5] Here, Congress has not.

Plaintiff overtly relies on implied—not "express," *id.*—authority, as required. It contends that the phrase "by appropriate process" in the CRA creates a "special statutory proceeding" that "displaces the Federal Rules of Civil Procedure" and immunizes the Attorney General's demand from judicial review.[6] Not so. *See United States v. Weber*, Docket No. 2:25-cv-09149-DOC-ADS, 2026 U.S. Dist. LEXIS 8545, at

---

[3] *See* Sec'y's Mot. to Dismiss Part II.

[4] *See* Fed. R. Civ. P. 1 ("These rules govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81."); *id.* 81, adv. comm. notes ("Rules 1 and 81 provide that the rules shall apply to all suits of a civil nature, whether cognizable as cases at law or in equity, except those specifically excepted").

[5] *See also, e.g.*, *Marek v. Chesny*, 473 U.S. 1,   11–12 (1985) (applying Federal Rules because there was no "clear expression of congressional intent . . . to exempt . . . [42 U.S.C. § 1988] from the operation of" the Federal Rules (cleaned up)); *Califano v. Yamasaki*, 442 U.S. 682, 700 (1979) (applying Federal Rules "[i]n the absence of a direct expression by Congress of its intent to depart from the usual course of trying 'all suits of a civil nature' under the Rules established for that purpose" (quoting Fed. R. Civ. P. 1)).

[6] ECF No. 9-1 at 5.

*23 (C.D. Cal. Jan. 15, 2026) ("Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures.").

The Supreme Court has said so. In *United States v. Powell*, 379 U.S. 48 (1964), the Court considered a statute that allowed a district court to compel production of records "by appropriate process"—language identical to that used in the CRA.[7] The Court declared that the statute "contains no provision specifying the procedure to be followed," so "the Federal Rules of Civil Procedure apply."[8]

Other cases illustrate how Congress *can* clearly show that it means to displace the Federal Rules—it provides details about the alternative proceeding, such as "*who*" may participate, "*when*" it is to occur, and "*how*" it should be conducted. *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1349 (11th Cir. 2017) (emphasis in original).[9] Title III offers nothing approaching this level of specificity.

---

[7] *Id.* at 52 (citing 26 U.S.C. § 7604(a)).

[8] *Id.* at 58 n.18; *see also United States v. Mellon*, 719 F. App'x 74, 76 (2d Cir. 2018) (applying *Powell*).

[9] *See, e.g.*, *Burch*, 861 F.3d at 1349 (because 9 U.S.C. § 4 of the FAA expressly sets forth "*who* is entitled to make a jury demand," "*when* the specific party must make its demand," and "*how* a party must make its demand," it "displace[s] the general jury demand procedures provided in Federal Rule of Civil Procedure 38" (emphasis in original)); *ISC Holding AG v. Nobel Biocare Finance AG*, 688 F.3d 98, 112 (2d Cir. 2012) (application to compel arbitration under 9 U.S.C. § 4 of the FAA displaced Federal Rule 56, since it provided specific requirements regarding notice, service, a hearing, the issues to be resolved by a court, the timing of a trial, and remedies); *New York Times Co. v. Gonzales*, 459 F.3d 160 (2d Cir. 2006) (holding that federal statute did not create a "special statutory proceeding" intended to displace Federal Rule 57 because it did not "involve[] procedures and remedies specifically tailored to a limited subset of cases").

A broader look at the CRA supports the point—compare Title III of the CRA with Title VI of the same act.[10]   In Title VI, Congress provided a 1,646-word description of how to conduct certain special proceedings related to voting discrimination.  In an action brought by the Attorney General alleging that a person was deprived of the right to vote "on account of race or color," the Court could "make a finding whether such deprivation was or is pursuant to a pattern or practice."[11]  If it did, then "any person of such race or color resident within the affected area" could apply to the court for "an order declaring him qualified to vote."[12]  Congress set out rules for handling the application.  Among other things, an application had to "be heard within ten days," required certain findings about the person's qualifications to vote, and provided that the person's statements under oath were "prima facie evidence" as to qualifications.[13]  The state would then get a chance "to show cause within ten days . . . why an order of the court should not be entered."[14]  The state could challenge the findings, the legal basis for a decision, and have a hearing if there was "a genuine issue of material fact."[15]  Congress also gave rules for remedies.  For example, an order could "not be stayed" if it would deprive the person of the right to

---

[10] *See Parker Drilling Management Services v. Newton*, 587 U.S. 601, 609 (2019) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme. . . . [I]nterpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning." (cleaned up)).

[11] 52 U.S.C. § 10101(e).

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

vote in an upcoming election and a state election official's "refusal . . . to permit any person so declared qualified to vote . . . shall constitute contempt of court."[16]  In other words, Congress very carefully described "*who*" may participate in the proceeding, "*when*" it is to occur, and "*how*" it should be conducted.  *Burch*, 861 F.3d at 1349 (emphasis in original).

So, Congress knew how to craft special procedures for district courts to follow under the CRA.  Compared with the detailed instructions in Title VI, there is no reason to believe Congress meant to adopt an entirely new procedural framework in Title III with the mere phrase "by appropriate process."[17]

Plaintiff's cases to the contrary are nonbinding and have been overruled by *Powell*, 379 U.S. 48, which concerned the exact language at issue here: "by appropriate process."  The cases are also unpersuasive, as they lack—sometimes admittedly—any textual basis.  *See In re Gordon*, 218 F. Supp. 826, 826 (S.D. Miss. 1963) ("The Act is rather scant.  It does not provide guideposts for many perplexing questions which are presented from time to time.").  Even the then-Chief Judge of the Fifth Circuit, Hon. Elbert P. Tuttle, remarked that the basis for ordering a summary

---

[16] *Id.*

[17] *See Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."); *see also, e.g.*, *Mei Xing Yu v. Hasaki Restaurant, Inc.*, 944 F.3d 395, 408 (2d Cir. 2019) (refusing to displace Federal Rule 68 by requiring judicial review of settlements, where Congress gave "painstaking attention to procedural requirements" in the Fair Labor Standards Act, yet was "silent" as to whether judicial review of a settlement was required).

Title III proceeding was only "implicit in the enactment," rather than expressly stated in the text.  Elbert P. Tuttle, Equality and the Vote, 41 N.Y.U. L. Rev. 245, 255 (Apr. 1966).  *Compare id. with Scanlon*, 362 U.S. at 407 (requiring "express statutory authorization").

Moreover, Plaintiff's own conduct in this action is inconsistent with a summary proceeding exempted from the Federal Rules.  Plaintiff filed a complaint in the style of a typical action governed by the Federal Rules and did not object to the intervention of other parties.[18]  *See United States v. Oregon*, Docket No. 6:25-cv-01666-MTK, 2026 U.S. Dist. LEXIS 25259, at *24 n.1 (D. Or. Feb. 5, 2026) ("Even if *Lynd* applied here, the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation.").

Finally, as Plaintiff concedes,[19] each of these cases comes from the Fifth Circuit in the early 1960s—a unique place and time in the evolution of Americans' voting rights.  A well-intentioned judiciary frequently found itself at odds with "recalcitrant official defendants" who "treat[ed] each case as if no precedent had already been established by the federal courts, thus requiring a county-by-county series of lawsuits to vindicate rights that . . . were regularly being denied American citizens of the Negro race."  Elbert P. Tuttle, Equality and the Vote, 41 N.Y.U. L. Rev. 245, 257 (Apr. 1966).  Frustrated with litigants' consistent defiance of voting rights and eager to right these grievous wrongs as soon as possible, Chief Judge Tuttle explained that "it devolved

---

[18] ECF No. 22 (taking no position on proposed intervention).
[19] ECF No. 9-1 at 4 n.1.

upon the appellate courts, to a greater extent than had theretofore been usual in American jurisprudence, to fashion means to give effect to principles of law, once firmly established, much more rapidly than would be possible if full sway were allowed to the normal procedural maneuvering." *Id.*

There is no similar exigency here.  To whatever extent circumstances in the Jim Crow South justified stretching the CRA's text to allow courts to protect the voting rights of Black Americans, there is nothing analogous in this case.

### 2. DOJ Must Show that its Demand Is Enforceable

Even where a federal agency claims a broad investigative authority, "a court may not permit its process to be abused." *Powell*, 379 U.S. at 58.

To prevent this, the target of an investigation "is entitled" to an "adversary hearing" and "may challenge the summons on any appropriate ground"; the court may "inquire into the underlying reasons for the examination." *Id.* (cleaned up).  The agency's demand cannot be not issued "to harass" or "pressure" the target. *Id.*  And it must not be "of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).

In practice, this means the agency bears a burden.  Among other things it "must show" that its demand is "pursuant to a legitimate purpose," is "relevant to the purpose," and "that the administrative steps required . . . have been followed." *RNR Enterprises v. SEC*, 122 F.3d 93, 96 (2d Cir. 1997) (cleaned up).  The demand must be "within the authority of the agency," the demand "not too indefinite," and the

information sought "reasonably relevant." *Id.* at 97. If the agency makes a sufficient showing, the respondent can still preclude enforcement by "showing that the subpoena is 'unreasonable' or was issued in bad faith or for an 'improper purpose,' or that compliance would be 'unnecessarily burdensome.'" *Id.* (cleaned up).

### 3. DOJ's Demand Lacks a Legitimate Purpose, Is Not Even Relevant to that Stated Purpose, and Fails to Comply with the Administrative Requirements of the CRA

For the reasons set forth in the Secretary's motion to dismiss,[20] Plaintiff cannot make the threshold showing that its demand is enforceable: (1) Plaintiff's stated reason for its demand (i.e., a nationwide audit for NVRA and HAVA compliance) is not "a legitimate purpose" under the CRA[21]; (2) a demand for Connecticut's entire VRL is not "relevant to the purpose" of conducting an audit for compliance with NVRA or HAVA[22]; and (3) the demand fails to comply with the CRA's required "administrative step[]" that it state a basis for the demand.[23] Similarly, (4) DOJ's demand is evidently motivated by an "improper purpose" (e.g., an audit, data sharing, criminal enforcement, immigration enforcement) and should be denied for that reason, as well.[24]

---

[20] *See* Sec'y's Mot. to Dismiss Part V.A.
[21] *RNR Enterprises*, 122 F.3d at 96.
[22] *Id.*
[23] *Id.*
[24] *Id.*

4.    **DOJ's Demand Is Unreasonable because a VRL Is Not Subject to the CRA's Retention Requirement**

Even if DOJ could state a valid basis and purpose, which it cannot, it should be denied as unreasonable because it targets materials outside the scope of the CRA and demands production of those materials in a manner not provided for by the CRA.

An election officer must "retain and preserve, for a period of twenty-two months from the date of [a federal election] . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election."[25]   This cannot include a VRL that is continuously updated in real time, contains information on all voters in the state, and was created by the Secretary.  *See Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (a court may consider whether a particular "record" falls under the CRA).

i.    **A VRL Cannot Be "Retained and Preserved" because It Is Constantly Updated**

Because of competing requirements under federal law, a statewide VRL is not something that can be "retain[ed] and preserve[d]" for twenty-two months.[26]

HAVA mandates that each state maintain a statewide VRL—a "computerized list," which must be "the single system for storing and managing the official list of registered voters throughout the State" and used as "the official voter registration list for the conduct of all elections for Federal office in the State."[27]   Updating the list is critical to maintaining accurate data, and crucially, mandatory under HAVA: "All

---

[25] 52 U.S.C. § 20701.
[26] *Id.*
[27] *Id.* § 21083(a)(1)(A)(i), (viii).

10

voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official."[28]  "Regular" list maintenance is also required under both HAVA and NVRA.[29]  And nothing in either law compels a state to retain records of all changes.[30]

Connecticut implements these federal requirements through a system known as the Centralized Voter Registration System or "CVRS."  At bottom, CVRS is a living database of local voter registration lists maintained by each of the state's 169 municipalities.[31]  Each municipality has two Registrars of Voters ("ROVs")—one from each party—and a Registrar of Vital Statistics—typically, a Town Clerk—who compile and maintain the lists at the local level.[32]  Consistent with federal mandates,

---

[28] *Id.* § 21083(a)(1)(A)(vi).

[29] *See id.* § 21083(a)(2) ("The appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis"); *id.* § 21083(a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly"); *id.* § 20507(c)(2)(A) ("A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.").

[30] *See* National Clearinghouse on Elec. Admin., Fed. Elec. Comm'n, Implementing the Nat'l Voter Registration Act of 1993: Requirements, Issues, Approaches, and Examples 7-1 (Jan. 1, 1994) ("[a]s a matter of prudence, *though not as a requirement of [NVRA]*, States might also want to retain . . . all records of removals from the voter registration list" (emphasis added)).

[31] *See* Conn. Gen. Stat. §§ 9-189, 9-190; Rosenberg Aff. ¶¶ 9–11.

[32] *See* Conn. Gen. Stat. §§ 7-42, 9-35–50b, 9-189, 9-190.

Case 3:26-cv-00021-KAD    Document 59    Filed 02/27/26    Page 13 of 27

they update the list on a continuous basis and input changes directly into CVRS.[33]
When election officials update CVRS, prior versions are not saved.[34]

These statutorily mandated processes are incompatible with Plaintiff's reading of the CRA. If the CVRS is a record that must be "retain[ed] and preserve[d]" for twenty-two months, then local officials would be *prohibited* from updating it. Instead, they are *required* to update it "on an expedited basis at the time the information is provided" to them and then at "regular" intervals thereafter.[35] Congress would not have intended to create this obvious conflict. By DOJ's reading, simply complying with HAVA and NVRA (and associated state laws) would violate the CRA and even expose countless local election officials across the country to criminal liability under the CRA. Courts do not read statutes to create these type of conflicts.[36] For similar reasons, the rule of lenity also precludes Plaintiff's reading.[37]

---

[33] *See* 52 U.S.C. § 21083(a)(1)(A)(vii); *see also, e.g.*, Conn. Gen. Stat. §§ 9-21a(a), 9-45, 9-50b(c); Rosenberg Aff. ¶¶ 11–22.

[34] *See* Rosenberg Aff. ¶ 23.

[35] 52 U.S.C. § 21083(a)(1)(A)(vii), (a)(2), (a)(4).

[36] *See id.* § 20702; *Perry v. Dowling*, 95 F.3d 231, 236 (2d Cir. 1996) ("[A] permissible construction of the statute is one that 'reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' expressed intent.'" (quoting *Rust v. Sullivan*, 500 U.S. 173, 184 (1991)).

[37] *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 16 (2011) ("the rule of lenity can apply when a statute with criminal sanctions is applied in a noncriminal context"); *Maracich v. Spears*, 570 U.S. 48, 97 (2013) (Ginsburg, J., dissenting) ("Because this is a civil case, I need not consider what defenses respondent-lawyers might have were they criminally prosecuted. But because we are interpreting a criminal statute, it is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage, even in a civil case." (cleaned up)).

These concerns about criminal liability under the CRA are hardly speculative. At the time of the CRA's passage, the Attorney General opined that a conflict between Title III and a state law that required local election officials to alter qualifying election records would be a crime under the CRA.[38]    And currently, criminal enforcement of the CRA appears to be a priority for DOJ.    Among other things, the Elections E.O. emphasized criminal enforcement of federal voting laws; DOJ has been exploring theories for criminally charging state and local officials for conduct charges related to election administration; and DOJ used the CRA as a basis for a criminal warrant in Georgia.[39]    President Trump later singled out Connecticut as a possible target, calling the state "a very corrupt voting place."[40]

---

[38] *See Miscellaneous Bills Regarding the Civil Rights of Persons within the Jurisdiction of the United States: Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong. 229 (1959) (statement of William P. Rogers, Att'y Gen. of the United States) ("Mr. [Byron] ROGERS. . . . Let us assume . . . [the state] direct[s] that within 30 days the registrars and everybody who has anything to do with the records, shall destroy them . . . . Mr. [Byron] ROGERS. And [Title III] says you should keep it for 3 years; and you passed this law. They would be guilty of a crime?    Attorney General [William] ROGERS. Yes.    Mr. [Byron] ROGERS. A Federal crime?    Attorney General [William] ROGERS. That is right.").

[39] *See* E.O. 14248 §§ 2(e), 5; Devlin Barrett & Nick Corasaniti, Justice Dept. Explores Using Criminal Charges Against Election Officials, N.Y. Times (Jul. 2, 2025), https://www.nytimes.com/2025/07/02/us/politics/justice-department-election-data.html ("Senior Justice Department officials are exploring whether they can bring criminal charges against state or local election officials if the Trump administration determines they have not sufficiently safeguarded their computer systems"); Application & Affidavit for Search Warrant (N.D. Ga. Jan. 28, 2026), https://www.nytimes.com/interactive/2026/02/10/us/politics/fulton-county-search-warrant-affidavit.html.

[40] Kaitlin McCallum, Trump attacks: 'Connecticut is a very corrupt voting place," Hartford Courant (Feb. 12, 2026), https://www.courant.com/2026/02/12/trump-attacks-connecticut-is-a-very-corrupt-voting-place/.

## ii.    The CRA Only Concerns Local Election Records

"[T]he Civil Rights Act of 1960 . . . gave the Attorney General access to *local* voting records."  *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966) (emphasis added).  Nothing about the context and early use of the CRA suggests that it was intended to authorize DOJ to obtain *statewide*—much less *nationwide*—records.

Election administration in our country is, by design, "highly decentralized."[41] "The Constitution initiates decentralization by placing the primary responsibility for holding elections with states.    States have further decentralized election administration by delegating most election administration responsibilities to local governments."[42]

Accordingly, statewide VRLs were uncommon as of 1960, when Congress enacted the CRA.[43]  They continued to exist only in small numbers for decades, until HAVA required states to implement them in 2002.[44]

---

[41] *Jones v. United States Postal Service*, 488 F. Supp. 3d 103, 125 (S.D.N.Y. 2020).

[42] J. Weinstein-Tull, Election Law Federalism, 114 Mich. L. Rev. 747, 752 (Mar. 2016) (cleaned up).

[43] *E.g.*, *Miscellaneous Bills Regarding the Civil Rights of Persons within the Jurisdiction of the United States: Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong. 702 (1959) (statement of Joe T. Patterson, Att'y Gen. of Mississippi) ("Mr. PEET. Mr. Attorney General, could you tell us how many people are registered to vote in the State of Mississippi?  Mr. PATTERSON. That I cannot. And my reason for that is that we have no central gathering agency, no central agency in the State government whereby the number of qualified electors are reported.  The only way that question could be accurately answered . . . would be to call upon the circuit clerk of every one of the 82 counties . . . .").

[44] *E.g.*, Conference Report, Help America Vote Act of 2002, Cong. Rec. Vol. 148 No. 136, S10488, S10491 (Oct. 16, 2002) ("In most States, registration will be maintained for the first time on a statewide basis rather than jurisdiction by jurisdiction.");  Fed. Elec. Comm'n, "Implementing the Implementing the National Voter Registration Act: A Report to State and Local Election Officials on Problems

Unsurprisingly then, all of the early Title III litigation Plaintiff relies upon dealt with local—not statewide—records and concerned a relatively small number of voters. *E.g.*, *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (Attorney General sought records from Wilcox County, Ala., which had 8,719 eligible voters). Indeed, other Fifth Circuit authority flatly states that Title III only extends to "documents in the custody of local voting registrars." *Bell v. Southwell*, 376 F.2d 659, 664 n.8 (5th Cir. 1967). So does the Supreme Court. *Katzenbach*, 383 U.S. at 313 ("[T]he Civil Rights Act of 1960 . . . gave the Attorney General access to local voting records.").

Given this tradition of local election administration and the rarity of statewide election records as of 1960, it is unlikely that Congress envisioned that the CRA allowed the Attorney General to demand statewide records for millions of voters.[45]

---

and Solutions Discovered 1995-1996," at 101 (noting that as of the mid-1990s "over a dozen States already maintain some form of statewide computerized voter registration list"), https://www.eac.gov/sites/default/files/eac_assets/1/28/Implementing%20the%20NVRA--Report%20to%20State%20and%20Local%20Election%20Of.pdf; Hans A. von Spakovsky, Comm'r, Fed. Elec. Comm'n, "Implementation of Computerized Voter Registration Databases," at 8 ("[M]ost voter registration lists were maintained by counties and towns, not states . . . . By 2000, only ten states . . . had implemented statewide registration lists[.]"), https://www.fec.gov/resources/about-fec/commissioners/von_Spakovsky/speeches/speech20060330.pdf.

[45] *E.g.*, *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 171 (2003) (a statute "cannot be read to govern a situation that Congress clearly did not contemplate"); *Murphy Bros. v. Michetti Pipe Stringing*, 526 U.S. 344, 353 n.5 (1999) ("Congress could not have foreseen the situation posed by this case, for . . . in 1949 Congress did not anticipate use of facsmile [sic] transmissions." (cleaned up)).

### iii.    A VRL Does Not "Come Into" the Secretary's Possession because It Is Created by the Secretary

A statewide VRL is not something "which come[s] into [the Secretary's] possession."[46]  The CRA "requir[es] states to preserve records that voters submit to them—not records that states create."  *United States v. Benson*, Docket No. 1:25-cv-1148, 2026 U.S. Dist. LEXIS 27501, at *31 (W.D. Mich. Feb. 10, 2026).

This is because the phrase "come into possession" is synonymous with "obtain" or "acquire," and describes receipt from an outside source.[47]  Nor is a statewide VRL "related to" other records the Secretary obtains.  Although "related to" can have an expansive meaning, the Court must read it in context.  *See Dubin v. United States*, 599 U.S. 110, 119 (2023) ("'In relation to' is . . . context sensitive. . . . [T]he kind of relationship required, its nature and strength, will be informed by context." (cleaned up)).[48]  Here, the CRA references coming into the possession of records "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election."[49]  These are "records that election officials *receive*, rather than *create*." *Benson*, 2026 U.S. Dist. LEXIS 27501, at *30 (emphasis in original).  So, Title III

---

[46] 52 U.S.C. § 20701.

[47] *E.g.*, *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) ("the verb 'obtain' was defined as 'to come into possession of' or to 'get or acquire' (citing Random House Dictionary of the English Language 995 (1966)); Webster's New World Dictionary (1960) ("acquire" means "to get or gain" and "to get possession of; get as one's own"; "obtain" means "to get possession of, especially by trying; procure").

[48] *E.g.*, *Alabama Assn. of Realtors v. HHS*, 594 U.S. 758, 763 (2021) ("The Government contends that the first sentence of §361(a) gives the CDC broad authority to take whatever measures it deems necessary . . . . But the second sentence informs the grant of authority by illustrating the kinds of measures that could be necessary . . . .")

[49] 52 U.S.C. § 20701.

merely allows the Attorney General to "determine whether the State is improperly rejecting voter registration applications" she has received—not to audit administrative records she has created.  *Id.*

### 5.    The Demand Is Unreasonable because the CRA Does Not Require Electronic Production

If the Attorney General makes a valid demand under the CRA, retained records must be "made available for inspection, reproduction, and copying at the principal office of such custodian."[50]  Here, Plaintiff demanded that the Secretary produce an electronic copy of Connecticut's VRL via email or a file-transfer system.

But the CRA only contemplates physical access at a particular location. Requiring an official to deliver an electronic version of a record (which is not "ma[king it] available for inspection, reproduction, [or] copying") to the Attorney General in the District of Columbia (which is not "at the principal office of" the Secretary) would read this provision out of the statute.[51]

The Secretary's reading of § 20703 is also consistent with other provisions of Title III.[52]  Like § 20703, § 20705 emphasizes the physical location of records by conferring jurisdiction on a federal court in the district where "a record or paper so

---

[50] 52 U.S.C. § 20703.

[51] *See Burrus v. Vegliante*, 336 F.3d 82, 91 (2d Cir. 2003) ("Where possible we avoid construing a statute so as to render a provision mere surplusage."); *see also, e.g.*, *Greater Birmingham Ministries v. Secretary of State*, 105 F.4th 1324, 1332 (11th Cir. 2024) ("[E]lectronic production is neither public inspection nor photocopying; it is an entirely different method of disclosure.").

[52] *See Am. International Group v. Bank of Am. Corp.*, 712 F.3d 775, 783 (2d Cir. 2013) ("parallel statutory provisions should be read in pari materia" (cleaned up)).

demanded is located."[53]  And at least one court has refused to discount the importance of the records' physical location under this provision.[54]

Legislative history further supports the point that the CRA does not contemplate electronic disclosure.  Title III effectively codified the district court's order in *In re Wallace*, 170 F. Supp. 63 (M.D. Ala. 1959), in which the Civil Rights Commission sought to obtain certain voting records under the Civil Rights Act of 1957.  Rather than compel production, the court "relieve[d] movants . . . of any obligation to produce the records . . . , and . . . eliminate[d] the necessity for the records to be moved from their present location.  Instead, each of the registrars . . . w[as] ordered to make said records available at their present location . . . for copying, inspection, and photographing by the Commission or its duly authorized agents."  *Id.* at 69–70.

Congress—openly concerned with the specter of too much federal intrusion into State elections—took the same approach: "[P]roduction would normally be at the usual place of custody of the voting records. . . . . [W]e thought the subp[o]ena power might be construed as an interference with the State's power over voting, and we wanted to limit it merely to the right of inspection . . . ."[55]  Courts applying Title III

---

[53] 52 U.S.C. § 20705.

[54] *See United States v. Raffensperger*, Docket No. 5:25-cv-00548-CAR, 2026 U.S. Dist. LEXIS 12804 (M.D. Ga. Jan. 23, 2026) (rejecting the Attorney General's argument that the Middle District had jurisdiction because VRL was "located" in the Middle District, since an "electronic copy . . . can be accessed online . . . within the Middle District," since "construction of 'located' makes today's electronic records 'located' in every judicial district across the nation").

[55] *See Proposals to Secure, Protect, and Strengthen Civil Rights of Persons under the Constitution and Laws of the United States: Hearings before the Subcomm.*

in the 1960s took the same approach, no matter how cumbersome it might be for DOJ.[56]

Congress knows how to mandate affirmative production of records.[57]  For instance, just months before passing the 1960 CRA, Congress passed the Labor-Management Reporting and Disclosure Act of 1959, which contains a requirement similar to the CRA: a labor union must "maintain at the principal office of [the union] copies of any [collective bargaining] agreement made or received by such labor organization, which copies shall be available for inspection."[58]  That language does not contemplate production.  We know this because Congress also included a separate provision requiring the union "to forward a copy of each collective bargaining agreement . . . to any employee who requests such a copy."[59]  The CRA has no similar provision requiring an election official to "forward a copy" of a voting record to the Attorney General.

If it wants, Congress also knows how to change the CRA to mandate production.  It has amended statutes to require a custodian to affirmatively produce

---

*on Const. Rights of the S. Comm. on the Judiciary*, 86th Cong. 192 (1959) (statement of William P. Rogers, Att'y Gen. of the United States).

[56] *E.g.*, *Kennedy v. Owen*, 321 F.2d 116, 117 (5th Cir. 1963) (ordering "inspection, reproduction and copying to take place in accordance with a schedule to be established forthwith by the District Court, and to commence forthwith in one of the seven counties herein involved, and upon completion thereof to commence in another of the seven counties, and to continue in such manner, county by county and in consecutive order, until such inspection, reproduction and copying is completed").

[57] *See Credit Suisse Securities (USA) LLC v. Simmonds*, 566 U.S. 221, 228 (2012) ("Had Congress intended this result, it most certainly would have said so.").

[58] 29 U.S.C. § 414.

[59] *Id.*

electronic documents where it had previously only required the custodian to provide access to physical papers.  The Freedom of Information Act ("FOIA") originally only required "public inspection and copying" of physical papers.[60]  But Congress later amended FOIA to require production of electronic records.  Today, an agency must affirmatively make records "available for public inspection in an electronic format" and in responding to requests, must provide the record "in any form or format requested" and "make reasonable efforts to search for the records in electronic form or format."[61]  Congress has not done so with the CRA.

In short, the text, other provisions of Title III, and similar language in other statutes show that § 20703 does not require an election official to electronically produce documents to Plaintiff.

## B.  Alternatively, the Secretary Is Entitled to Discovery

If the Court is not inclined to grant the Secretary's Motion to Dismiss, it should allow discovery into the true purpose for Plaintiff's demand, its intended uses, and how it intends to comply with federal privacy law.

Under both *Powell* and a typical action governed by Federal Rules, the Secretary is entitled to discovery.  Since the Federal Rules apply in either case, Plaintiff's Motion to Compel is effectively a Rule 56 Motion for Summary Judgment. "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to . . . to

---

[60] *See* Pub. L. No. 89-487, 80 Stat. 250 (1966); *New York Legal Assistance Group v. Board of Immigration Appeals*, 987 F.3d 207, 209 (2d Cir. 2021).

[61] 5 U.S.C. § 552(a)(2), (3)(c).

take discovery." Fed. R. Civ. P. 56(d); *see also Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*, 574 F.3d 129, 149 (2d Cir. 2009) ("a party against which summary judgment is sought must be afforded a reasonable opportunity to elicit information within the control of his adversaries" (cleaned up)). The nonmoving party's affidavit must explain "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995).

As described further in the accompanying affidavit,[62] broadly, the Secretary seeks additional facts on two issues. First, she requires further information concerning the purpose of DOJ's request for voter data from Connecticut and other states. DOJ has not presented the Secretary with evidence of voting discrimination, violations of HAVA or NVRA, or any other indicia of problems with Connecticut's voter list maintenance practices. Additional facts could confirm DOJ's public statements that it intends to conduct a national voter roll audit, which is an improper use of the CRA. Also, DOJ's actions and public statements, as well as credible media reports, suggest that the true purpose behind the December 12 Demand is not to conduct an audit to determine compliance with NVRA and HAVA. Additional facts could confirm that it intends to share the data it collects with other federal agencies and/or confirm credible media reports that DOJ intends to use the voter data for other purposes, such as criminal or immigration enforcement. Similarly, Connecticut's

---

[62] Rosenberg Aff. ¶¶ 72–88.

election administration practices have also been unfairly targeted by President Trump. Additional facts could confirm that DOJ is pursuing Connecticut's voting records in bad faith and/or to conduct a fishing expedition to find evidence to support President Trump's claim.

Discovery regarding the purposes and intended uses of DOJ's demand is also relevant to other facts that may give rise to other affirmative defenses, including, but not limited to, whether DOJ's proposed uses unconstitutionally infringe on Connecticut's right to set the qualifications of electors, U.S. Const. Art. I, § 2, whether DOJ's demand satisfies the Fourth Amendment's reasonableness requirement, *e.g.*, *Gimbel v. FDIC*, 77 F.3d 593 (2d Cir. 1996), and whether DOJ's demand is overbroad, intended to harass Connecticut, intended to pressure Connecticut into taking other action, or lacks a good-faith basis, *e.g.*, *United States v. Powell*, 379 U.S. 48 (1964).

Second, the Secretary requires further facts regarding DOJ's compliance with federal privacy law, such as DOJ's intended uses and data retrieval mechanisms. To the extent Plaintiff's requested relief in this action violates federal privacy law, it would be barred.

Facts related to these issues will be obtained through document requests, interrogatories, and, if necessary, depositions of persons likely to have material information. Potential deponents will be identified after documentary discovery, but could reasonably include, at a minimum, the signatories on DOJ's demands to Connecticut (Deputy Assistant Attorney General Michael E. Gates and Attorney

Brittany E. Bennett) and other federal officials involved in the requests to states similarly situated to Connecticut (e.g., Assistant Attorney General Harmeet K. Dhillon, Acting Chief of the Voting Section Eric Neff, former Acting Chief of the Voting Section Maureen Riordan). Potential deponents could also reasonably include individuals with technical expertise concerning the storage and handling of the data DOJ intends to collect.

Outside of prior correspondence with DOJ on related matters and publicly available sources that her office has diligently searched, the Secretary has been unable to obtain additional information to support her defenses. Her December 24 Response specifically noted the absence of both a valid "purpose" for DOJ's demand under the CRA and adequate assurances that DOJ would comply with federal privacy law. The Secretary invited DOJ to submit additional information that could support its claims, but DOJ responded by filing this action.

**CONCLUSION**

The Court should deny Plaintiff's Motion to Compel. Alternatively, the Court should reserve ruling to allow discovery as set forth above.

Respectfully submitted,

DEFENDANT
STEPHANIE THOMAS,

WILLIAM TONG
ATTORNEY GENERAL

By: ___/s/ *Michael Rondon*_____
Michael Rondon (ct31022)
Blake Sullivan (ct30289)
Assistant Attorneys General
Attorney General's Office, Special Litigation
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Tel:  (860) 808-5020
Fax: (860) 808-5347
Michael.Rondon@ct.gov
Blake.Sullivan@ct.gov

**<u>CERTIFICATION</u>**

I hereby certify that on February 27, 2026 a copy of the foregoing was electronically filed and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's system.

U.S. DOJ-Civil Rights Dept.
Brttany E. Bennett
950 Pennsylvania Ave, NW
Washington, DC 20579
Brittany.bennett@usdoj.gov

William M. Bloss
Koskoff, Koskoff & Bieder, P.C.
350 Fairfield Ave.
Bridgeport, CT 06604
bbloss@koskoff.com

Elias Law Group LLP
David Robert Fox, Marisa O'Gara, and Tori Shaw
250 Massachusetts Ave NW
Suite 400
Washington, DC 20001
dfox@elias.law
mogara@elias.law
tshaw@elias.law

ACLU Foundation of Connecticut
Dan Barrett and Jaclyn Marie Blickley
P.O. Box #320647
Hartford, CT 06132
dbarrett@acluct.org
jblickley@acluct.org

ACLU Foundation of Connecticut
Joseph Purpura Gaylin

80 State House Square
PO Box 230178
Hartford, CT 06123
jgaylin@acluct.org

American Civil Liberties Union Foundation
Patricia Jia Yan
915 15th Street NW
Washington, DC 20005
pyan@aclu.org

American Civil Liberties Union Foundation
Sophie Lin Lakin, Theresa J. Lee, and William Hughes
125 Broad Street
New York, NY 1004
slakin@aclu.org
tlee@aclu.org
WHughes@aclu.org

/s/ *Michael Rondon*
Michael Rondon (ct31022)
Assistant Attorney General