**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>STEPHANIE THOMAS, in her Official Capacity as Secretary of State for the State of Connecticut,<br><br>*Defendant*. | Case No. 3:26-cv-00021 (KAD) |

<u>**DEFENDANT-INTERVENORS COMMON CAUSE AND CLAIRE EWING'S JOINT MOTION TO DISMISS, OPPOSITION TO MOTION TO COMPEL, AND RESPONSE TO ORDER TO SHOW CAUSE**</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 2

    I.   The United States Seeks to Force the Disclosure of Sensitive Voter Data.................. 2

    II.  The United States Seeks to Unlawfully Construct a National Voter Database
         with the Requested Data. ........................................................................ 5

    III. The United States Seeks to Unlawfully Use the Data to Disenfranchise Voters.......... 8

LEGAL STANDARD.............................................................................................. 11

ARGUMENT ....................................................................................................... 11

    I.   The United States Is Not Entitled to Summary Proceedings for its Data
         Request................................................................................................ 11

    II.  The United States Seeks Records Outside the Scope of Title III. ............................ 17

    III. The Complaint Fails to State a Claim Under Title III, Because It Does Not
         Adequately Plead That DOJ Has Provided a Written Statement of Its Basis
         and Purpose........................................................................................... 18

         A.  DOJ's statement of the basis and the purpose for its request is
             inadequate. ................................................................................. 19

         B.  DOJ's statement of the basis and the purpose for its request is
             pretextual.................................................................................... 22

    IV. Nothing in Title III Entitles DOJ to Unredacted Records.......................................... 25

CONCLUSION...................................................................................................... 29

## INTRODUCTION

Defendant-Intervenors Common Cause and Claire Ewing respectfully submit this motion to dismiss the United States' Complaint, Dkt. No. 1, opposition to the United States' motion to compel production, Dkt. No. 9, and response to the Court's Order to Show Cause, Dkt. No. 10.

In this case, as in dozens across the country, the United States seeks to compel the disclosure of sensitive personal voter data to which it is not entitled, using the civil rights laws as a pretext. Through its motion to compel, it attempts to do an end run around the core procedural protections of the Federal Rules, in particular motions to test the sufficiency of the pleadings. These protections are particularly vital here, where the United States' effort fails as a matter of law three times over. The Complaint and the documents incorporated by reference therein do not plausibly establish that the United States has provided the statutorily-required basis and purpose underlying its request for data. Even if they did, production would still be inappropriate, because the requested documents fall outside the scope of the United States' investigative authority and because nothing in the relevant statutes precludes redaction of sensitive voter information.

Congress has repeatedly legislated to ensure that all eligible Americans can participate in free, fair, and secure elections. Against the backdrop of the turmoil of the Jim Crow era, Congress enacted the Civil Rights Act of 1960 ("CRA"), including the public records provisions in Title III, to facilitate investigations of civil rights violations preventing eligible citizens from voting. *Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 126 (3d Cir. 2024) (explaining that Congress enacted the CRA to rein in "efforts to deny the right to vote," including "arbitrary registration procedures" to qualify to vote). As the U.S. Department of Justice ("DOJ") has explained, Title III was designed to "secure a more effective protection of the right to vote." U.S. Dep't of Just., *C.R. Div., Federal Law Constraints on Post-Election "Audits"* 2 (July 28, 2021), https://perma.cc/74CP-58EH (citing *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp.

848, 853 (M.D. Ala. 1960) ). The federal government's demand for Connecticut's unredacted voter file—which contains sensitive personal information including driver's license numbers and/or Social Security numbers from millions of Connecticut voters—undermines the CRA's core purposes, because releasing voter records without redaction and for purposes far afield from protecting voter access would only deter voter participation and impair the right to vote.

District courts in California, Oregon, and Michigan have recently dismissed materially-identical complaints seeking those states' complete voter files without leave to replead. *See United States v. Weber*, No. 2:25-CV-9149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, No. 6:25-cv-1666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Benson*, No. 1:25-cv-1148-HYJ-PJG, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026). This Court should do the same.

## BACKGROUND

### I. The United States Seeks to Force the Disclosure of Sensitive Voter Data.

Beginning in May 2025, DOJ began sending letters to election officials in at least forty states, making escalating demands for the production of voter registration databases, with plans to gather data from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Feb. 27, 2026), https://perma.cc/8YMZ-AD97.

On August 6, 2025, DOJ sent a letter to Connecticut Secretary of State Stephanie Thomas, which propounded several questions regarding Connecticut's voter registration and list maintenance procedures. Pl.'s Mot. for Order to Compel, Ex. 1, Ltr. from Michael E. Gates to the Hon. Stephanie Thomas dated August 6, 2025, Dkt. No. 9-2 ("August 6 Letter"); Compl. ¶ 20. The letter also requested that Connecticut provide information about purported "registered voters identified as ineligible to vote" due to being non-citizens or due to a felony conviction, and asked

for a response within 14 days. August 6 Letter at 2. The August 6 Letter referenced the NVRA but did not mention either HAVA or the CRA. *See id*. On August 20, the Secretary responded to the questions in the August 6 Letter and noted that her office was gathering the rest of the requested data. Pl.'s Mot. for Order to Compel, Ex. 2, Ltr. from the Hon. Stephanie Thomas to Michael Gates and Maureen Riordan dated August 20, 2025, Dkt. No. 9-3; Compl. ¶ 23.

On December 12, DOJ sent a letter demanding an electronic copy of Connecticut's entire statewide voter registration list within 14 days. Pl.'s Mot. for Order to Compel, Ex. 3, Ltr. from Brittany E. Bennett to the Hon. Stephanie Thomas dated December 12, 2025, Dkt. No. 9-4 ("December 12 Letter"); Compl. ¶¶ 24-25.[1] The letter stated that the production "should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number . . . ." December 12 Letter at 1. The letter cited various purported authorities for the request, including DOJ's authority under the NVRA and HAVA to bring enforcement actions. *See id.* at 1-2. It also cited the CRA as authority for its request and noted that the "purpose of this request is to ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA," but did not elaborate further or refer to any compliance deficiencies by Connecticut with respect to those statutes' voter list maintenance requirements. *Id.* at 2.

On December 24, the Secretary's office responded and refused to provide an unredacted voter registration list without legal authority requiring such disclosure. Pl.'s Mot. for Order to Compel, Ex. 4, Ltr. from Gabe Rosenberg to Brittany E. Bennett dated December 24, 2025, Dkt. No. 9-5 ("December 24 Letter"); Compl. ¶ 27. The Secretary's office explained that "the Secretary

---

[1] Though the Complaint alleges that DOJ had already previously requested a copy of Connecticut's statewide voter registration list in its August 6 Letter, Compl. ¶ 21, the August 6 Letter includes no such request. *See* August 6 Letter.

cannot provide [DOJ] with Connecticut's" voter registration list "because [DOJ's] letter offers no authority that requires or permits her to do so, no facts to suggest that Connecticut fails to comply with the list maintenance requirements of the [NVRA] or HAVA, and no reason to believe [its] request complies with all applicable state or federal privacy laws." December 24 Letter. The Secretary's office noted that if DOJ "intend[s] to rely on other authorities or allegations not raised in [its] letter, the Secretary welcomes the opportunity to review them." *Id.*

The United States responded by filing this lawsuit, which is one of at least thirty similar suits seeking disclosure of sensitive voter data.[2] The next day, the United States also filed a motion to compel the production of records—namely, "an electronic copy of the Connecticut statewide Voter Registration List, to include *all fields*, including, each registrant's name, date of birth, address, and as required by HAVA, the last four digits of the registrant's social security number, driver's license/state identification number or the unique HAVA identifier." Pl.'s Mot. to Compel, Dkt. No. 9, at 3; *accord* Mem. in Supp. of Request to Compel Prod. of Recs., Dkt. No. 9-1, at 14 ("Mot. to Compel Br."). The day after that, this Court issued an Order to Show Cause, directing Defendant Stephanie Thomas, the Secretary of State of Connecticut, to respond to the motion to compel. Order to Show Cause, Dkt. No. 10; *see also* Minute Order (Jan. 14, 2026), Dkt. 30 (directing Defendants to respond to the motion to compel and the Complaint).

---

[2] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls* (Feb. 26, 2026), https://perma.cc/67UZ-KJFY; Press Release, U.S. Dep't of Just., *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026), https://perma.cc/3L8Q-SJM5; Press Release, U.S. Dep't of Just., *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026), https://perma.cc/6QP2-8ZXC; Press Release, U.S. Dep't of Just., *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/HHJ7-JWQQ; Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/TQ5T-FB2A; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

## II.    The United States Seeks to Unlawfully Construct a National Voter Database with the Requested Data.

As documented in extensive public reporting and statements by administration officials, DOJ's request for private, sensitive voter data from Connecticut and other states does not appear to relate to voter roll list maintenance under the NVRA or HAVA, the statutes invoked in the December 12 Letter. Instead, the request appears to be in connection with novel efforts by the United States to construct a national voter database, and to otherwise use untested forms of database matching to scrutinize state voter rolls—all part of a broader effort to "nationalize" elections.

According to reporting, federal employees "have been clear that they are interested in a central, federal database of voter information."[3] DOJ is coordinating these unprecedented efforts with the federal Department of Homeland Security ("DHS"), according to reported statements from DOJ and DHS. *Id.*[4] One recent article extensively quoted a lawyer who recently left DOJ's Civil Rights Division, describing the Administration's aims in these cases:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.[5]

---

[3] Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

[4] *See also, e.g.*, Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09.

[5] Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG., Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

Indeed, publicly-disclosed documents have confirmed that DOJ has asked staffers from the new "Department of Government Efficiency" ("DOGE") to identify noncitizens in state voter rolls by matching voter data with data from the Social Security Administration.[6] DOJ officials have since claimed that "we've checked 47.5 million vot[er] records" and found "several thousand non-citizens who are enrolled to vote in federal elections," although reporting indicates that these efforts are producing substantial false positives—*i.e.*, that they are flagging U.S. citizens as being non-citizens who are ineligible to vote.[7]

According to additional public reporting, these efforts are being conducted with the involvement of self-proclaimed election integrity advocates within and outside the government who have previously sought to disenfranchise voters and overturn elections. Those advocates include Heather Honey, who sought to overturn the result of the 2020 presidential election in multiple states and now serves as DHS's "deputy assistant secretary for election integrity."[8] Also involved is Cleta Mitchell, a private attorney and leader of a national group called the "Election Integrity Network," who has, among other things, promoted the use of artificial intelligence to challenge registered voters.[9]

---

[6] *E.g.*, Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025, https://perma.cc/X3Q6-AFJU.

[7] December 5, 2025 Post by @AAGDhillon, https://x.com/AAGDhillon/status/1997003362944251914; Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://perma.cc/6PY2-3F3D.

[8] *See* Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html (documenting "ascent" of election denier Honey); Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAPITAL-STAR, Aug. 27, 2025, https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-election-is-appointed-to-federal-election-post; Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6.

[9] *See, e.g.*, Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters; *see also* Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://perma.cc/J8VZ-X4N4 (reporting that

A recent federal court filing by DOJ further corroborates how United States officials have been seeking to use voter data in conjunction with data-matching and aggregation techniques, with these outside "election integrity" advocates. As detailed in the filing, which was made on behalf of the U.S. Social Security Administration ("SSA"):

> SSA determined in its recent review that in March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrections to the Record at 5, *AFSCME v. Soc. Sec. Admin.*, No. 25-cv-596, Dkt. No. 197 (D. Md. Jan. 16, 2026) ("*AFSCME* Notice").[10] The filing—which does not specify the terms of the "Voter Data Agreement" or the activities these DOGE actors or others undertook pursuant to it—also indicated that, around the same period, DOGE actors also shared unknown amounts of Social Security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." *Id.* at 6.

The current administration has made clear the purpose of these efforts. This month, President Trump announced his desire to "nationalize" elections in certain states: "The Republicans should say, 'We want to take over,'" he said. "We should take over the voting, the voting in at least many—15 places. The Republicans ought to nationalize the voting."[11]

---

Mitchell had received a "full briefing" from federal officials); Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://perma.cc/5W2N-SS2Q ("Mitchell is promoting a tool called EagleAI, which has claimed to use artificial intelligence to automate and speed up the process of challenging ineligible voters.").

[10] *See also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245.

[11] Reid Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026, https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html.

### III.    The United States Seeks to Unlawfully Use the Data to Disenfranchise Voters

Additional federal government documents indicate how the United States ultimately plans to use voters' sensitive personal data: to assert control over voting eligibility in states as part of its efforts to "nationalize" elections, to order the disenfranchisement of voters, and potentially to contest the results of elections. As noted in Defendant-Intervenors' motion to intervene, in connection with its requests for states' voter data, the United States has begun asking states to execute a memorandum of understanding describing how the data will be used. *See* U.S. Dep't of Just., Civ. Div., Confidential Mem. of Understanding, Ex. 2, Mot. to Intervene, Dkt. No. 35-2 ("MOU") (draft agreement); *see also* Declaration of Erik Neff in Support of Motion to Compel, *United States v. Raffensperger*, No. 26-cv-485-ELR, Dkt. No. 31-2, ¶ 21 (N.D. Ga. Feb. 19, 2026) (acknowledging MOU and representing that two states have signed it).[12] The terms of the MOU purport to vest the United States with substantial new authority to identify supposedly ineligible voters on state voter rolls and then to compel states to remove these voters from the rolls, depriving them of the franchise.

The NVRA and HAVA give states the responsibility of conducting a "reasonable effort" to maintain voter lists and remove actually ineligible voters from the rolls. 52 U.S.C. § 20507(a)(4); § 21083(a)(4)(A). The particular procedures developed for complying with HAVA's requirement to maintain a centralized voter file are thus "left to the discretion of the State." 52 U.S.C. § 21085. Moreover, the NVRA builds in significant protections for voters, requiring that, once identified, certain potentially ineligible voters *must* necessarily stay on the rolls for two election cycles so as to limit the likelihood of a state removing eligible voters by mistake. *Id.* § 20507(d)(1)(B). That is consistent with Congress's core goals in the NVRA of

---

[12] An endorsed version of the MOU, bearing DOJ's signature, is attached to this motion as Exhibit 1.

protecting and expanding the right to register to vote and participate in democracy. *E.g.*, 52 U.S.C. § 20501.

The terms of the MOU, however, purport to place authority to identify supposed ineligible voters in the hands of the federal government. MOU at 2, 5. The MOU makes DOJ a "Custodian" of the state's voter file and provides that DOJ will analyze the file and identify "any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's [voter list] for NVRA and HAVA compliance, i.e., that your state's [voter list] only includes eligible voters." MOU at 5. And under the MOU's terms, once federal officials identify supposed "ineligible voters," states would be required to "remov[e]" these voters "within forty-five (45) days" and then resubmit their voter lists for additional analysis. *Id.* These removals would be required under the terms of the MOU notwithstanding the procedural protections afforded to voters by the NVRA, including the statute's firm bar on systematic removals of voters within 90 days of an election, 52 U.S.C. § 20507(c)(2).[13]

DOJ's actions also indicate that it may target specific groups of voters in its use of the requested data. In its initial August 6 Letter to the Secretary, and in letters to other states requesting the same private voter data, DOJ requested information about how election officials, among other things, identify and remove duplicate registrations and verify that registered voters are not ineligible to vote, such as due to a felony conviction or lack of citizenship.[14] *See* August 6 Letter

---

[13] *See also* Jonathan Shorman, *Trump's DOJ Offers States 'Confidential' Deal to Wipe Voters Flagged by Feds as Ineligible*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/.

[14] *See also, e.g.*, Br. in Supp. of Mot. to Intervene as Defs., Exhibit No. 1, Letter from Maureen Riordan to Sec'y of State Al Schmidt (June 23, 2025), *United States v. Pennsylvania*, No. 2:25-cv-1481-CB (W.D. Pa. Oct. 9, 2025), Dkt. No. 37-1 (Pennsylvania); Mot. for Leave to File Mot. to Dismiss, Exhibit A, Letter from Michael E. Gates to Sec'y of State Jocelyn Benson (July 21, 2025), *United States v. Benson*, No. 1:25-cv-1148-HYJ-PJG (W.D. Mich. Nov. 25, 2025), Dkt. No. 34-3 (Michigan); Decl. of Thomas H. Castelli in Supp. of State Defs.' Mot. to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'y of State Tobias Read (July 16, 2025), *United States v. Oregon*, No. 6:25-cv-1666-MTK (D. Or. Nov. 17, 2025), Dkt. No. 33-1 (Oregon); Decl. of Malcolm A. Brudigam in Supp. of Defs.' Mot.

at 1-2. Many of these same voters are uniquely vulnerable to being wrongly removed from the voter rolls based on imperfect data matching systems, including naturalized citizens (who may have indicated they were not a citizen on a government form prior to naturalization) and voters with felony convictions (who may have been previously ineligible to vote before having their rights restored).

In short, extensive public reporting, court filings, and DOJ officials' statements and admissions indicate that the United States's aim in seeking sensitive voter data is to turn states' voter rolls into a tool for unlawfully and improperly mass-challenging voters and interfering with the states' democratic processes.

And recent events have further highlighted the abnormal nature of the United States' request. On January 24, 2026, Attorney General Pamela Bondi wrote a letter to Minnesota Governor Tim Walz, purporting to discuss DHS's "Operation Metro Surge" activities in the Twin Cities amidst ongoing violence against the civilian population there.[15] Like Connecticut, Minnesota has been sued by the federal government seeking access to its unredacted voter rolls. The letter sets out three actions that the federal government wants Minnesota to take to "restore the rule of law, support ICE officers, and bring an end to the chaos," one of which is to "allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's

---

to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'y of State Shirley Weber (July 10, 2025), *United States v. Weber*, No. 2:25-cv-9149 (C.D. Cal. Nov. 7, 2025), Dkt. No. 37-2 (California).

[15]   *Read Bondi's Letter to Minnesota's Governor*, N.Y. TIMES, Jan. 24, 2026, https://www.nytimes.com/interactive/2026/01/24/us/pam-bondi-walz-doc.html ("Bondi Letter"); *see also* Order, *Tincher v. Noem*, No. 0:25-cv-4669 (D. Minn. Jan. 16, 2026), Dkt. No. 85 (granting injunction against certain DHS practices towards the civilian population of Minneapolis-St. Paul in connection with purported immigration enforcement operations there).

voter registration practices comply with federal law as authorized by the Civil Rights Act of 1960."[16]

## LEGAL STANDARD

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, it does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court need not accept a complaint's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nor can "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," survive a motion to dismiss. *Id*. at 678-79. Additionally, it is "well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998). Courts may consider, in addition to the complaint, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (citation omitted).

## ARGUMENT

### I.    The United States Is Not Entitled to Summary Proceedings for its Data Request.

In its motion to compel, the United States claims that its request is not subject to meaningful procedural safeguards, in particular scrutiny under Federal Rule of Civil Procedure 12. It asserts that Title III universally "displaces the Federal Rules of Civil Procedure by creating a 'special statutory proceeding'" where "'[a]ll that is required is a simple statement by the Attorney General[,]'" made after "a written demand for Federal election records and papers covered by the statute, explaining that the person against whom an order is sought has failed or refused to make

---

[16] Bondi Letter at 2-3.

the requested records" available. Mot. to Compel Br. at 5 (citations omitted); *see also* Compl. ¶¶ 1-4.

The CRA says nothing of the sort, and binding precedent and the Federal Rules are to the contrary. "Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause." *Weber*, 2026 WL 118807, at *8; *accord Oregon*, 2026 WL 318402, at *8 ("There is no current or binding authority for the proposition that Title III precludes the Court from evaluating the sufficiency of Plaintiff's allegations regarding Defendants' alleged failure to comply with Title III, including whether—applying Rule 12(b)(6) standards—a valid Title III demand was made in the first place.").

Start with the text. Title III provides that when the Attorney General makes a demand for voting-related records or papers, the federal district court where such demand is made "shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). This "appropriate process" is set forth in the Federal Rules of Civil Procedure, which, with limited exception, "govern the procedure in *all* civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1 (emphasis added). The Rules contain limited and narrow carveouts to their own application, none of which include the claim under Title III at issue here. *See* Fed. R. Civ. P. 81; *Brennan-Centrella v. Ritz-Craft Corp. of Pa.*, 942 F.3d 106, 111 (2d Cir. 2019) ("As a matter of statutory construction, . . . mention of one impliedly excludes others." (internal quotation marks omitted)). Indeed, Rule 81 affirmatively states that the Rules *do* apply in "proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute . . . ." Fed. R. Civ. P. 81.[17]

---

[17] This is why *Benson* was incorrect to state in dicta that "most of the Federal Rules of Civil Procedure are simply

Binding precedent is in accord. The Supreme Court has held that the Federal Rules of Civil Procedure apply to summonses. *See Donaldson v. United States*, 400 U.S. 517, 528 (1971) ("The Civil Rules, of course, do have an application to a summons proceeding." (citing Fed. R. Civ. P. 81)), *superseded by statute on unrelated grounds as recognized by Polselli v. IRS*, 598 U.S. 432 (2023); *accord Becker v. United States*, 451 U.S. 1306, 1307-08 (1981) (Rehnquist, J., in chambers) (same). Indeed, shortly after the enactment of Title III, the Court held that proceedings under the IRS's authority to compel production of records were governed by the Federal Rules and that the government bore the burden to establish the statutory requirements prior to enforcement. *See United States v. Powell*, 379 U.S. 48, 57-58 (1964). The IRS statute is materially identical to Title III.[18] *Compare* 26 U.S.C. § 7604(a) ("[T]he United States district court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data[.]"), *with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper."). Any assertion that *Powell* does not control because of other text within the IRS statutes must fail on the basis of *Powell* itself: the Supreme Court explained that "the Federal Rules of Civil Procedure apply" expressly "[b]ecause [§] 7604(a)

---

inapplicable to the enforcement of an administrative subpoena." 2026 WL 362789, at *10 (internal quotation marks omitted). Indeed, the Federal Rules apply generally to the actions seeking to compel production of documents, whether or not they are pursuant to a federal subpoena. For example, in applications made under 28 U.S.C. § 1782, an analogous statute allowing parties to seek discovery for use in foreign proceedings, the procedures laid out in the Federal Rules still apply. *See, e.g.*, *Sampedro v. Silver Point Cap., L.P.*, 958 F.3d 140, 142 n.1 (2d Cir. 2020) (approving of the district court's application of Rule 72(a), providing the standard of review of a magistrate judge's decision); *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 135 (2d Cir. 2017) (endorsing the issuance of a protective order under Rule 26(c)).

[18] It is unclear whether the United States argues that *Powell* is distinguishable as applying only to IRS subpoenas, as opposed to other administrative subpoenas. Regardless, any such argument is foreclosed by Second Circuit precedent, which has applied the *Powell* framework to cases involving administrative subpoenas issued by agencies other than the IRS. *See, e.g.*, *In re Gimbel*, 77 F.3d 593, 596 (2d Cir. 1996) (FDIC subpoena); *SEC v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047, 1053 (2d Cir. 1973) (SEC subpoena).

contains no provision specifying the procedure to be followed in invoking the court's jurisdiction." *Powell*, 379 U.S. at 58 n.18 (emphasis added).[19]

In its motion to compel, the United States relies primarily on out-of-Circuit cases from more than sixty years ago and does not point to any more recent caselaw supporting its position on summary proceedings. *See* Mot. to Compel Br. 5-7, 13.[20] In particular, it extensively cites *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), which arose out of the specific context of the Jim Crow South and was decided prior to the Supreme Court's decision in *Powell*—which, unlike *Lynd*, is binding on this Court. *See Oregon*, 2026 WL 318402, at *8 ("[T]he Supreme Court's holding in *Powell* squarely rejects Plaintiff's contention and reliance on *Lynd*.").

The United States' reliance on *Lynd* is misplaced for multiple reasons. For one, as this Court noted, the United States affirmatively chose to "commence[] this matter with the filing of a Complaint." *See* Minute Order, Dkt. No. 30 (Jan. 14, 2026). The United States affirmatively invoked the Rules to initiate this litigation and to defend its pleadings elsewhere, and therefore it cannot now disclaim them because the results proved unfavorable. *See Oregon*, 2026 318402, at *8 n.1 ("Even if *Lynd* applied here, the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation. By contrast, *Lynd* appears to contemplate an application directly to the court for the records.").

---

[19] Although DOJ may note that the Internal Revenue Code contains a provision barring the IRS from subjecting taxpayers "to unnecessary examination or investigations," 26 U.S.C. §7605(b), this substantive prohibition has nothing to do with the "appropriate process" relevant to requests under Title III. Moreover, Title III does contain substantive limitations, including on the type of records that may be demanded, *see* Section II, and the written statement that the Attorney General must provide.

[20] Even if *Lynd* and other early Fifth Circuit cases are treated as persuasive authority, they do not create the unfettered authority that the United States describes. *See In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) (acknowledging that while "[t]he right of free examination of official records is the rule" under Title III there could be "exception[s]" where "the purpose is speculative, or from idle curiosity"). *Lynd* noted that the CRA authorizes jurisdiction by "appropriate process" to compel production, 52 U.S.C. § 20705, which the court had "no doubt" would "include the power and duty to issue protective orders"—such as orders protecting and redacting sensitive information. 306 F.2d at 230.

Nor is the information sought here at all analogous to the data requests at issue in *Lynd* and the other early cases DOJ cites. Those cases were decided before sensitive personal identifying information, such as a Social Security number or driver's license number, became widely collected as part of a person's voter registration record, and before the passage of landmark federal statutes protecting such information.[21] Even then, *Lynd* explicitly noted that the records at issue were not sensitive or private. 306 F.2d at 231 ("[W]e are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection . . . .").

At bottom, *Lynd* and the United States' other Fifth Circuit cases emerged out of a radically different context. The United States acknowledges that "[c]aselaw addressing the CRA in any depth is confined to courts within the Fifth Circuit in the early years following the CRA's enactment. Since then, courts have not had occasion to revisit the issue." Mot. to Compel Br. at 4 n.1. But the United States studiously ignores why that is the case. *Lynd* was decided by the Jim Crow-era Fifth Circuit, consisting of Alabama, Florida, Georgia, Louisiana, Mississippi, and Texas.[22] In these states, election officials notoriously used every possible means to block Black Americans from registering to vote.[23] Congress enacted Title III to facilitate discrimination suits against recalcitrant Jim Crow counties that refused to process the voter registrations of Black voters and that stymied every effort to enforce federal law, sometimes with help from friendly judges. *Lynd*, 306 F.2d at 228 ("[Title III's] purpose is to enable the Attorney General to determine

---

[21] *E.g.*, Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (1974); Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), *codified at* 18 U.S.C. §§ 2721 *et seq.*; E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002); Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (2014), *codified at* 44 U.S.C. §§ 3351 *et seq.* (2014).

[22] "Federal Judicial Circuits: Fifth Circuit," FEDERAL JUDICIAL CENTER, https://perma.cc/9MSD-EFRB (last visited Jan. 21, 2026).

[23] *See generally*, *e.g.*, Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976).

whether [52 U.S.C. § 10101 pattern-or-practice] suits or similar actions should be instituted. And it is to enable him to obtain such evidence for use in such cases if and when filed."). By the time *Lynd* was decided, the county registrar defendants had already spent eighteen months filing "a series of motions, motions to dismiss, opposing substitution motions for more definite statement and briefs and repeated extended oral arguments thereon," all "with no clear-cut ruling, no indication that this interminable proceeding would ever come to an end, and certainly never an order for production." *Id.* at 227.

It was against this backdrop of open, explicit discrimination and prolonged abuse of judicial process that the Fifth Circuit noted that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226 (internal citation omitted). In that context, "the factual foundation for" the basis and the purpose of the Attorney General's request was self-evident, and plenary consideration thus not required. *See id.* That court's treatment of the CRA cannot be divorced from its context. By contrast, here, more than sixty years later, the context of *this* request could not be more different. The United States has invoked the CRA for unprecedented purposes, to make sweeping demands for extensive voter data with no showing or claim of legal deficiencies or violations of rights, while making unprecedented demands for sensitive personal information.

After choosing to initiate this action by filing a Complaint in accordance with the procedures set forth in the Federal Rules, the United States attempts to get out from under the consequences. It relies on *Lynd*—which is not binding, did not concern the sensitive voter information of the type at issue here, and emerged from a radically different procedural and factual context—to insist it is entitled to summary relief without *any* review of its statutorily required

stated basis and purpose. Under the Rules' plain text and binding precedent, this is not the law. "Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures." *See Weber*, 2026 WL 118807, at *8. Because the Rules apply, the Complaint must survive scrutiny under Rule 12—which it does not.[24]

## II.    The United States Seeks Records Outside the Scope of Title III.

Turning to the substance of the request, the Western District of Michigan has held that the United States' request for a statewide voter file sought records not covered by Title III. *See Benson*, 2026 WL 362789, at *11. The same is true here.

Recall that Section 301 requires elections officials to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Section 303—the provision granting the Attorney General authority to request records—only obligates officials to turn over "[a]ny record or paper required by [Section 301] to be retained and preserved," *id.* § 20703—that is, records that have "come into [their] possession," *id.* § 20701. While "all records and papers" is indeed sweeping language, Title III is distinct from other statutory records provisions in that it provides an immediate textual limitation on this broad language. As held by *Benson*, the phrase "come into . . . possession," refers to records that elections officials obtain, rather than those they create. 2026 WL 362789, at *9 ("Congress frequently uses the phrase 'come into possession' to refer to items that a person *obtains* rather than *creates*." (emphasis in original) (collecting federal statutes)). District courts in this Circuit have similarly equated "coming into possession" with receipt. *See, e.g., SEC*

---

[24] In addition to Rule 12, the Rules' provisions for discovery are relevant here. *See generally* Fed. R. Civ. P. 26. Discovery is particularly important for this application under Title III because of the compelling evidence that DOJ's stated purpose is pretextual—meaning it has not provided a statement of *the* basis and *the* purpose for its request. *See* Section III.B.

*v. Infinity Q Diversified Alpha Fund*, No. 22-cv-9608 (PKC), 2025 WL 2792571, at *4 (S.D.N.Y. Oct. 1, 2025) ("'Receive' means 'to come into the possession of.'" (citing Merriam Webster's Dictionary)); *Chiarenza v. IBSG Int'l, Inc.*, No. 09-cv-408 (RRM) (MDG), 2009 WL 10706707, at *2 n.2 (E.D.N.Y. Sept. 10, 2009) (distinguishing between information someone or his agents "may possess" already and information "which comes into [their] possession").

As *Benson* noted with respect to Michigan, Connecticut's statewide voter registration file is a live, continuously updated document created by state officials—so it is not a record or paper "which come[s] into [election officials'] possession." *Benson*, 2026 WL 362789, at *10. This reading also makes sense in light of the history that motivated Title III, that is, the destruction of Black Americans' voter registration forms by state officials. *See id.* at *9 (citing a 1959 report from the United States Commission on Civil Rights finding that "[r]ejected [voter registration] applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible").[25] The records DOJ seeks from Connecticut officials are not ones that "come into [their] possession," 52 U.S.C. § 20701—they are records that those officials create themselves. DOJ's request therefore falls outside of the scope of Title III, so its demand fails as a matter of law and this case should be dismissed for this reason alone.

## III.    The Complaint Fails to State a Claim Under Title III, Because It Does Not Adequately Plead That DOJ Has Provided a Written Statement of Its Basis and Purpose.

Even if DOJ sought records covered by the CRA, the law requires that when the Attorney General makes a demand for records under Title III, she must provide "a statement of the basis

---

[25] Moreover, accepting DOJ's argument that a state's voter registration list is a record covered by Title III would lead to absurd consequences: because Title III requires that elections officials—under threat of criminal sanctions—retain and preserve any covered records, the state would be forced to archive a copy of its voter registration file every time a voter is added or deleted from the rolls—something which occurs dozens of times a day. *Compare* Conn. Sec'y of State, *Registration & Party Enrollment Statistics as of October 31, 2024*, https://perma.cc/6W2S-8GYE, *with* Conn. Sec'y of State, *Registration & Party Enrollment Statistics as of October 17, 2025*, https://perma.cc/F9PS-UVPL (showing net change of almost one hundred voters per day).

and the purpose therefor." 52 U.S.C. § 20703. The statements that DOJ offers fail to clear this bar twice over: one, they are inadequate, particularly in light of the scope of DOJ's unprecedented demand for Connecticut's full and unredacted state voter registration list, and two, they are pretextual, contradicted by a growing pile of judicially-noticeable evidence. The United States has not established it is entitled to its requested relief, so the Complaint fails to state a claim for relief for this independent reason.

### A.  DOJ's statement of the basis and the purpose for its request is inadequate.

Title III of the CRA sets out retention requirements regarding federal election records, 52 U.S.C. § 20701, and requires that "[a]ny record or paper" required to be retained "shall, upon demand in writing by the Attorney General or [her] representative . . . be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative," *id*. § 20703. "This demand shall contain a statement of *the basis and the purpose therefor*." *Id*. (emphasis added).

The "basis" and "purpose" are distinct concepts. The "basis" is an explanation of why the Attorney General believes there is a violation of federal civil rights law. *See Lynd*, 306 F.2d at 229 n.6; *Oregon*, 2026 WL 318402, at *9 (holding the basis prong requires "a factual basis for investigating a violation of a federal statute"); *Weber*, 2026 WL 118807, at *9 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."). The "purpose" is an explanation of how the requested records would help determine if there is a violation. *See Lynd*, 306 F.2d at 229 n.6; *Oregon*, 2026 WL 318402, at *11 ("[T]he 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights.").

DOJ's requests fail to provide "a statement of the basis and the purpose" sufficient under

the statute to support disclosure of the unredacted voter file. *Id*. Here, the Complaint offers only the allegation: "The written demand 'contain[ed] a statement of the basis and the purpose therefor.'" Compl. ¶ 30 (citation omitted). This is a legal conclusion—a "formulaic recitation[] of the elements of a cause of action" rather than "*factual* allegations . . . [that are] enough to raise a right to relief above the speculative level." *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (emphasis in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

The letters incorporated by reference into the Complaint provide little more. The August 6 Letter does not mention the CRA at all. *See* August 6 Letter. And the December 12 Letter—which is the first to mention the CRA—likewise includes only a bare allegation that the purpose is to "ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA." December 12 Letter at 2. Neither the Complaint nor the letters allege anything amiss with Connecticut's list maintenance. This omission is fatal. *See Weber*, 2026 WL 118807, at *9-10 (detailing how the United States did not meet the statutory "basis" requirement as it failed to provide any reason why it believed the state violated federal law in comparable action against California).

Even if the United States had provided a proper "basis" for its demand—and it did not—it fails to explain any connection between its purported "purpose" and the request for the full and unredacted voter file. DOJ bluntly asserts that federal law requires certain information to appear on voter registration applications and that this information is necessary to evaluate Connecticut's compliance with HAVA and the NVRA. *See* Mot. to Compel Br. at 10. But this misunderstands Connecticut's obligation: to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," 52 U.S.C. § 20507; Compl. ¶ 11.

In fact, unredacted voter registration files are not necessary to investigate Connecticut's compliance: A single snapshot of a state's voter list does not and could not provide enough information to determine if the state has made a "reasonable effort" to remove ineligible voters under Section 8 of the NVRA. Compl. ¶ 11; 52 U.S.C. § 20507(a)(4)(A)–(B). The NVRA and HAVA both leave the mechanisms for conducting list maintenance within the State's discretion. *See* 52 U.S.C. § 20507(a)(4), (c)(1); § 21083(a)(2)(A), § 21085. The procedures carried out by a state or locality establish its compliance; the unredacted voter file does not. Even were the United States to use voter file data to identify voters who had moved or died on Connecticut's voter list at a single point in time, that would not amount to Connecticut failing to comply with the "reasonable effort" required by the NVRA or HAVA. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624-27 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this voter list maintenance context).

The basis and purpose requirement under the CRA is a "critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 2026 WL 118807, at *9. The statutory requirement is not perfunctory; it requires a specific statement as to the reason for requesting the information and how that information will aid in the investigatory analysis. *See Oregon*, 2026 WL 318402, at *9 ("If *any* purpose—regardless of its relationship to the purposes of the statute itself would suffice, then the requirement of stating the demand's purpose would serve no function."). In the context of administrative subpoenas, and specifically in assessing an analogous power by which federal agencies obtain records in service of investigations, courts have found that the test of judicial enforcement of such subpoenas includes an evaluation of whether the investigation is "conducted pursuant to a legitimate purpose," *Powell*, 379 U.S. at 57, and that

such subpoenas "may not be so broad so as to be in the nature of a 'fishing expedition,'" *Peters v. United States*, 853 F.2d 692, 700 (9th Cir. 1988); *accord United States v. Construction Prods. Research Inc.*, 73 F.3d 464, 471 (2d Cir. 1996) (similar). Such purpose requirements ensure that the information sought is relevant to the inquiry and not unduly burdensome. *See, e.g.*, *CFPB v. Law Offices of Crystal Moroney*, 63 F.4th 174, 185 (2d Cir. 2023).

As such, even if some other voting records or some portion of the voter file were necessary to investigate Connecticut's "compliance with federal election law, particularly the NVRA and HAVA," Compl. ¶ 8, the United States has not provided any justification for why the full unredacted voter file is necessary. For decades, DOJ has neither sought nor required a full, unredacted voter file in its NVRA compliance investigations. *See, e.g.*, Press Release, U.S. Dep't of Just., *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018), https://perma.cc/G2EZUUA5 (describing letters to all 44 states covered by the NVRA with requests for list maintenance information but without demanding voter files). The United States' failure to articulate the basis and the purpose for its demand for the *full and unredacted* voter file is fatal to its request.

**B.  DOJ's statement of the basis and the purpose for its request is pretextual.**

The government's statement is not just insufficient as a matter of law; it is also pretextual. Section 303 requires a statement of "the basis and the purpose" of a records request, and by twice using the definite article, the statute requires not just *a* basis or purpose among many, but *the actual* basis and purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–66 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the definite and indefinite article). But the United States has not disclosed the actual purpose for its requests, and this Court "is not obliged to accept a contrived statement and purpose" in place of an accurate one. *Weber*, 2026 WL 118807, at *10.

This is yet another ground for dismissal.

In considering a motion to dismiss, a court may consider judicially noticeable facts, which include "relevant matters of public record." *Giraldo v. Kesller*, 694 F.3d 161, 164 (2d Cir. 2012). Here, such matters include the fact that DOJ has filed at least thirty lawsuits under the CRA, seeking to compel the voter registration lists of states and the District of Columbia, as well as DOJ's admissions in court. *See Global Network Comm'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (contemplating judicial notice of "the fact of . . . litigation and related filings"). The Court may also take judicial notice of DOJ's documents, such as Attorney General Bondi's letter leveraging the continued deployment of federal law enforcement against production of Minnesota's voter file and the executed MOU, bearing the DOJ seal and signatures from the head of the Civil Rights Division, as well as President Trump's comments regarding nationalizing elections. *See N.Y. Times Co. v. U.S. Dep't of Just.*, 756 F.3d 100, 110-11 n.8 (2d Cir. 2014) (taking judicial notice of statements made by President Obama in a graduation speech and by Attorney General Eric Holder in a letter to the Senate); *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) ("[O]n a motion to dismiss, a court may consider . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." (citation omitted)). Indeed, this Court need not shut its eyes to the true purpose of DOJ's request, even on a motion to dismiss. *See, e.g.*, *Cangemi v. United States*, 13 F.4th 115, 124 n.4 (2d Cir. 2021) (taking judicial notice of factual truth of representations made on U.S. Army Corps of Engineers' website regarding the progress of the study at issue in litigation); *23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174, 183 n.7 (taking judicial notice of a poster published by an anti-smoking group for the proposition that wall displays of cigarettes near registers is a form of promotion).

Judicially noticeable materials show that compliance with the NVRA and HAVA is not the true basis and purpose for DOJ's data requests. Far from ensuring compliance with the NVRA and HAVA, the memorandum of understanding that DOJ has proposed to states actually *runs afoul* of those statutes. As noted, the NVRA and HAVA require a state to conduct a "reasonable effort" to remove ineligible voters from the rolls, 52 U.S.C. §§ 20507(a)(4), 21083(a)(4)(A), and the NVRA includes safeguards to protect voters from erroneous removal, 52 U.S.C. § 20507, including requirements that certain voters *must* necessarily stay on the rolls for two election cycles so as to limit the likelihood of a state removing eligible voters by mistake, *id.* § 20507(d)(1)(B). But the MOU indicates multiple contemplated violations of those statutory requirements. First, it seeks to place authority to identify supposed ineligible voters in the hands of the federal government, contrary to statutory text, *id.* § 21085 (methods of complying with HAVA "left to the discretion of the State"). MOU at 2, 5. Second, its substantive terms seek to compel states to remove supposedly ineligible voters "within forty-five (45) days," MOU at 5, in a way that would violate multiple protections of the NVRA, 52 U.S.C. § 20507. The MOU shows that the United States' supposed purpose is not in compliance with federal law but usurping state authority in ways contrary to federal law.

Instead, public reporting and public, judicially noticeable documents confirm that the United States' *actual* purpose is not to ensure compliance with the NVRA and HAVA, but to build an unprecedented national voter file through novel, error-prone forms of data-matching and to use this tool to identify supposedly ineligible voters and then challenge their right to vote. *See* Background, Sections II & III. As *Weber* characterized it, considering a more limited set of the public reporting and documents than those presented here, "[i]t appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a

24

centralized federal database." 2026 WL 118807, at *10; *accord Oregon*, 2026 WL 318402, at *11, *13 (similar). As Congress has never authorized the creation of such a database, its creation would violate the federal Privacy Act. *See* 5 U.S.C. § 552a(e)(7) (prohibiting the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote); *Weber*, 2026 WL 118807, at *17-19 (detailing the way in which the federal government's data demands "violate the Privacy Act").

The United States' failure to honestly disclose what it is doing and will do with voters' sensitive personal information—to state *the* true purpose for the demand for Connecticut voters' protected personal data—is independently fatal to the CRA claim. "Congress passed the NVRA, Civil Rights Act, and HAVA to protect voting rights. If DOJ wants to instead use these statutes for more than their stated purpose, circumventing the authority granted to them by Congress, it cannot do so under the guise of a pretextual investigative purpose." *Weber*, 2026 WL 118807, at *12; *accord Oregon*, 2026 WL 318402, at *11 ("The presumption of regularity that has been previously extended to [the United States] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds.").

Under the circumstances here, the United States' invocation of Title III of the CRA fails in multiple ways to provide a statutorily sufficient "statement of the basis and the purpose" for its demand and does not comply with the CRA. Dismissal is proper.[26]

## IV.    Nothing in Title III Entitles DOJ to Unredacted Records.

Even if disclosure were appropriate, sensitive personal voter information would still be

---

[26] Dismissal on the grounds set forth above would also be proper under Federal Rule of Civil Procedure 12(c) or after discovery regarding the United States' purported basis and purpose for its requests pursuant to Federal Rule of Civil Procedure 56.

subject to redaction, which is not barred under Title III. Indeed, courts have found that redaction may be required to prevent the disclosure of sensitive personal information that would create an intolerable burden on the constitutional right to vote. While DOJ states that it will comply with all relevant federal privacy protections, *see* Mot. to Compel Br. at 9, redaction is particularly appropriate in light of DOJ's admissions that federal government officials have shared sensitive Social Security information with third-parties seeking to challenge registrations and (as DOJ itself states) "overturn elections." *AFSCME* Notice at 5-6.[27]

As discussed, Title III was enacted prior to the collection of sensitive personal information, particularly driver's license or Social Security numbers, as part of voter registration. *See* Section I. It makes sense that caselaw from this period (which DOJ insists has great persuasive value) distinguishes the records then at issue—"public records which ought ordinarily to be open to legitimate reasonable inspection"—from "confidential, private papers and effects." *Lynd*, 306 F.2d at 231. Indeed, the public version of the voter file today is in fact "ordinarily . . . open to legitimate reasonable inspection"; it is only the uniquely sensitive fields that are not. The information collected as part of registering to vote has changed over time, meaning courts adjudicating requests for records under Title III must now consider voters' privacy interests.

Cases interpreting Section 8(i) of the NVRA are instructive,[28] because courts have consistently permitted—and sometimes required—redaction of voters' sensitive personal data before disclosure to protect voter privacy and ensure compliance with federal and state law. Like the CRA, the NVRA is silent as to how sensitive personal information should be treated during disclosure. *See* 52 U.S.C. §§ 20703, 20507(i)(1). As here, Courts must interpret the NVRA's

---

[27] This is also why Connecticut's participation in the Electronic Registration Information Center, which facilitates information sharing among states, is of no moment.

[28] DOJ itself notes that the NVRA and CRA should be interpreted similarly. *See* Mot. to Compel Br. at 13 n.3.

disclosure provisions in a manner that does not unconstitutionally burden the right to vote. *See United States v. Kozeny*, 541 F.3d 166, 176 (2d Cir. 2008) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." (quoting *Jones v. United States*, 529 U.S. 848, 857 (2000))).

Federal courts have consistently struck this balance, interpreting the "all records concerning" language in Section 8(i)[29] to permit—and sometimes require—redaction and the protection of confidential materials. As the First Circuit has noted, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," and such redaction "can further assuage the potential privacy risks implicated by the public release of the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021) (NVRA disclosure provisions "must be read in conjunction with the various statutes enacted by Congress to protect the privacy of individuals and confidential information held by certain governmental agencies" and protecting sensitive information from disclosure); *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023) (similar); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022) (similar).

Redaction also may be affirmatively required if the disclosure would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth

---

[29] Specifically, Section 8(i) of the NVRA requires that: "Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," with exceptions "to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1).

Amendments." *See, e.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) (quotation marks and citation omitted). The Fourth Circuit, even while granting access to voter registration applications, affirmed the importance of redacting Social Security numbers, which are "uniquely sensitive and vulnerable to abuse." *Id.*[30] The court emphasized that the NVRA reflected Congress's view that the right to vote was "fundamental," and that the unredacted release of records risked deterring citizens from registering to vote and thus created an "intolerable burden" on this fundamental right. *Id.* at 334, 339; *cf. In re Coleman*, 208 F. Supp. at 200 (noting, in the context of a Title III records request, multiple considerations which could be "[s]ignificant," including whether "official records are privileged, or exempt from discovery for any sound reason of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right"). As such, public disclosure provisions such as those in the NVRA and Title III must be interpreted to avoid this unconstitutional burden. *See Long*, 682 F.3d at 339; *Bellows*, 92 F.4th at 56.

The same privacy and constitutional concerns warranting redactions under the NVRA apply equally to requests under the CRA. *Cf. Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 281-82 (2024) (Gorsuch, J., concurring) ("[O]ur Constitution deals in substance, not form. However the government chooses to act, . . . it must follow the same constitutional rules."). And even DOJ's preferred case law acknowledges that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230, such as the redaction of sensitive fields that courts have consistently

---

[30] The United States itself has explained—on multiple occasions—that the NVRA does not prohibit the States from redacting "uniquely sensitive information" when disclosing voting records. *See, e.g.*, Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows*, No. 23-1361 (1st Cir. July 25, 2024), 2023 WL 4882397 at *27–28; Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found. v. Schmidt*, No. 23-1590 (3d Cir. Nov. 6, 2023), https://perma.cc/3BQ9-36UJ ("States may redact certain information before disclosing Section 8(i) records."); Br. for the United States as Amicus Curiae, *Project Vote/Voting for Am., Inc. v. Long*, No. 11-1809 (4th Cir. Oct. 18, 2011), 2011 WL 4947283, at *11, 25–26.

determined are entitled to protection from disclosure.[31]

## CONCLUSION

For all these reasons, the United States' Motion to Compel should be denied and the

Complaint dismissed.

Dated: February 27, 2026                          Respectfully submitted,


William Hughes*                                   */s/William Hughes*
Theresa J. Lee*                                   Joseph Gaylin (#ct32089)
Sophia Lin Lakin*                                 Elana Bildner (#ct30379)
AMERICAN CIVIL LIBERTIES UNION                    Dan Barrett (#ct29816)
FOUNDATION                                        Jaclyn Blickley (#ct31822)
125 Broad St., 18th Floor                         AMERICAN CIVIL LIBERTIES UNION
New York, NY 10004                                FOUNDATION OF CONNECTICUT
(212) 549-2500                                    P.O. Box 230178
whughes@aclu.org                                  Hartford, CT 06123
tlee@aclu.org                                     (860) 471-8471
slakin@aclu.org                                   jgaylin@acluct.org
                                                  ebildner@acluct.org
Patricia Yan*                                     dbarrett@acluct.org
AMERICAN CIVIL LIBERTIES UNION                    jblickley@acluct.org
FOUNDATION
915 15th St. NW                                   *Counsel for Defendant Intervenors Common*
Washington, DC 20001                              *Cause and Claire Ewing*
(202) 457-0800
pyan@aclu.org                                     * Admitted *pro hac vice*

---

[31] The United States cites *Crook v. S.C. Election Comm.*, No. 2025-CP-40-06539 (S.C. Ct. C.P. Oct. 1, 2025), a non-binding decision which briefly discussed Title III in dicta. Mot. to Compel Br. at 12. *Crook* did not address arguments regarding the need to redact sensitive voter information or Title III's scope or basis-and-purpose requirement, so it carries little persuasive weight.