IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>STEPHANIE THOMAS, in her Official Capacity as Secretary of State for the State of Connecticut,<br><br>*Defendant*. | Case No. 3:256-cv-00021 (KAD) |

**AMICUS BRIEF OF THE DEMOCRATIC NATIONAL COMMITTEE**

## I.     INTRODUCTION

Federal law authorizes the Attorney General to demand voter registration records, but she cannot do so based on a misrepresentation. Rather than disclosing "the basis and the purpose" for its demand for the complete, unredacted Connecticut voter file—as Title III of the Civil Rights Act of 1960, 52 U.S.C. § 20703, requires—the U.S. Department of Justice ("DOJ") suggests it is engaged in routine enforcement of federal civil rights laws. To the contrary, DOJ is consolidating state databases into a national voter file and seemingly intends to transfer the personally identifying information and party affiliation of every registered voter in Connecticut to the Department of Homeland Security ("DHS"). This deception invalidates the Title III demand. A DOJ that cannot be forthright with state officials cannot be trusted with the personal information of every registered voter in Connecticut. The Democratic National Committee ("DNC") submits this amicus brief to protect the privacy of its members and the interests of its candidates and campaigns in free and fair elections and respectfully requests that this Court deny DOJ's Motion for Order to Compel and grant Secretary Thomas's Motion to Dismiss.

## II.    INTEREST OF AMICUS CURIAE

The DNC is the oldest continuing party committee in the United States. Its purposes and functions are to communicate the Democratic Party's position on issues, protect voters' rights, and aid the election of Democratic candidates nationwide, including by organizing citizens to register to vote and to cast ballots in favor of Democratic candidates. The DNC represents millions of voters, including nearly 800,000 registered Democrats in Connecticut.

DOJ has demanded a copy of the State of Connecticut's complete, unredacted voter registration list. This demand forces Democrats to choose between participating in elections and the privacy and security of their personal information. Conditioning the right to vote on the release

of private information "creates an intolerable burden on that right." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012). The concerns of ordinary Democrats are amplified by uncertainty as to the intended use of their data. In turn, the DNC has a significant protectable interest in the success of Democratic candidates, and pressure on Democrats to avoid registration or even remove themselves from the voter rolls would impose an intolerable burden on that interest. *See, e.g., Paher v. Cegavske*, No. 3:20-cv-243, 2020 WL 2042365, at *2–3 (D. Nev. Apr. 28, 2020); *cf. Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 519–21 (2026).

### III.    BACKGROUND

In June 2025, DOJ began sending letters demanding complete, unredacted copies of state voter files, and a senior official eventually acknowledged that DOJ intends to send demands to all 50 states. *See* Jonathan Shorman, *DOJ Plans to Ask All States for Detailed Voting Info*, Stateline, Aug. 1, 2025, https://perma.cc/526V-97C3. Early letters indicated that the files would be used to oversee "HAVA compliance" (*i.e.*, compliance with the Help America Vote Act of 2002) or "full compliance with the NVRA," the National Voter Registration Act of 1993. *See, e.g.*, Ltr. from Maureen Riordan, U.S. Dep't of Justice, to Steve Simon, Minn. Sec'y of State (June 25, 2025), https://perma.cc/NZ9N-FCDC; Ltr. from Michael E. Gates, U.S. Dep't of Justice, to Deirdre Henderson, Lt. Gov. of Utah (July 15, 2025), https://perma.cc/FV8G-W965. DOJ has since confirmed that it is sharing lists with DHS and developing a national voter file. *See* Tr. 120:6–121:2, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Dec. 12, 2025), ECF No. 92; The Independent Institute, *Harmeet Dhillon | Trump DOJ: Ensuring Election Integrity and Fixing Immigration* (Dec. 9, 2025), https://www.youtube.com/watch?v=FLtqQqt2FwA (at 1:59) (describing data comparison between states); Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, Stateline, Sept. 12, 2025, https://perma.cc/C6RQ-6ATP (quoting

DOJ and DHS statements); Devlin Barrett and Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times, Sept. 9, 2025, https://perma.cc/9PM4-2A6R. Collectively, these admissions and recent DOJ actions cast "serious doubt as to the true purposes for which [DOJ] is seeking voter registration lists in this and other cases." *United States v. Oregon*, No. 6:25-cv-1666, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026).

On August 6, 2025, DOJ sent a letter to Connecticut Secretary of State Stephanie Thomas posing questions regarding voter registration list maintenance and Connecticut's responses to the U.S. Election Assistance Commission's biennial Election Administration and Voting Survey ("EAVS"), as well as requesting data on "registered voters identified as ineligible to vote." Aug. 6 Ltr. at 1–2, ECF 9-2. Unlike contemporaneous letters to other states, the August 6 letter did not request a copy of Connecticut's complete voter file. *See id.* at 2. *But see* Compl. ¶ 21, ECF No. 1 (alleging the August 6 letter requested a copy of the file). Secretary Thomas responded to this letter 14 days later and indicated that she would provide duplicate and felony conviction data "as soon as practical." Aug. 20 Ltr. at 1–4, ECF No. 9-3. Nearly four months hence, DOJ sent a second letter demanding a copy of Connecticut's statewide voter registration database, to contain "all fields," including "the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's [S]ocial [S]ecurity number. Dec. 12 Ltr., ECF No. 9-4. The letter asserted that Section 11 of the NVRA, 52 U.S.C. § 20510, and Section 401 of HAVA, 52 U.S.C. § 41111, provide authority to demand unredacted voter files. *Id.* at 1–2. The second letter also invoked Title III of the Civil Rights Act of 1960 ("Title III"), 52 U.S.C. §§ 20701–06, as authority for the demand and stated, "The purpose of this request is to ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 2. This letter requested the unredacted voter file within fourteen days, *i.e.*, by the

day after Christmas. *Id.* at 3. On Christmas Eve, the Office of the Secretary of State declined to provide the unredacted voter file. *See* Dec. 24 Ltr., ECF No. 9-5.

On January 6, 2026, DOJ filed suit against Secretary Thomas, demanding production of the complete, unredacted Connecticut voter file, solely pursuant to Title III. Compl. ¶¶ 29–31. The next day, DOJ filed a "motion for order to compel." DOJ Mot., ECF No. 9. On February 27, Secretary Thomas filed a brief in opposition to DOJ's motion and moved to dismiss. *See* Conn. Opp., ECF No. 59; Conn. Mot., ECF No. 58.[1]

### IV.   LEGAL STANDARD

Title III of the Civil Rights Act of 1960 (Title III), 52 U.S.C. §§ 20701–06, mandates that "every officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal election] . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" or transfer them to another officer of election or designated custodian. 52 U.S.C. § 20701. In turn,

> Any record or paper required by [Title III] to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative.

52 U.S.C. § 20703. "This demand shall contain a statement of the basis and the purpose therefor." *Id.* "The United States district court for the district in which a demand is made pursuant to [Title

---

[1] To date, DOJ has sued 29 states and the District of Columbia for unredacted voter files. *See* U.S. Dep't of Justice, *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls* (Feb. 26, 2026), https://perma.cc/YAV8-KGEZ. DOJ also claims it has obtained or is obtaining roughly 18 states' complete, unredacted voter files through voluntary disclosures. *See Unmasking Election Corruption*, Just the News Not the Noise (Dec. 9, 2025), https://justthenews.com/podcasts/john-solomon-reports/unmasking-election-corruption-insights-harmeet-dhillon-and-j (at 20:55).

4

III], or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705.

V.     **ARGUMENT**

DOJ cannot obtain the complete, unredacted Connecticut voter file—including voters' Social Security numbers, driver's license numbers, dates of birth, and partisan affiliations—based on a facially deficient Title III demand. By offering mere pretext rather than an honest statement of "the basis and the purpose" for the demand, the Attorney General has forfeited Title III authority. 52 U.S.C. § 20703. Title III requests are subject to "appropriate process," 52 U.S.C. § 20705, scrutiny the instant request cannot bear.

A.     **DOJ Has Obscured the True Basis and Purpose for Its Title III Demand.**

DOJ's Title III claim seeking the complete, unredacted Connecticut voter file should be dismissed because the demand did not state "the basis and the purpose therefor." 52 U.S.C. § 20703; *see also* Conn. Mem. at 26–31, ECF No. 58-1. Title III requires candor between federal officials and state and local election administrators who safeguard voters' sensitive personal information. Thus, DOJ cannot use Title III to obtain records "under the guise of a pretextual investigative purpose." *United States v. Weber*, No. 2:25-cv-9149, 2026 WL 118807, at *12 (C.D. Cal. Jan. 15, 2026); *see also CFPB v. Accrediting Council for Independent Colleges & Secondary Schs. (ACICS)*, 854 F.3d 683, 690 (D.C. Cir. 2017) (emphasizing that the validity of a civil investigating demand "is measured by the stated purpose," making notification of purpose "an important statutory requirement"). Yet DOJ has provided Connecticut and its citizens with less than a half-truth. Months after sending a narrower information request, DOJ issued a blanket demand for the complete, unredacted voter file, ostensibly "to ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA." Dec. 12 Ltr. at 2. But "[b]ehind

5

this screening, there appears to be a different purpose." *Weber*, 2026 WL 118807, at *11 (addressing California request). DOJ has publicly confirmed that it is sharing voter files with DHS and compiling a national voter file. *See, e.g.*, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, *supra*; *see also Weber*, 2026 WL 118807, at *11. As explained below, neither action is related to NVRA or HAVA enforcement. *See Oregon*, 2026 WL 318402, at *10 n.4 & n.5, *13 (addressing parallel litigation).[2]

Title III demands a statement of "*the* basis and *the* purpose" for the demand, not merely *a* basis and *a* purpose. 52 U.S.C. § 20703 (emphases added). By twice using the definite article, Title III requires the Attorney General to offer "a discrete thing": the complete basis and purpose of the request and not merely one basis and purpose among many. *Niz-Chavez v. Garland*, 593 U.S. 155, 166 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between definite and indefinite article). Without a complete statement of the basis and the purpose of the demand, state officials and reviewing courts "cannot accurately determine whether the inquiry is within the authority of the [Justice Department] and whether the information sought is reasonably relevant." *ACICS*, 854 F.3d at 691; *see also In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963) (indicating that Title III requests cannot be "used without restraint"). Ultimately, "half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be . . . misrepresentations." *Universal Health Servs. v. United States ex. rel. Escobar*, 579 U.S. 176, 188 (2016); *cf. Dep't of Commerce v. New York*, 588 U.S. 752, 781–85 (2019) (remanding agency action due to pretextual invocation of the Voting Rights Act). Thus, DOJ's refusal to be forthright

---

[2] DOJ similarly invoked HAVA when requesting 2020 election records, even while asserting an interest in "transparency." Oct. 30 Ltr., https://perma.cc/WCM3-FVTW. Repeat demands for records based on pretextual invocation of HAVA undercut purported reliance on that statute here.

with state officials about the intended use of sensitive personal information is fatal to the demand. *Cf. United States v. Raffensperger*, No. 5:25-cv-548, 2026 WL 184233 (M.D. Ga. Jan. 23, 2026) (dismissing Georgia Title III request for failure to comply with statutory requirements).

DHS has broad authority over counterterrorism, emergency management, immigration, and border protection, but its powers do not extend to NVRA or HAVA enforcement. *See* 6 U.S.C. § 111(b); *cf.* 52 U.S.C. §§ 20510(a), 21111 (DOJ authority). Even if DOJ were only interested in comparing the Connecticut voter file with DHS data to identify voters who may not meet state eligibility requirements—which might not require transferring the voter file to DHS custody—such database matching would not advance NVRA or HAVA enforcement. The NVRA's affirmative list maintenance mandate concerns only deceased registrants and those who are no longer eligible based on a change of address. *See* 52 U.S.C. § 20507(a)(4); *see also, e.g.*, *Am. Civ. Rights Union v. Phila. City Comm'rs* ("*ACRU*"), 872 F.3d 175, 182 (3d Cir. 2017) ("By its terms, the mandatory language in Section 8(a)(4) only applies to registrants who have died or moved away."). HAVA specifies that appropriate officials must remove voters from statewide voter registration lists using a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters . . . consistent with the [NVRA]," *id.* § 21083(a)(4)(A), and this provision does not "broaden[] the scope of the NVRA's list-maintenance obligations." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019); *see also ACRU*, 872 F.3d at 184–85 (rejecting contention that HAVA "augment[s]" NVRA list maintenance requirements); 52 U.S.C. § 21083(a)(2)(B) (guidelines for list maintenance); 52 U.S.C. § 21145(a)(4) (directing that nothing in HAVA supersedes the NVRA). Federal data concerning deaths and changes of address is held by the Social Security Administration ("SSA") and the U.S. Postal Service ("USPS") respectively, not DHS. *See* 42 U.S.C. § 1306c(d) (defining

7

SSA Death Master File); 52 U.S.C. § 20507(c)(1) (describing use of USPS address information by election officials); *see also* 39 C.F.R. § 122.2(b) (providing for prompt transmission of change-of-address information to election officials); Exec. Order. No. 14,248, § 3(a), 90 Fed. Reg. 14005, 14007 (Mar. 25, 2025) (ensuring that SSA allows election officials to access the Death Master File). Thus, DHS data is not relevant to NVRA and HAVA enforcement.

Adding the complete, unredacted Connecticut voter file to a DOJ national voter database also does not advance even the pretextual purpose of investigating Connecticut's NVRA and HAVA compliance. The NVRA requires that states conduct only a "reasonable effort to remove the names of ineligible voters by reason of the death of the registrant[] or a change in the residence of the registrant." 52 U.S.C. § 20507(a)(4). With respect to movers, the "reasonable effort" requirement can be met using Postal Service data alone. 52 U.S.C. § 20507(c)(1). In any case, joining the Connecticut voter file to another state's voter file—a file Connecticut does not possess and is not legally required to obtain—does not help DOJ determine whether Connecticut has met the "reasonable effort" requirement. *Cf.* 52 U.S.C. § 21083(a)(2)(A)(ii) (requiring voter file coordination with in-state databases on felony status and death records). HAVA merely reiterates the NVRA's list maintenance requirements, *see, e.g.*, *Bellitto*, 935 F.3d at 1202; *ACRU*, 872 F.3d at 184–85, and comparison to another state's database has no bearing on HAVA database design mandates, such as consolidation of duplicate records. 52 U.S.C. § 21083(a)(2)(B)(iii).[3]

---

[3] Through the Electronic Registration Information Center—a membership organization made up of 24 states and the District of Columbia—Connecticut obtains cross-state mover reports based on voter registration and motor vehicle data. *See* Electronic Registration Information Center, *FAQ's*, https://perma.cc/AY53-TF3Z; *see also* Electronic Registration Information Center, *Technology & Security Overview*, https://perma.cc/CY4E-85VL. However, 25 states that register voters do not participate in this exchange, and federal law does not mandate interstate comparison of voter registration records. DOJ suggests that states participate in interstate data exchanges to help identify and remove "duplicate voter registrations." DOJ Mem. at 11, ECF No. 9-1. This makes

Even if Title III required the Attorney General's representative to provide only "a purpose" and not "the purpose" of a demand—and it does not—DOJ's demand for the complete, unredacted Connecticut voter file is unrelated to "Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA." Dec. 12 Ltr. at 2.[4] For nearly two decades, DOJ has neither demanded nor required a complete, unredacted voter file to investigate NVRA violations or oversee compliance with a remedy. *See, e.g.*, Press Release, U.S. Dep't of Justice, *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements*, July 5, 2018, https://perma.cc/G2EZ-UUA5 (describing 2017 letters to all 44 states covered by the NVRA requesting list maintenance information but not demanding voter files). And with good reason. As noted above, the NVRA's affirmative list maintenance mandate requires only a "reasonable effort" to remove deceased registrants and movers. *See* 52 U.S.C. § 20507(a)(4); *see also id.* § 20507(c)(1) (allowing the requirement concerning movers to be met as a matter of law using safe harbor procedures). DOJ has recognized this flexible standard

---

little sense, as HAVA addresses only the presence of duplicates within a single statewide database, not double registration or double voting across states.

[4] In other states, DOJ asserted that the purpose of obtaining the unredacted voter file is to ascertain compliance only with the NVRA or only with HAVA. *See, e.g.*, Aug. 18 Ltr., *United States v. Scanlan*, 1:25-cv-371 (D.N.H. Sept. 30, 2025), ECF No. 6-9 (HAVA only); Aug. 21 Ltr., *United States v. Weber*, No. 2:25-cv-9149 (C.D. Cal. Nov. 7, 2025), ECF No. 37-2 at 24 (NVRA only). DOJ has also incorporated a demand for the unredacted voter file as a purported oversight measure in a recent consent decree. *See* Consent Decree ¶ 11, *United States v. N.C. State Bd. of Elections*, No. 5:25-cv-283 (E.D.N.C. Sept. 8, 2025), ECF No. 72. The Attorney General's assertion of varying purposes for identical voter file demands suggests that the claimed enforcement aims here are mere pretext. *Cf. Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (deeming departures from substantive and procedural norms to be evidence of pretext). Shockingly, immediately after the shooting of Alex Pretti, the Attorney General tied the handover of Minnesota's unredacted voter file to the "chaos in Minnesota." Ltr. from Att'y Gen. Bondi to Gov. Walz (Jan. 24, 2026), https://perma.cc/9WT4-HQF4; *see also* U.S. Notice of Corrections to the Record, *AFSCME v. Social Security Admin.*, No. 1:25-cv-596 (D.D.C. Jan. 16, 2026), ECF No. 197 (disclosing "Voter Data Agreement" under which Social Security Administration agreed to "analyze state voter rolls" with the aim of "overturn[ing] election results in certain States").

9

since the Act's passage. *See, e.g.*, U.S. Dep't of Justice, *The National Voter Registration Act of 1993* (last updated Nov. 1, 2024), https://perma.cc/D8YZ-F9AM; U.S. Dep't of Justice, *NVRA List Maintenance Guidance* (Sept. 2024), https://perma.cc/J3C2-WSSE. Thus, state and local procedures establish compliance; voter files that result from those procedures do not. *See Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–26 (6th Cir. 2025), *petition for cert. pending*, No. 25-437 (filed Oct. 7, 2025) (defining "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard"); *Bellitto*, 935 F.3d at 1205 (finding a "reasonable effort" based on safe harbor procedures alone). Even if DOJ could use unredacted voter data to find deceased voters on the registration rolls, *see* DOJ Mem. at 11, ECF No. 9-1, this would not indicate that state actions to remove such voters did not meet the "reasonable effort" requirement. *See Benson*, 136 F.4th at 626–27 (rejecting identification of "27,000 'potentially deceased' voters on Michigan's registration rolls" as evidence of an NVRA violation); *see also Judicial Watch v. Griswold*, 554 F. Supp. 3d 1091, 1108 (D. Colo. 2021) (recognizing that procedures may be reasonable as a matter of law); 52 U.S.C. § 20507(d)(1) (limiting removal of movers). Ultimately, the NVRA places responsibility for voter registration list maintenance with the States and does not authorize the Justice Department to search for individual registrants who federal officials suspect may not meet state eligibility requirements.[5]

---

[5] In 2006 and 2008, DOJ sought and obtained two state voter registration files, including Social Security numbers, for the ostensible purpose of assessing NVRA compliance. *See* Compl. ¶ 9, *United States v. Georgia*, No. 1:06-cv-2442 (N.D. Ga. Oct. 12, 2006); Consent Decree, *United States v. Georgia*, No. 1:06-cv-2442 (N.D. Ga. Oct. 30, 2006); Tex. MOU (May 13, 2008), *available at United States v. Oliver*, No. 1:25-cv-1193 (D.N.M.), ECF No. 51-6. DOJ did not pursue an enforcement action based on either file, *see* U.S. Dep't of Justice, *Cases Raising Claims under the National Voter Registration Act*, https://perma.cc/A3JG-CNZA, and for the next 17 years abandoned any attempt to use voter files to assess NVRA compliance.

HAVA enforcement also does not require or use complete, unredacted voter files. Although HAVA requires that statewide voter registration databases have specific list maintenance capabilities, *see* 52 U.S.C. § 21083(a)(2), (4), these requirements are implemented pursuant to state discretion, *id.* § 21085. DOJ previously recognized as much when it entered a consent decree requiring "reasonable steps" to identify possible duplicate registrations and movers and "review" of registrants previously identified "as potentially deceased"—not perfect removal of ineligible registrants and consolidation of duplicate records. Consent Decree ¶¶ 4, 8–9, *United States v. State of New Jersey*, No. 06-4889 (D.N.J. Oct. 12, 2006), https://perma.cc/TF6V-NUY4; *see also* U.S. Election Assist. Comm'n, *Voluntary Guidance on Implementation of Statewide Voter Registration Lists* 11-14 (July 2005), https://perma.cc/KJX9-ZZ3W ("recogniz[ing] the fallibility of databases" and prioritizing "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters"). And once a HAVA-compliant system was in place, the decree required reporting of list maintenance statistics but did not demand copies of complete, unredacted voter files. *See* N.J. Consent Decree ¶ 11. Although DOJ now claims it needs unredacted voter files to determine if voters have been registered since HAVA went into effect without submitting a driver's license or Social Security number, *see* DOJ Mem. at 10; *see also* 52 U.S.C. § 21083(a)(5), that inquiry at most requires production of voter records *lacking* these identifiers, along with associated registration dates. Producing records that include driver's license and Social Security numbers does not assist bona fide HAVA enforcement.

    **B.**    **Title III Requests Are Subject to Ordinary Judicial Oversight.**

DOJ cannot avoid scrutiny of the basis and purpose for its Title III demand by claiming that the Civil Rights Act of 1960 authorizes a "special statutory proceeding." *See, e.g.*, DOJ Mem. at 5; *see also Ensuring Election Integrity and Fixing Immigration*, *supra* (at 2:41) ("The 1960 Civil

Rights Act is actually very clear. The Attorney General doesn't have to show her homework as to what she is going to do with it, and I am her designee. So, I get to ask for that information and they have to give it."). In fact, Title III requires an honest statement of "the basis and the purpose" of the request. 52 U.S.C. § 20703. Thus, this Court's role "is not so limited." *Oregon*, 2026 WL 318402, at *8. The grave issues at stake in this litigation require this Court to subject the Attorney General's request to exacting scrutiny under the procedures mandated by the Federal Rules and fundamental due process. *See* Conn. Opp. 3–8.

Title III does not authorize the "special statutory proceeding" that DOJ demands. DOJ relies on the 1962 decision of the U.S. Court of Appeals for the Fifth Circuit in *Kennedy v. Lynd*, 306 F.2d 222, to make this claim. *See* DOJ Mem. at 5–6, 13. To be sure, *Lynd* indicated that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226 (quoting former 42 U.S.C. § 1974b). But *Lynd* was decided in the early 1960s, an era of racist disenfranchisement and massive resistance to civil rights, even within the federal judiciary. *See, e.g.*, *Kennedy v. Bruce*, 298 F.2d 860, 862 (5th Cir. 1962) (reversing dismissal in conflict with controlling law). As the Supreme Court has recognized, "history did not end in 1965." *Shelby County v. Holder*, 570 U.S. 529, 532 (2013). In 1965, the Voting Rights Act removed the exigency that might have justified paltry process by suspending disenfranchising tests and devices that Title III had been used to investigate and imposing preclearance on states that had used them. *See South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966) (describing case-by-case use of Title III); *see also id.* at 319, 333–34 (upholding suspension in covered states). Six decades since DOJ last litigated a Title III action, basic principles of federal law dictate that the requisite statement of the basis and the purpose for a Title III request is subject to judicial oversight.

Rule 81(a)(5) of the Federal Rules of Civil Procedure now establishes that the Rules "apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings." Fed. R. Civ. P. 81(a)(5). These rules protect the rights of recipients and guarantee that "an adversary hearing, if requested, is made available." *Becker v. United States*, 451 U.S. 1306, 1308 (1981). Indeed, just two years after the Fifth Circuit decided *Lynd*, the Supreme Court decided *United States v. Powell*, 379 U.S. 47 (1964), which required the government to establish statutory requirements before a tax subpoena may be enforced. *See id.* at 57–58. Even after a federal official has met that burden, the recipient of a summons or subpoena must then be afforded the opportunity to rebut the government's prima facie case or establish that "judicial enforcement would be an abuse of the court's process." *Mollison v. United States*, 481 F.3d 119, 122 (2d Cir. 2007) (internal citation and quotation marks omitted). Such due process is the prerequisite to judicial enforcement of a records request issued by another branch of government. *See, e.g.*, *Trump v. Mazars USA, LLP*, 591 U.S. 848, 862–63 (2020) (addressing whether a subpoena was "related to, and in furtherance of, a legitimate task of the Congress"). Ultimately, the "Supreme Court's holding in *Powell* squarely rejects [DOJ's] contention and reliance on *Lynd*." *Oregon*, 2026 WL 318402, at *8.

The text of Title III does not insulate the demand from such judicial review. 52 U.S.C. § 20703; *cf.* Fed. R. Civ. P. 81(a)(5) (allowing exclusion from the Federal Rules as "provided by statute"). Rather, Title III's jurisdictional provision authorizes only "appropriate process to compel the production" of documents. 52 U.S.C. § 20705; *see also Raffensperger*, 2026 WL 184233, at *3 (requiring strict adherence to the text of Title III). Where Congress authorizes alternative procedures to the Federal Rules of Civil Procedure, it does so explicitly and in detail.

13

*See, e.g.*, 42 U.S.C. § 2000a-5 (procedures under Title II of the Civil Rights Act of 1964); *see also Katzenbach v. McClung*, 379 U.S. 294, 295–96 (1964) (describing these procedures as "a special statutory proceeding"). Moreover, the statutory requirement that the Attorney General must offer "the basis and the purpose" for a Title III request would serve no purpose if—as DOJ contends—federal courts may adjudicate only whether a demand has been made and the custodian of documents has received notice of the proceeding. *See Oregon*, 2026 WL 318402, at *9. It remains possible that an "assertion that the demand was made for the purpose of investigating possible violations of a Federal statute" could meet the basis and purpose requirement, *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963), but only when the assertion is complete and accurate, *cf. SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."). Here, DOJ suggested that it needed the complete, unredacted Connecticut voter file to investigate NVRA and HAVA compliance. At best, this is a baseless and ill-conceived fishing expedition. At worst, it is simple pretext. While DOJ might ordinarily be presumed to be acting in good faith, "appropriate process" requires an opportunity to prove otherwise. *See In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962). Moreover, district courts have recently "identified serious defects in the government's explanations and representations . . . prompting judges to discount government submissions, compel expedited discovery, and withhold the presumption." Ryan Goodman et al., *The "Presumption of Regularity" in Trump Administration Litigation* (Nov. 20, 2025), https://perma.cc/PL5G-BTAN; *see also Oregon*, 2026 WL 318402, at *11 ("The presumption of regularity that has been previously extended to [DOJ]

that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds.").[6]

Thus, the U.S. District Court for the Central District of California recently determined that "Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause." *Weber*, 2026 WL 118807, at \*8; *see also id.* (confirming that "[n]othing in the text of Title III requires a special statutory proceeding or any abbreviated procedures" and that "appropriate process" allows courts to "determine that the DOJ has not met Title III['s] statutory requirements"). Soon thereafter, the District of Oregon applied "the Federal Rules of Civil Procedure" to a Title III claim and dismissed the suit for failure "to state an adequate basis and purpose." *Oregon*, 2026 WL 318402, at \*8; *see also id.* at \*13 (describing the request as "chilling" "overreach"). And earlier this month, the Western District of Michigan dismissed a third Title III suit. *See Benson*, 2026 WL 362789, at \*11. This Court should follow the emerging consensus, impose rigorous scrutiny, and dismiss the Title III claim.

## VI.   CONCLUSION

For the reasons set out above, this Court should deny DOJ's Motion for Order to Compel and grant Secretary Thomas's Motion to Dismiss.

---

[6] The U.S. District Court for the Western District of Michigan recently declined to consider whether DOJ's "request is in bad faith," but that decision is procedurally distinguishable and led to avoidable error. *United States v. Benson*, No 1:25-1148, 2026 WL 362789, at \*8 (W.D. Mich. Feb. 10, 2026). On the procedural side, the court considered only a motion to dismiss—not a motion for order to compel—and so it rejected arguments over bad faith as going "to the truth of the DOJ's allegations." *Id.*; *cf. id.* at \*7 (recognizing opportunity to establish bad faith in subpoena enforcement actions). Even on a motion to dismiss, however, the court should have considered the plausibility of DOJ's allegations. *See id.* at \*2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Had the court done so, it might have recognized the incompatibility between the data requested and the statutes DOJ purported to enforce. *See, e.g.*, *id.* at \*9 (addressing categories of voters not subject to NVRA and HAVA list maintenance requirements).

15

| | |
|---|---|
| Respectfully submitted, | Dated: March 2, 2026 |

| | |
|---|---|
| Kevin N. Reynolds<br>CT Fed. Bar. No. 12305<br>Law Office of Kevin N. Reynolds<br>71 Sycamore Road<br>West Hartford, CT 06117<br>(860) 308-2388<br>kreynolds@rsgllc.com | /s/ Daniel J. Freeman<br>Daniel J. Freeman*<br>Democratic National Committee<br>430 South Capitol Street SE<br>Washington, DC 20003<br>(202) 863-8000<br>freemand@dnc.org<br><br>* Pro Hac Vice Application<br>   Forthcoming<br><br>*Counsel for Proposed Amicus* |

16