# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,

               Plaintiff,

v.

STEPHANIE THOMAS, *et al*.,

               Defendants.

Case No. 3:26-CV-00021-KAD

 

**UNITED STATES' CONSOLIDATED MEMORANDUM IN:**
**(1) <u>OPPOSITION</u> TO MOTIONS TO DISMISS BY DEFENDANT THOMAS**
**(Dkt. 58) AND INTERVENOR-DEFENDANTS (Dkt. 56 & Dkt. 60) <u>AND</u>**
**(2) <u>REPLY</u> IN SUPPORT OF UNITED STATES' MOTION TO COMPEL (Dkt. 9)**

TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 2

II.    BACKGROUND ................................................................................................ 5

III.    MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND
CANNOT CHALLENGE THE BASIS AND PURPOSE FOR THE DEMAND ........................ 7

   A.    THE FEDERAL RULES OF CIVIL PROCEDURE ARE INAPPLICABLE TO MOTIONS TO COMPEL
UNDER SECTION 305 OF THE CRA. ...................................................................... 8

   B.    TITLE III OF THE CRA DOES NOT REQUIRE ALLEGATIONS THAT THE FEDERAL ELECTION
RECORDS DEMANDED ARE NEEDED TO INVESTIGATE RACE-BASED DENIAL OF VOTING RIGHTS. .. 13

   C.    DEFENDANTS CANNOT CHALLENGE THE ATTORNEY GENERAL'S BASIS AND PURPOSE TO
INVESTIGATE CONNECTICUT'S HAVA AND NVRA COMPLIANCE. .............................. 17

   D.    CONNECTICUT'S SVRL FALLS WITHIN SECTION 301'S BROAD DEFINITION OF "ALL RECORDS
AND PAPERS" RELATING TO REGISTRATION TO VOTE IN FEDERAL ELECTIONS ............................. 21

   E.    THE UNITED STATES IS ENTITLED TO CONNECTICUT'S FEDERAL ELECTION RECORDS,
INCLUDING ITS SVRL ..………………………………………………………………26

IV.    THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS............ 32

   A.    THE UNITED STATES IS COMPLYING WITH THE PRIVACY ACT............................................ 33

   B.    THE FIRST AMENDMENT DOES NOT PROHIBIT ACCESS TO DATA THE UNITED STATES NEEDS
FOR ITS HAVA CLAIM. ...................................................................................... 35

   C.    THE E-GOVERNMENT ACT DOES NOT PREVENT THE UNITED STATES FROM OBTAINING DATA
SUPPORTING ITS HAVA CLAIM. ........................................................................... 35

   D.    THE DRIVER'S PRIVACY PROTECTION ACT DOES NOT ALLOW SECRETARY THOMAS TO DENY
THE UNITED STATES LIST MAINTENANCE DATA. ...................................................... 37

V. CONCLUSION ................................................................................................. 38

## Table of Authorities

**Statutes**

5 U.S.C. § 552a ............................................................................................ 35

8 U.S.C. §§ 1445, 1449 ................................................................................. 25

10 U.S.C. § 130c ........................................................................................... 24

13 U.S.C. § 214 ............................................................................................. 24

18 U.S.C. §§ 2721 ......................................................................................... 36

26 U.S.C. § 7605 ........................................................................................... 11

28 C.F.R. §§ 0.50, 0.51 ................................................................................. 34

28 U.S.C. § 1782 .............................................................................. 31, 1, 23, 33

30 U.S.C. § 1732 ........................................................................................... 24

42 U.S.C. § 2000e-2 ...................................................................................... 14

42 U.S.C. §§ 3604-3606, 3617 ..................................................................... 14

44 U.S.C. § 3101 ........................................................................................... 34

44 U.S.C. § 3572 ........................................................................................... 24

52 U.S.C. § 20703 ................................................................................... passim

52 U.S.C. § 21083 ......................................................................................... 29

52 U.S.C. § 10101 ......................................................................................... 13

52 U.S.C. § 20507 ............................................................................... 5, 23, 30-31

52 U.S.C. § 20701 ................................................................................... passim

52 U.S.C. § 20704 ........................................................................... 30, 31, 32, 33

52 U.S.C. § 20705 ................................................................................. 2, 8, 37

52 U.S.C. § 21083 ............................................................................... 5, 7, 19, 29

52 U.S.C. § 21111 ........................................................................................... 5

52 U.S.C. §§ 10301-10306, 10309 ............................................................... 14

52 U.S.C. §§ 20510 .................................................................................... 6, 27

52 U.S.C. §§ 20701-20706 ................................................................. 11, 14, 27

52 U.S.C. §§ 230701, 20703 ......................................................................... 23

68 CFR 47611 ................................................................................................ 34

68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003) ............................................... 33

70 Fed. Reg. 43904-01 (July 29, 2005) ........................................................ 33

82 Fed. Reg. 24147-01 (May 25, 2017) ........................................................ 33

**Cases**

*Ala. ex rel.* Gallion *v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960) ................................... 8, 13, 32

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*,
    594 U.S. 758 (2021) (per curiam) ........................................................... 29, 28

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ............................................ 5, 30

*Biden v. Nebraska*, 600 U.S. 477 (2023) ...................................................... 27, 28, 29

*Bostock v. Clayton Cnty.*, Ga., 590 U.S. 644 (2020) .................................................. 17

*Coleman v. Campbell*, 208 F. Supp. 199 (S.D. Miss. 1962) .......................................... 14, 15, 18

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) (per curiam) ................................. 8

*Ebert v. Poston*, 266 U.S. 548 (1925) ......................................................... 16

*Ex Parte Siebold*, 100 U.S. 371 (1879) ...................................................... 5

*In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963) ................................................. 9-10

*Intel Corp. v. Advanced Micro Devices, Inc.* 542 U.S. 241 (2004) ........................................ 1, 2

*Judicial Watch v. Lamone*, 399 F. Supp. 3d 425 ......................................................... 23

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ................................................... passim

*Learning Resources, Inc. v. Trump*, 607 U.S. -- ........................................... 8, 29, 27, 28

*Open Democracy v. Scanlan*, 2025 WL 1503937 (D.N.H. May 27, 2025) ...................................... 32

*Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) .................................. 23

*Foster v. Love*, 522 U.S. 67 (1997) ........................................................... 5, 30

*U.S. Term Limits*, *Inc. v. Thornton*, 514 U.S. 779 (1995) ...................................... 5, 30

*United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846 (W.D. La. 1960) ............ 8, 9

*United States v. Benson*, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) .......................... passim

*United States v. Bisceglia*, 420 U.S. 141 (1975) ................................................. 8

*United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006) ....................... 4

*United States v. Great N. Ry. Co.*, 343 U.S. 562 (1952) ........................................ 16

*United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269 (1929) ........................................ 16

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ........................................ 8, 9, 11, 19, 29

*United States v. Oregon*, 2026 WL 318402 (D. Or. Feb. 5, 2026) ........................................ 11, 10

*United States v. Weber*, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ............................... 8, 10, 12

*West Virginia v. EPA,* 597 *U.S.* 697 (2022) ........................................................................... 27

**Rules**

Fed. R. Civ. P. 34 ........................................................................................................................... 9

Fed. R. Civ. P. 81 ........................................................................................................................... 9

**Other**

U.S. Const. art. I, § 4, cl. 1 ........................................................................................................... 4

Pub. L. No. 107–347, § 208 ..................................................................................................... 35, 36

Plaintiff United States of America respectfully submits this consolidated Memorandum of Law re.: (1) Opposition to the Motions to Dismiss by Secretary Thomas (Dkt. 58); Intervenor-Defendants SEIU District 1199NE, Connecticut Alliance for Retired Americans, Connecticut Citizen Action Group, and Bette Marafino (Dkt. 56); and Intervenor-Defendants Common Cause and Claire Ewing (Dkt. 60); <u>and</u> (2) Reply in Support of the United States' Motion to Compel (Dkt. 9).[1] Collectively, Secretary Thomas and the Intervenor-Defendants are referred to as "Defendants."

This Court entered an Order to Show Cause on Jan. 8. 2026.  Dkt. 10.  In subsequent text docket entries, the Court explained that, "based upon the limited filings to date," enforcing a demand under the CRA appeared unlike the ordinary civil case, but "akin, for example, to 28 U.S.C. Section 1782, which authorizes the district court to adjudicate disputes over discovery sought in aid of foreign and international tribunals."  *See* Dkt. 30 as amended by Dkt. 33.  None of the defense briefs address this issue.

The United States agrees that this case involves the application of a particularized statute rather than the ordinary application of the Federal Rules.  A material difference in the two statutes mentioned in Dkt. 30 and 33, is that the district court's power under 28 U.S.C. § 1782 is discretionary and permissive, while production under the CRA is mandatory.  A district court *may* order production of records under Section 1782 but is not required to do so.  *See Intel Corp. v. Advanced Micro Devices, Inc*., 542 U.S. 241, 246 (2004); 28 U.S.C. § 1782 ("the district court of the district in which a person resides or is found may order …").  In contrast, Section 3 of the CRA is mandatory.  *See* 52 U.S.C. § 20703 (stating that any record "*shall, upon demand* … be made

---

[1]  In addition, Secretary Thomas filed a response (Dkt. 57) to the Court's Order to Show Cause (Dkt. 10), which this consolidated brief also addresses.

1

available") (emphases added).  Simply put, "the Court's disposition is required by the text of the statute."  *Intel Corp.*, 542 U.S. at 267 (Scalia, J., concurring).

## I.    INTRODUCTION

The Attorney General of the United States brought this case as part of her investigation of Connecticut's list maintenance practices under the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA").  The United States sent a demand letter to Secretary Thomas in accordance with Title III of the Civil Rights Act of 1960 ("CRA"), requesting the Secretary's cooperation in providing federal election records necessary to assess HAVA and NVRA requirements.  Secretary Thomas refused to produce those records.  This action followed. Dkt. 1, Compl., ¶¶ 23, 28.

Title III of the CRA provides the principal statutory authority for the United States to immediately obtain federal election records including Connecticut's statewide Voter Registration List ("SVRL").  Those provisions broadly authorize the Attorney General to compel production of "all records and papers" that "come into … possession" of the officers of election relating to registration or other acts requisite to voting in federal elections.  52 U.S.C. § 20701; *see also* 52 U.S.C. § 20705 (authorizing the Attorney General to bring an action to compel the production of federal election records demanded under Section 303 of the CRA).  In that manner, Title III is unique because it is purely an investigative tool.  As such, it enables the Attorney General to

determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[2]

The CRA restricts the courts to a "severely limited" inquiry: (1) Did the Attorney General make a written demand for federal election records stating the basis and purpose?; (2) Was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration?"; (3) Did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"?; and (4) Did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements? *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703.  As explained below, the record in this case demonstrates that the United States has satisfied each of these requirements.

Secretary Thomas has argued at length that the United States is amassing a nationwide voter database. Dkt. 58-1 at 1-8.  It is not.  The Civil Rights Division's sole purpose in requesting Connecticut's SVRL is to assess the state's compliance with the voting laws that the Civil Rights Division enforces.  Second Declaration of Eric Neff (2d Neff Decl.) ¶¶ 2-6.  When the Civil Rights Division performs this individualized assessment, the State's SVRL is compartmentalized and maintained by the Civil Rights Division separately from the SVRL of any other State.  The maintenance, use, and destruction of those records is in full compliance with the requirements in

---

[2] Circuit caselaw addressing the CRA in any depth has been confined to courts within the Fifth Circuit in the early years following the CRA's enactment.  The United States is unaware of any circuit courts disagreeing with the Fifth Circuit's approach to the CRA.  Recently, two district courts in the Ninth Circuit and one district court in the Sixth Circuit reached a contrary conclusion.  However, those decisions are burdened by misapplications of the statute. *See infra* at 9-13,17, 22-26.

the CRA, Privacy Act, and all other federal laws governing the records. 2d Neff Decl. ¶ 7.[3] The fact that the United States is also assessing whether other states are complying with the list maintenance provisions is not relevant to the election records the United States seeks from Connecticut.

Secretary Thomas has also argued that the CRA has never been used for the purpose of obtaining voter lists to enforce the list maintenance provisions of HAVA and the NVRA. Dkt. 58-1 at 1, 18. That is also incorrect. For example, in two matters against Georgia and Texas back in 2006 and 2008, the United States obtained the SVRLs, including drivers' license numbers and the last four of the Social Security numbers (SSN4), to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[4] The extent of the litigation necessary to obtain those records in 2026 simply reflects a coordinated effort to impede federal enforcement of HAVA and the NVRA.

Therefore, the United States respectfully submits that the Court should grant its Motion to Compel (Dkt. 9), deny the Motions to Dismiss (Dkts. 56, 58, 60) and enter an order compelling

---

[3] The Civil Rights Division has requested information for the election laws that the Civil Rights Division enforces. And the Criminal Division of the Department of Justice is making separate requests for information as noted in the Rosenberg declaration. Dkt. 58-2 at ¶ 24-25.

[4] See Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Dkt. 1. The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*, *supra*, at Dkt. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited March 12, 2026). For the Court's convenience, the three documents are provided herein as 2d Neff Decl., Exs. 6-8.

production of Connecticut's SVRL and other responsive federal election records.

## II.    BACKGROUND

While the United States Constitution invests States with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those State choices. The Elections Clause provides that, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; *but* the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1 (emphasis added). The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the three statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State

are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1). Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510(a), 20507(b), 20507(a)(4).

Acting pursuant to the United States' authority to enforce these federal election statutes, on August 6, 2025, the United States wrote to Secretary Thomas, the official charged with administering elections in Connecticut. Dkt. 1, ¶ 20. The United States had reports from the Election Assistance Commission that Connecticut was not tracking duplicate registrations, and indicating that Connecticut ranks near the bottom nationally in removing deceased persons from its voter registration list. Dkt. 9-2 at 2-3. The United States requested Secretary Thomas to provide responsive information within 14 days. Dkt. 9-2 at 2. The Secretary responded to the United States' request with some explanation and with an assurance that Connecticut was "gathering the requested data and will provide it as soon as practical." Dkt. 1 at ¶ 23; Dkt. 9-3 at 5. However, Connecticut's response contained concerning information regarding duplicates: "Currently, CVRS has no automatic method of detecting duplicates. Registrars must reconcile the data provided by this office when performing list maintenance." Dkt. 9-3 at 3.

After four months and still not receiving the data, the United States followed up by letter on December 12, 2025, allowing an additional fourteen days for Connecticut to comply with the demand.  Dkt. 9-4 at 2.  The United States indicated that it was making a demand under the CRA for the federal election records to be produced and include an electronic copy of the full SVRL including either the driver's license number, the SSN4, or both, as provided by HAVA.  Dkt. 1 at ¶¶ 24-26; Dkt. 9-4 at 2-3.  It further informed the Secretary that Connecticut's SVRL could be produced through the Department of Justice's secure file-sharing system.  Dkt. 9-4 at 3.

On December 24, 2025, Secretary Thomas declined to produce the election records.  *See* Dkt. 9-5 at 3-4.  She disputed the basis and purpose of the demand, and argued that state law, the Privacy Act, and the E-Government Act barred disclosure.  *See id*. at 2-4.  On January 6, 2026, the Attorney General instituted summary proceedings to compel production.  *See* Compl., Dkt. 1.

The United States seeks these documents to evaluate Connecticut's compliance with the list maintenance provisions of HAVA and the NVRA, and if appropriate, to bring an enforcement action.  *See* 2d Neff Decl. ¶ 2.  HAVA requires that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" the applicant's driver's license number or if that is unavailable, the last four digits of the Social Security number.  52 U.S.C. § 21083(a)(5)(A)(i).  That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections.  2d Neff Decl. ¶ 4.

### III.    MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND CANNOT CHALLENGE THE BASIS AND PURPOSE FOR THE DEMAND

Defendants misapprehend the nature of a CRA claim by erroneously suggesting the Court should apply the Federal Rules of Civil Procedure to the demand for records under the CRA.  They incorrectly maintain that Title III of the CRA applies to only discrimination claims.  They ask the

Court to ignore caselaw under the CRA and allow an impermissible challenge to the basis and purpose of the Attorney General's written demand. Likewise, they assert that the Court should undermine the Attorney General's enforcement authority by rewriting the congressional mandate in the CRA. In place of producing all election records requisite to voting in federal elections, Defendants invite the Court to narrow the mandate to encompass only publicly available records. For the reasons discussed below, the Motions to Dismiss (Dkts. 56, 58, 60) should be denied and the United States' Motion to Compel (Dkt. 9) should be granted.

    **A.**    **The Federal Rules of Civil Procedure are inapplicable to motions to compel under Section 305 of the CRA.**

Defendants argue that the Federal Rules of Civil Procedure govern these proceedings. *See* Dkt. 59 at 3-7; Dkt. 57 at 27-30; Dkt. 60 at 11-17. They repeat what the Fifth Circuit has described as "a basic misconception … concerning a Title III proceeding." *Lynd*, 306 F.2d at 225.

The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Contrary to what the Defendants argue, no factual allegations of a substantive violation of federal law are required. Instead, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped [her] with machinery thought suitable for

the effective fulfillment of that obligation" through Title III of the CRA.[5]  *Id.* at 230.  That approach makes sense.  The United States cannot be expected to effectively enforce federal election laws such as HAVA if the Attorney General is required to allege facts from federal election records that state officers of election have denied to her.  *See id.* at 227 (the Attorney General's "right to records does not require that [she] show [she] could win without them").

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings."  *Id.* at 225.  It is "a special statutory proceeding in which the courts play a limited, albeit vital, role."  *Id.*  In structuring the statute in this way, Congress has indicated that the Federal Rules of Civil Procedure are inapplicable.  "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure."  *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 852 (comparing CRA applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations").  The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation.  *See Citizens Councils*, 187 F. Supp. at 847.  In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed."  *Id.* (emphasis added).  To summarize, "[t]here is no place for any other procedural device or maneuver," including the motions to dismiss presently before the Court, in

---

[5] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not."  *United States v. Bisceglia*, 420 U.S. 141, 148 (1975).  The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude.  *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission).  The investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm.

response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).

A recent decision issued by a district court in the Sixth Circuit agreed with *Lynd* and rejected the arguments raised by Defendants. *See United States v. Benson*, No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789, at *7 (W.D. Mich. Feb. 10, 2026) appeal filed, (6th Cir. Feb. 25, 2026) (No. 26-1225). Instead, the *Benson* court construed "a request for records under the CRA as a form of administrative subpoena." *Id.* (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963)). Therefore, "'[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…'" *Benson*, 2026 WL 362789, at *7 (quoting *United States v. Markwood*, 48 F.3d 969, 982 (6th Cir. 1995)). The court acknowledged that "'a district court's role in the enforcement of an administrative subpoena is a limited one.'" *Benson*, 2026 WL 362789, at *7 (quoting *Markwood*, 48 F.3d at 976).

Two district courts in the Ninth Circuit reached a different conclusion but erred in doing so. Both courts misread the Supreme Court's decision in *United States v. Powell*, 379 U.S. 48 (1964), to reject the Fifth Circuit's holding in *Lynd* that Title III of the CRA is a special statutory proceeding where the Federal Rules of Civil Procedure do not apply. *See United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402, at **7-8 (D. Or. Feb. 5, 2026) appeal filed, (9th Cir. Feb. 25, 2026) (26-1231); *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807, at *8 & n.15 (C.D. Cal. Jan. 15, 2026) appeal filed (9th Cir. Feb. 25, 2026) (26-1232).[6] *Powell* applied the Federal Rules of Civil Procedure to an IRS administrative summons. There, the Supreme Court made the unremarkable observation that because section 7604(b) of the Internal

---

[6] Defendants cite extensively to *Weber* throughout their briefs. *See* Dkts. 57, 58 and 60, *passim*. As discussed below, *Benson* addressed many of the legal errors in *Weber* that call into question whether *Weber* merits any consideration.

Revenue Code ("IRC") "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply…[.]" 379 U.S. at 58 n.18. However, the *Oregon* court applied a much broader construction of *Powell* than the Supreme Court intended.

The *Oregon* court found that *Powell* involved interpretation of "a similar statute" to Title III of the CRA, and the decision's admonition that "the court may 'inquire into the underlying reasons for the examination [of records]'" therefore applied to the CRA. *Oregon*, 2026 WL 318402, at *8 (quoting *Powell*, 379 U.S. at 58 & n.18). Although accurately quoted language from *Powell*, *see id.*, the *Oregon* court omitted any explanation that the quoted language referred to a process expressly provided in the IRC that is missing from the CRA. The Supreme Court explained that judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id*. That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Id.* at 52-53 (quoting 26 U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel records under the CRA. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process for election officers to object to Title III proceedings being initiated against them. *See id.*

Moreover, even with language in the IRC limiting records to "necessary" investigations, the Supreme Court noted that strong deference is given to the Government to investigate, and "'does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, *or even just because it wants assurance that it is not*.'"

*Powell*, 379 U.S. at 57 (quoting *Morton Salt*, 338 U.S. at 642-43) (emphasis added).  *Powell* is completely consistent with *Lynd* and in no way restricts records demands under the CRA to the statutory limitations that Congress included in the IRC.[7]

In addition to *Powell*, the *Weber* court also referred to what it indicated was a decision of the United States Supreme Court.  *See Weber*, 2026 WL 118807, at *8 (citing "*Becker v. United States*, 451 U.S. 1306 (1981)").  That is incorrect.  *Becker* was an order issued by the Circuit Justice on an application for a temporary stay.  *See* 451 U.S. 1306 (1981) (Rehnquist, J., in chambers) (continuing temporary stay pending review by the Court).  The subsequent history indicates that the stay was continued, 452 U.S. 912 (1981), and later vacated and denied, 452 U.S. 935 (1981), leaving it without any precedential authority.

Moreover, in *Becker*, which involved an administrative summons under the IRC, then-Justice Rehnquist specifically recognized that *Powell*'s reference to the Federal Rules of Civil Procedure applying to records demanded under the IRC was "'not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and adversary hearing, if requested, is made available.'" *Becker*, 451 U.S. at 1308 (Rehnquist, J., in chambers) (quoting *Donaldson v. United States*, 400 U.S. 517, 528-29 (1971)).  Justice Rehnquist distinguished between agency efforts to "to take what is potentially income-producing property" from efforts to "merely require [the respondent] to produce evidence." *Id.*  Although "the need for summary enforcement of IRS summonses is clear and justifies dispensing with Federal Rules" in

---

[7] The *Oregon* decision similarly misread *Lynd* by reasoning "the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation" instead of applying "directly to the court for the records." *Oregon*, 2026 WL 318402, at *8 n.1.  *Lynd* does not say filing a pleading waives the CRA's expedited process.  Instead, as discussed above, the Fifth Circuit explained only that any pleadings that are filed do not need to "satisfy usual notions under the Federal Rules of Civil Procedure." 306 F.2d at 225-26.

the latter context (gathering evidence), "the need to proceed summarily is less clear, as is the justification for dispensing with otherwise applicable provisions of the Federal Rules" in the former context (seizing income-producing property).  *Id.*; *see id.* at 1310-11.  When it comes to requests for evidence, "[o]bviously the taxpayer cannot simply write his own ticket as to the manner in which relevant nonprivileged evidence shall be made available to the IRS."  *Id.* at 1311.  In other words, far from supporting Defendants' argument that the summary proceeding does not apply to production of federal records under the CRA, Justice Rehnquist's opinion in *Becker* undercuts it.

Accordingly, the "usual notions under the Federal Rules of Civil Procedure" do not apply to the CRA's "special statutory proceeding" to compel production of federal election records.  *Lynd*, 306 F.2d at 225-26; *see also Gallion*, 187 F. Supp. at 852 (same).

> **B.    Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.**

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records."  CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960).  This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections.  *Lynd*, 306 F.2d at 226.  Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…."  52 U.S.C. § 20701.  Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [her] representative."  52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, the Defendants argue that the only permissible basis for a Title III request is to enforce constitutional rights and maintains that assessing a State's compliance with HAVA and the NVRA does not suffice.  Dkt. 58-1 at 23-24; Dkt. 57 at 13-16; Dkt. 60 at 19.  Congress made clear in the CRA where it intended a remedy to be limited to racial discrimination.  *See* Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90 (applying Title VI of the CRA to violations of rights "on account of race or color") (codified as amended at 52 U.S.C. § 10101).  That is consistent with express limitations Congress made to remedies in other civil rights statutes.  *See*, *e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race, color…" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301-10306, 10309 (prohibiting discrimination "on account of race, color," or language minority status in the Voting Rights Act of 1965); 42 U.S.C. §§ 3604-3606, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968).  No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text.  *See* 52 U.S.C. §§ 20701-20706.

Moreover, in *Gallion,* a case cited by Defendants, Dkt. 57 at 14, 31; Dkt. 58-1 at 23, n.86, the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*."  *Gallion*, 187 F. Supp. at 848 (emphasis added).  Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role."  *Lynd*, 306 F.2d at 225.  The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute."  *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also In re Coleman*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a

sufficient purpose to examine federal election records is "to see if any Federal laws were violated").

Defendants suggest that enforcing list maintenance by examining compliance with HAVA's identification requirements is incompatible with securing an individual's right to vote. *See* Dkt. 58-1 at 2, 24; Dkt. 59 at 1; Dkt. 57 at 12-13, 22. Defendants are mistaken. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier [SSN4s]. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 31-32 (Aug. 2021) (excerpts provided as 2d Neff Decl., Ex. 11). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *id.* at 29, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id.* It explained, "[u]sed cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when it enacted HAVA

in 2002. It explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to "reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found."[8]  H.R. Rep. 107-329, pt. 1, at 36 (2001).

Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate, while also undermining the Attorney General's enforcement of requirements in HAVA that help protect voting rights. Where, like here, the language of an enactment is unambiguous, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929). Well-established principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925).

 "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo.*

---

[8] Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. 2d Neff Decl. ¶¶ 14-16. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached to 2d Neff Decl., Ex. 9). As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as 2d Neff Decl., Ex. 10).

*Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

The *Benson* court rejected arguments that parallel those of the Defendants in this case, concluding that the CRA cannot be rewritten to restrict the statute's scope. The court first rejected *Weber*'s imposition of a temporal limitation on the CRA to only those statutes in effect when the Act became law. The court explained, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes," *Benson*, 2026 WL 362789, at *8, such as HAVA. Turning to the argument that Title III of the CRA only could be used to investigate racial discrimination, *Benson* observed that "the CRA's text includes no such limitation…." *Id.*

As a result, the United States respectfully submits that the Court must decline Defendants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id*.

### C.    Defendants cannot challenge the Attorney General's basis and purpose to investigate Connecticut's HAVA and NVRA compliance.

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records that articulates "the basis and purpose therefor." 52 U.S.C. § 20703. The United States has done that. On December 12, 2025, the United States sent Secretary Thomas a written demand for a copy of Connecticut's SVRL. *See*

Dkt. 9-4.  As stated in that demand, the basis for the demand was Title III of the CRA, the NVRA

and HAVA, and the purpose was to "ascertain Connecticut's compliance with the list maintenance

requirements of the NVRA and HAVA."  Dkt. 9-4 at 2.

Nevertheless, Defendants argue that the United States failed to provide a sufficient

statement of the basis and purpose of its request for federal election records.  Dkt. 58-1 at 20-21,

30-31; Dkt. 59 at 9; Dkt. 57 at 16-18; Dkt. 60 at 18-22.  They argue that the only permissible basis

for a Title III request is to enforce constitutional rights.  Dkt. 58-1 at 23-24; Dkt. 57 at 13-16; Dkt.

60 at 19.[9]  As a threshold matter, the CRA does not allow these criticisms to derail the United

States' demand for election records.

Defendants cannot use any "procedural device or maneuver," including the Defendants'

motions to dismiss, to challenge or "ascertain the factual support for, or the sufficiency of, the

Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written

demand."  *Lynd*, 306 F.2d at 226.  No discovery or other tools ordinarily available under the

Federal Rules of Civil Procedure may be used to question or examine "the reasons why the

Attorney General considers the records essential…"  *Id.*  "Questions of relevancy or good cause

or other like considerations" that may be assessed under other statutes to which the Federal Rules

of Civil Procedure are applicable "are completely foreign to the summary proceeding" under

Section 304 of the CRA.  *Id.* at 228; *see also Benson*, No. 1:25-cv-01148-HYJ-PJG, 2026 WL

---

[9] Common Cause-Intervenors accuse the United States of attempting to disenfranchise voters.
Dkt. 60 at 8-10, 22-24.  Indeed, they go even further, repeating unsubstantiated and erroneous
news reports claiming that the goal of the United States is "unlawfully and improperly mass-
challenging voters and interfering with the states' democratic process."  *Id*. at 10.  At bottom, the
alarmist contentions made by Intervenors reflect their disagreement with investigation and
enforcement of the list maintenance requirements in HAVA that were enacted by Congress on a
bipartisan basis.  As explained above, those requirements help protect, not hinder, individual
voting rights.

362789, at *8 (W.D. Mich. Feb. 10, 2026) ("[T]he CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose."). Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *See Coleman I*, 208 F. Supp. at 200-01. In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226; *cf. Powell*, 379 U.S. at 56 (explaining that there is no judicial oversight "to oversee the [IRS] Commissioner's determinations to investigate"). Movants' motions to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fail under the plain language of the statute, as applied by federal courts.

Federal courts have rejected contentions that parallel those made by Defendants. Defendants' contention that the demand needs to include a factual basis showing an *extant* violation of federal law fails for the reasons discussed above. *See supra*, Part III(A) (describing why the investigative nature of a demand under Title III forecloses any requirement that a specific allegation of a violation of federal law be included in that demand). Instead, a reference to the statutory basis for making the demand, namely HAVA, suffices.

Section 303's requirement that the written demand "contain a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General [must] identify in a general way the reasons for [her] demand." *Coleman II*, 313 F.2d at 868 (citation omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." *Id.* (emphasis added); *see also Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed "to see if any federal laws were violated"); *cf. Morton Salt*, 338 U.S. at 642-43 (same construction of administrative subpoena by the FTC). The United States satisfied that requirement by stating that

the purpose of the request was to "ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA."  Dkt. 9-4 at 2.

Even if the court allows the type of inquiry Defendants seek—and it should not—the United States can demonstrate its factual basis.  HAVA requires that voter registration applicants provide a driver's license and SSN4 if they have one.  *See* 52 U.S.C. § 21083(a)(5)(A)(i).  The United States needs to verify that states are collecting these numbers by looking at an unredacted voter list.  *See* 2d Neff Decl. ¶¶ 4-6.  The United States made this demand in the December 12 Letter:

> [T]he electronic copy of the statewide Voter Registration List ("VRL") must contain all fields, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA") to register individuals for federal elections.  *See* 52 U.S.C. § 21083(a)(5)(A)(i).

December 12 Letter (Dkt. 9-4 at 1).  The accompanying footnote explained that when Congress charged the Attorney General with HAVA enforcement, it "plainly intended that DOJ be able to conduct an independent review of each state's list…."  *Id.* at n.1.  These numbers are also necessary to fulfill the purpose of assessing whether a state is complying with list maintenance requirements because the HAVA identifiers are used to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections.  2d Neff Decl. ¶¶ 4-5.[10]

---

[10]  Even if more of an explanation were required, the August 6, 2025 Letter provided a context for the December 12, 2025 demand letter, explaining that data from the Election Assistance Commission showed the State of Connecticut having one of the lowest rates in the nation for removing deceased persons from the voter registration rolls, and that Connecticut had not tracked information about duplicate registrations.  *See* Dkt. 9-2 at 2.

**D.    Connecticut's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections.**

The scope of federal election records covered by Title III of the CRA is broadly established by Congress.  Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election.  52 U.S.C. § 20701 (emphasis added).  This language is unequivocal in its breadth.

Indeed, federal courts that have applied Section 301 have concluded that Congress meant what it said in the statute.  It does not exclude production of non-public records, despite the Secretary's claim that "Connecticut law [prohibits her] from producing much of the information …" Dkt. 9-5 at 2; Dkt. 58-1 at 32 (stating that any production is "limited by Connecticut's privacy protections for voter registration information").  One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election …' if they relate to acts requisite to voting in such election.

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701).  In *Lynd*, the Fifth Circuit likewise recognized that "the papers and records" covered by Section 301 "have been specifically identified by Congress."  306 F.2d at 226.  This requirement "is sweeping."  *Id*.  It applies to "all records and papers," as the statute provides, *id.*, and cannot be circumvented in the manner that the Defendants suggest.

Federal courts have concluded that Section 303 requires reproduction and copying.  For example, in *Lynd*, the court rejected a "mechanical objection[]" in which copying federal election records "would, at one time, have been a formidable thing."  *Lynd*, 306 F.2d at 231.  There, the court observed that "[m]odern photostating equipment will make short order of most of these demands."  *Id.*  Connecticut's SVRL is required by HAVA to be in electronic form.  It is axiomatic that providing the United States with an electronic copy of its SVRL will be much less burdensome than physical copying of every individual registration record if complete physical records even exist outside of their electronic form.

Secretary Thomas cites *Benson* for the proposition that Secretary Thomas does not come into possession of the SVRL.  Dkt. 59-1 at 16-17.  The *Benson* court read Section 301 much more narrowly and denied production of a SVRL for a narrower reason: that it applies "only to documents that people *submit* to the State as part of the voter registration process, not a document like the voter registration list that is *created* by state officials."  *Benson*, 2026 WL 362789, at *9 (emphasis added).  The United States respectfully disagrees; no other federal court has adopted such a limitation.  Moreover, today many – and likely even most – voter registration applications are only in electronic form in a SVRL.[11]  Such a reading would effectively carve out vast numbers of federal election records, which was plainly not the intention of Congress in passing such

---

[11]    According to the data that Connecticut reported to the U.S. Election Assistance Commission, it is doubtful that hundreds of thousands of federal voter registration records exist in any medium other than electronic form.  Over 100,000 voter registration transactions in Connecticut were reported as being done online, with part of an additional 732,283 done by email or fax.  *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024 Comprehensive Report at 162 (June 2025), *available at* https://www.eac.gov/research-and-data/studies-and-reports (last visited March 13, 2026).  Connecticut deploys electronic Voter Registration Systems in all of its jurisdictions, so it is likely that a large percentage of the remaining registrations are done electronically and not in paper form.  *Id*. at 31-32.  All this taken together, it is certain that a significant portion of Connecticut's registrations exist only in electronic form.

"sweeping" legislation.  *Lynd*, 306 F.2d at 226.  Even the *Benson* court expressed some discomfort at its conclusion, acknowledging that it was possible that "the distinction between voter registration applications and voter registration lists is overly pedantic."  2026 WL 362789, at *10. Nevertheless, *Benson* attributed any failing in that respect to "a pedantic distinction *made by Congress.*"  *Id.* (emphasis in original).

Federal courts have rejected similar attempts to limit the scope of voting records.  In *Judicial Watch v. Lamone*, the defendants argued that a "voter list is not a 'record' under Section 8(i)" of the NVRA, and even if it was, Maryland law allowed election officials to "limit the production of voting-related records more strictly than the NVRA."  399 F. Supp. 3d 425, 434 (D. Md. 2019).  The court rejected that contention. It explained that Maryland misunderstood the requirements of the NVRA and the plaintiff was entitled to the registered voter list because "a 'voter list' is simply a partial compilation of voter registrations" encompassed by the Act.  *Id.* at 442.  The court also was persuaded that the "focus on the information sought" was significant "rather than the particular language used to characterize that information."  *Id*. at 440 (citing *Project Vote v. Kemp*, 208 F.Supp.3d 1320, 1329 (N.D. Ga. 2016) (rejecting defendant's argument that plaintiff could not obtain voter list)); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (finding "all records" under Section 8(i)(1) included voter registration records).

Moreover, there is no reason to attribute such a "pedantic distinction" to Congress. *Benson*,2026 WL 362789, at *10.  The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified] election[s]" for a period of 22 months from the date of election.  52 U.S.C.

§§ 230701, 20703.  According to the *Benson* court, "'come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source" as opposed to the phrase "records in the possession of," which would include documents or records that were self-generated. 2026 WL 362789, at *9.  That, however, is not what the plain terms of the statute dictate:  an officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control.  *Webster's New World Dictionary of the American Language* 291, (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession").  And Secretary Thomas acquired the relevant records in the course of carrying out her duties as the State officer responsible for administering elections in Connecticut.

The *Benson* court's focus on the word "come" cannot create a carve-out for self-generated documents.  Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance.  *See Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) ("to enter upon or into possession of:  acquire esp. as an inheritance").  Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or trigger duties to act based on acquiring information or property *at a particular time*.  *See, e.g.*, 44 U.S.C. § 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. § 214 (similar); 30 U.S.C. § 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. § 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received").  Following this focus on the *when* and *how* an individual gains possession

24

of a record or paper, 52 U.S.C. § 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision – and then only "for a period of twenty-two months from the date" of that same election.

Contrary to the *Benson* court, then, "distinction[s] between possessing something and having something come into one's possession," 2026 WL 362789, at *9, are temporal distinctions – not distinctions between obtaining records from an outside source and through self-generation – as shown by the very example that court cites. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization is declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" at a later time must likewise surrender the document.  Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person" create a declaration of intention for a separate declarant. *See* 8 U.S.C. §§ 1445(f), 1449.

In any event, even if the *Benson* court's distinction between self-generated records and papers and those acquired from another source had merit, it would be irrelevant in all but the most marginal cases. Sections 20701 and 20703 focus on individual "officer[s] of election" and "person[s] having custody, possession, or control of such record[s] or paper[s]."  So even if someone in the Secretary of State's office generated the requested record and, under the *Benson* court's view, therefore did not "come into … possession" thereof, any other "officer of election" within the same agency that acquires the record has indeed "come into … possession" of the record

under that court's view and was obligated to "retain and preserve" it.  52 U.S.C. § 20701. And Secretary Thomas, now "having custody, possession, or control of such record or paper" must "ma[k]e [it] available for inspection, reproduction, and copying."  *Id.* § 20703.

Finally, this construction would create absurd results.  Title III was enacted to, *inter alia*, counteract discriminatory practices in allowing citizens to vote. *Lynd*, 306 F.2d at 228. (This is not to say that this is Title III's sole purpose. It is not.)  The United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA.  To ascertain whether a jurisdiction engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the electronic SVRL, so as to assure herself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced.  *See* 2d Neff Decl. ¶¶ 5-6.  Limiting the Attorney General's ability to anything other than *all records* would make it nearly impossible for her to carry out the duties assigned to her by Congress.

**E.    The United States is entitled to Connecticut's federal election records, including its SVRL.**

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…."  52 U.S.C. § 20703.  "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute… arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers … relating to any … act requisite to voting'."  *Id.*

Secretary Thomas argues that under the major questions doctrine the United States lacks authority to obtain a copy of the SVRL.  *See* Dkt. 58-1 at 17-20.  The major questions doctrine does not apply.

The United States exercises *investigatory* power under Title III, which is an express grant of authority from Congress to the Attorney General.  *See* 52 U.S.C. §§ 20701-20706.  None of the Supreme Court's major-questions precedents—which analyze the scope of delegations of traditionally congressional authority—support using that doctrine to analyze an executive official's mode of investigation regarding a concededly lawful federal statute. Secretary Thomas agrees that the United States can enforce the list maintenance provisions the NVRA and HAVA. *See* Dkt. 58-1 at 19.  Both the NVRA and HAVA authorize the Attorney General to bring a civil action in an appropriate district court for such declaratory and injunctive relief as are necessary to carry out the relevant requirements under the statutes.  52 U.S.C. §§ 20510(a) and 21111.  And the United States has used the CRA before to conduct statewide list maintenance enforcement under the NVRA and HAVA.  *See* 2d Neff Decl. ¶¶ 9-10.

The major-questions doctrine "teaches that there are 'extraordinary cases' that call for a different approach" than ordinary statutory interpretation—"cases in which the 'history and the breadth of the authority that the agency has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority."  *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); brackets omitted).  In short, the Court has "long expressed 'reluctan[ce] to read into ambiguous statutory text' extraordinary delegations of Congress's powers."  *Learning Resources, Inc. v. Trump*, 607 U.S. ___, Nos. 24-1287 & 25-250,

2026 WL 477534, at *7 (U.S. Feb. 20, 2026) (plurality opinion) (quoting *West Virginia*, 597 U.S. at 723; (brackets in original)).  That is not this case.

The major-questions doctrine applies only when interpreting "ambiguous statutory text." *Learning Resources*, 2026 WL 477534, at *7 (quoting *West Virginia*, 597 U.S. at 723); *see Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring) (noting that "none" of the Court's major-question precedents "purports to depart from the best interpretation of the text").  As discussed above, nothing about the text providing the Attorney General investigative authority under Title III is ambiguous, so the major-questions doctrine would not apply here.  *See* Section III.B. *supra.*

Moreover, the Attorney General is not claiming any delegated authority.  *Learning Resources*, 2026 WL 477534, at *7 (plurality opinion); *see Biden v. Nebraska*, 600 U.S. at 508 (Barrett, J., concurring) ("emphasiz[ing] the importance of *context* when a court interprets a delegation to an administrative agency").  Each of the Supreme Court's major-questions decisions asked whether "context," "includ[ing] not just other language within the statute, but 'constitutional structure' and 'common sense'" counseled against the Government's asserted "highly consequential power."  *Learning Resources*, 2026 WL 477534, at *7 (plurality opinion) (citations omitted).  In each case, the President or an administrative agency claimed the ability to regulate private conduct or exercise some other authority typically enjoyed by Congress.  *See, e.g.*, *id.* at *10 ("[W]hatever may be said of other powers that implicate foreign affairs, we would not expect Congress to relinquish its tariff power through vague language, or without careful limits."); *West Virginia*, 597 U.S. at 724 ("[T]he Agency's discovery allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."); *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 760 (2021) (per curiam) ("The new,

administratively imposed moratorium went further than its statutory predecessor, covering all residential properties nationwide and imposing criminal penalties on violators.").

The Attorney General is not claiming any new authority to revise or maintain Connecticut's voter rolls.  Rather, the Attorney General wants to verify that Connecticut is complying with specific federal law requirements like the requirement for HAVA identifiers to be filled in on a voter registration application. *See* 52 U.S.C. § 21083(a)(5)(A).[12]  The only way that the Attorney General can assess whether Connecticut is actually collecting the driver's license and SSN4 information required by 52 U.S.C. § 21083(a)(5)(A) on the voter registration application is to examine those election records.  That information is not provided in the redacted or public voter list.[13]  There is no question that enforcement of the list maintenance requirements of HAVA is for "the purpose of investigating possible violations of a Federal statute," and so the demand for the information meets the requirements of the CRA.  *Coleman II*, 313 F.2d at 868; *cf. Morton Salt*, 338 U.S. at 642-43 (confirming compliance with federal law is a legitimate purpose).

---

[12]  The major-questions doctrine applies in cases where the Government's claimed authority has potentially vast "economic and political" consequences.  *See, e.g.*, *Learning Resources*, 2026 WL 477534, at *9 (plurality opinion) (citation omitted) (citing projection that tariffs will "reduce the national deficit by $4 trillion" and lead to international agreements "worth $15 trillion"); *Nebraska*, 600 U.S. at 483 ("The Secretary's plan canceled roughly $430 billion of federal student loan balances ...."); *Alabama Ass'n of Realtors*, 594 U.S. at 764 (deeming $50 billion to be "a reasonable proxy of the moratorium's economic impact" and concluding that the moratorium would "intrude[] into an area that is the particular domain of state law").  This factor is absent here too.

[13]  If Defendants' position were to be adopted, it would eviscerate HAVA enforcement of 52 U.S.C. § 21083(a)(5)(A) and list maintenance in general.  The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA by having access to the voter identification numbers required by federal law.  As explained above, that information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.  *See supra* Part III(B).

For the same reason, state privacy laws must yield to the requirements to enforce HAVA contrary to Defendants' arguments. *See* Dkt. 58-1 at 32-34; Dkt. 57 at 21-22. The United States needs to review the unredacted data to verify that the HAVA identifiers are being collected by the local Registrars. *See* 52 U.S.C. § 21083(a)(5)(A).[14] "[I]t is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. at 384; *see also Inter Tribal Council of Ariz., Inc.*, 570 U.S. at 7-9 & n.1.

Defendants also ask the Court to legislate limitations conspicuously absent from Title III. They cite state and federal statutes governing privacy of voter registration records to support their argument that only a publicly available version of Connecticut's SVRL is required. *See* Dkt. 58-1 at 34-39; Dkt. 57 at 21-22, 32; Dkt. 60 at 28-29. The statutory text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that are public. Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

---

[14] The United States understands that Connecticut state law requires the state to collect the HAVA identifiers per the Rosenberg declaration, Dkt. 58-2 at ¶ 70. That does not allow the United States to verify that the information is actually being collected by the Registrars.

52 U.S.C. § 20704.  Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information.  Yet Defendants ignore the plain language of Section 304 and ask the Court to do the same by rewriting the CRA to exclude all non-public records and information.  Congress rejected the position that they advance by its broad reference to "all records and papers."  52 U.S.C. § 20701.  In sharp contrast, where Congress intended to require a smaller class of records to be produced in a statute, it has said so.  *See* 52 U.S.C. § 20507(i) (providing in the NVRA that voter records to be produced to the public for assessment of list maintenance "shall include lists of the names and addresses" of voters sent confirmation notices and any responses).  To put it succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including Connecticut's SVRL.  52 U.S.C. § 20701.  As *Lynd* made clear, "All means all." 306 F.2d at 230.  Therefore, the argument by Defendants that non-public records are excluded fails as a matter of law.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws.[15]  The unredacted SVRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a protective order.[16]  *Lynd*, 306 F.2d at 230.

---

[15] As the Second Neff declaration states, the Civil Rights Division's purpose for obtaining voter rolls is limited to assess compliance with HAVA and the NVRA.  2d Neff Decl. ¶¶ 2-6.  To the extent that this Court is concerned that the United States might use the election records for immigration enforcement or purposes other than determining compliance with HAVA or the NVRA, this Court can craft an order prohibiting such use when ordering Connecticut to comply with the CRA demand.

[16] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States offered several states a memorandum of understanding, or MOU, memorializing these requirements.  *See* 2d Neff Decl. ¶ 18.  As of March 13, 2026, fourteen states have provided their SVRLs without any MOU. *Id.* Two states have agreed to provide their SVRL under the terms of the MOU.  *Id.*

The data the United States has requested under the CRA is the same that twenty-five states (including Connecticut) and the District of Columbia routinely share through the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list maintenance requirements.[17]   Similarly, private parties have been granted access to even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights.  *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal dismissed sub nom. Formella v. Coal. for Open Democracy*, No. 25-1585, 2025 WL 3786144, No. 25-1585 (1st Cir. July 2, 2025).

Accordingly, the United States is entitled to reproduction and copying of Connecticut's unredacted electronic SVRL under the unambiguous language of Section 303 of the CRA.  *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56 (granting the Attorney General "an order to require the production of records for inspection, reproduction and copying…"); *Lynd*, 306 F.2d at 226 (same).

## IV.    THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS

Defendants make a variety of arguments that privacy laws require dismissal of the United States' efforts to compel production of Connecticut's federal election records.  *See* Dkt. 58-1 at 34-39; Dkt. 57 at 19-26; Dkt. 60 at 25-29.  Those arguments are misguided at best.  The United States does not dispute that the requirements of the Privacy Act and Section 304 of the CRA apply here,

---

[17] *See* ERIC, "About ERIC," *available at* https://ericstates.org/about/ (last visited March 13, 2026).

and it is complying with those requirements.  The First Amendment does not prohibit the collection of voter information by the United States to assess compliance with HAVA.  The requirement for a Privacy Impact Assessment under the E-Government Act does not apply to the investigation of Connecticut's list maintenance practices being conducted by the United States under.  Each of these arguments will be addressed briefly in turn.

### A.    The United States is complying with the Privacy Act.

Secretary Thomas argues that the United States must comply with the Privacy Act, and the United States is doing that. The Secretary suggests that the United States' demand is "blatantly lawless," Dkt. 58-1 at 35 (citation omitted) and violates the Privacy Act because it seeks records "describing protected First Amendment activity."  *Id*.  The Secretary also argues that the United States "has not plead that it has established a SORN or that an existing SORN" applies.  *Id*. at 36.

The demand by the United States expressly incorporates the Privacy Act.  *See* Dkt 9-4 at 2 & n.2 ("[A]l data received from you will be kept securely and treated consistently with the Privacy Act explained at …").  That said, there is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information.  In other words, the Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.[18]  The Complaint, incorporating the demand, is in full compliance.

---

[18]  As *Lynd* recognized under similar circumstances, any legitimate privacy concerns can be addressed through an appropriate protective order governing the production of the demanded federal election records, including compliance with Section 304 of the CRA and the Privacy Act. *See* 306 F.2d at 230.

The voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online. The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151. The list of routine uses for this collection of information includes JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). As referenced in SORN CRT-001 in the categories of records in the system: "The delegated legal duties and responsibilities of each section are described in detail at the Civil Rights Division Web page: *http://www.usdoj.gov/crt/crt-home.html*." 68 CFR 47611. Similarly, it is noted that the purposes of the SORN are broad:

> The purposes of this system are to assist all the sections within the Division in maintaining names of Division employees and their case investigation assignments, names of defendants or investigation targets, victims, witnesses or potential witnesses, or other persons or organizations as they relate to potential or actual cases, investigations, and matters of concern to CRT.

*Id.* The statutes cited for routine use in the Department of Justice SORNs include enforcement of HAVA, the NVRA, and the Civil Rights Act of 1960, as described in note 16 of the Department of Justice's Privacy Policy.[19]    The United States made its requests and filed this case pursuant to

---

[19]  Defendants claim that JUSTICE/CRT – 001 SORN does not give fair notice of the collection for Connecticut. That is not accurate. States have frequently been the subject of voting investigations and enforcement as JUSTICE/CRT – 001 SORN advises. The United States has been involved in statewide redistricting cases where it has used statewide voter registration lists (https://www.justice.gov/crt/cases-raising-claims-under-section-2-voting-rights-act-0#tx2021)

those statutes.  *See* Compl., Dkt. 1.  The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

To the extent that Defendants are concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS").  That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs.  2d Neff Decl. ¶ 8.

**B.    The First Amendment does not prohibit access to data the United States needs for its HAVA claim.**

The United States is not violating 5 U.S.C. § 552a(e)(7) of the Privacy Act by requesting Connecticut's SVRL.  Defendants contend that voter registration data the United States seeks is a form of political expression protected by the First Amendment and implicates a statutory bar to collecting such data.  *See* Dkt. 58-1 at 35.  But they miss the mark. Without question, voting and registration implicate speech and actions protected under the First Amendment.  But that does not foreclose the United States from enforcing federal election laws like HAVA.  Moreover, application of their argument would effectively prevent the Voting Section of the Civil Rights Division from engaging in any investigations or enforcement actions at all.  That plainly is not what Congress intended.

**C.    The E-Government Act does not prevent the United States from obtaining data supporting its HAVA claim.**

Secretary Thomas next argues that the demand for production of Connecticut's SVRA "implicates" the E-Government Act.  *See* Dkt. 58-1 at 39.  Without citing any caselaw in support

───────────────────────

(last visited March 13, 2026). Similarly, the Brief of Former DOJ Employees, Dkt. 71-1 at 20-21, explains uses of Title III in Georgia in the vote denial context and in Alabama and Virginia in the NVRA context in which sensitive voter data has been used.

of the argument, the Secretary claims that the Voting Section is required to conduct a "privacy impact assessment," or "PIA," before initiating an investigation of its compliance with HAVA. *Id.* Again, neither the E-Government Act nor interpretative case law support this assertion.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107–347, § 208(b)(1)(A)(ii)(II), which "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The demand that was made to the Secretary was to provide an existing voter registration list already maintained pursuant to federal law. The SVRL would be kept on a system for which a Privacy Impact Assessment has been done.[20] Only when a new system is established—not when each new data request is made—is a Privacy Impact Assessment required.[21]

Applying the E-Government Act to enforcement of voting statutes would lead to an absurd result in which thousands of Privacy Impact Assessments would have to be done whenever the Voting Section gathers any voter data to enforce the Voting Rights Act, HAVA, NVRA, or the

---

[20] An Initial Privacy Assessment (IPA) Determination was issued on October 12, 2012, showing that no Privacy Impact Assessment is required for the Justice Consolidated Office Network (JCON) system where personal identifying information associated with the United States' CRA demand is stored. *See* 2d Neff Decl. ¶ 19.

[21] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Act Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited March 12, 2026).

Uniform and Overseas Citizens Voting Act. Nothing in the E-Government Act or the purpose of the privacy provision in the Act suggests it was meant to encompass the enforcement provisions of all voting laws where voter data is examined. *See* Pub. L. No. 107–347, § 208(a).

> **D.    The Driver's Privacy Protection Act does not allow Secretary Thomas to deny the United States list maintenance data.**

Secretary Thomas' contention that the Attorney General's demand violates the Driver's Privacy Protection Act ("DPPA") also fails.  Dkt. 58-1 at 39-40.  The DPPA generally prohibits the disclosure of "personal information" obtained by a state Department of Motor Vehicles in connection with a motor vehicle record. *See* 18 U.S.C. §§ 2721(a), 2725(1), (3), (4). Nonetheless, the statute explicitly contains exceptions that permit certain governmental uses. Under 18 U.S.C. § 2721(b)(1), disclosure is allowed "for use by any government agency … in carrying out its functions," including law enforcement or other regulatory enforcement purposes. This statutory language demonstrates that the DPPA was not intended to block all government access to DMV records.

The DPPA's prohibition is clearly not implicated in the present case. The Department of Justice is a government agency performing a statutorily mandated function—verifying voter registration records and associated list maintenance activities by state and local entities. Under the governmental-function exemption in Section 2721(b)(1), the United States' use of DMV-provided information is permissible, even though the information originates from a motor vehicle record. Transfers of DMV data to government agencies for official functions, including voter registration administration, are therefore consistent with the DPPA and fall squarely within the statute's exceptions.

## V. CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Motions to Dismiss by Secretary Thomas (Dkt. 58), the SEIU-Intervenors (Dkt. 57), and the Common Cause Intervenors (Dkt. 60) be denied, and the United States' Motion to Compel Production of federal election records under Section 305 of the CRA (Dkt. 9) be granted.

Dated: March 13, 2026.

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General

ERIC V. NEFF
Acting Chief, Voting Section


/s/ Joseph W. Voiland_____
JAMES T. TUCKER
CHRISTOPHER GARDNER
JOSEPH W. VOILAND
Trial Attorneys, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street
Washington, D.C. 20002
James.T.Tucker@usdoj.gov
Christopher.Gardner@usdoj.gov
Joseph.Voiland@usdog.gov
Tel. (202) 353-5318

Attorneys for the United States