**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

THE UNITED STATES OF AMERICA    :                    3:26-CV-00021-KAD
     *Plaintiff*            :
                         :
     v.                     :
                         :
STEPHANIE THOMAS         :
     *Defendant.*          :                  MARCH 18, 2026

### THE SECRETARY'S REPLY TO DOJ'S OPPOSITION BRIEF AT ECF NO. 76

DOJ asserts that two items arising from the 2024 EAVS data led to this litigation: (1) allegedly insufficient duplicate registration tracking and (2) allegedly insufficient removal of deceased persons.[1] But DOJ has not explained how those issues support allegations that the Secretary is failing to carry out a "general program that makes reasonable [list maintenance] efforts" under NVRA or HAVA. Nor has DOJ identified any specific EAC guidance, data, or comparator of any type that the Secretary—or this Court—could use to assess "reasonable efforts." DOJ has not even looked to NVRA and HAVA's historical guidance *describing* "reasonable efforts," much less explained how its present concerns differ from those in 2019, when Connecticut and the United States entered a memorandum of understanding regarding the removal of deceased voters ("2019 MOU")[2], which said nothing about the need for a VRL. And critically, DOJ has not explained how an unredacted VRL is necessary to enforce the statutes, at all.

Identifying specific concerns with Connecticut's list maintenance practices might enable the Secretary to address them, likely without producing sensitive voter information that is irrelevant to DOJ's stated concerns under NVRA and HAVA. That approach would have been

---

[1] ECF No. 76 at 11.

[2] See February 14, 2019 Memorandum of Understanding between the United States and State of Connecticut ("2019 MOU") (attached as Exhibit 1).

more helpful, less confrontational, more likely to resolve DOJ's concerns, *and* consistent with DOJ's past practices in list maintenance cases before 2025.  But that is not what DOJ wants. Instead, without alleging a NVRA or HAVA violation, DOJ demands that this Court solve DOJ's own manufactured crisis based on an interpretation of Title III that is divorced from the CRA's plain purpose—to combat voter discrimination. DOJ insists that the Court do so without considering the evidence that the judicial machinery is being used to advance an improper purpose of the Federal government, let alone a purpose consistent with the statutes here. The Court should reject DOJ's arguments.

## I.    This Action is Inconsistent with DOJ's Past Practices.

A "list maintenance" case under the NVRA can have two types of allegations: (1) improper removal of eligible voters; and (2) ineffectual removal of ineligible voters.

The first concerns discrimination. It reflects Congress's insistence that NVRA list maintenance could not be performed in a way that violates the Voting Rights Act.[3] That is not the type of case DOJ is pursuing here, where it has disclaimed any allegation of voter discrimination.[4]

The second concerns the removal of ineligible voters. That is what DOJ is interested in here.[5] Unlike the first type of case—which has a traditional link to voting discrimination—the

---

[3] *See* 52 U.S.C. § 20507(b)(1) ("Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 . . . ."); *see also* IMPLEMENTING THE NVRA OF 1993: REQUIREMENTS ISSUES APPROACHES AND EXAMPLES, APPENDIX C - SENATE COMMITTEE REPORT ON S. 460, p. 18 ("The requirements of the [NVRA and VRA] are distinct and complementary. The States must comply with the National Voter Registration Act in a manner which does not violate the Voting Rights Act"). Available online at Implementing the NVRA of 1993 Requirements Issues Approaches and Examples Jan 1 1994.pdf. An overview of DOJ's historic list maintenance cases was published in 2019. *See* GAO Report on Voter Registration – Information on Federal Enforcement (June 2019), pp. 21-22. Available online at GAO-19-485, VOTER REGISTRATION: Information on Federal Enforcement Efforts and State and Local List Management

[4] ECF No. 76 at 19.

[5] ECF No. 76 at 12.

second type of case reflects purely administrative concerns.

DOJ fails to identify a single instance where it used the CRA to demand records in this second type of case. That is because Congress did not authorize DOJ to conduct this type of investigation under NVRA or HAVA. Indeed, absent concerns about voter discrimination, there is no basis for DOJ to invoke Title III. And there is no need to conflate the CRA with NVRA or HAVA because where, as here, a state's list maintenance procedures do not raise any concerns over unlawful removal of eligible voters, DOJ can and does take action to enforce NVRA and HAVA *without* requiring a VRL.

As the Secretary explained, these types of cases reflect Congress's two—sometimes competing—goals for voter registration.[6] DOJ makes no effort to explain how its attempt to use Title III to *prompt*, instead of *prevent*, a purge of registered voters is congruent with these distinct statutory regimes,[7] the principles of federalism embodied in the Elections Clause,[8] or the potential limits on Congress's powers to enforce the Fourteenth and Fifteenth Amendments.[9] Instead, DOJ ignores those possible conflicts.

That is notable in light of DOJ's past practice when addressing the one of the very provisions at issue in this case: the requirement to remove deceased persons from the VRL.[10] In 2018, DOJ inquired into Connecticut's procedures for removing deceased voters from its voting

---

[6] See ECF No. 58-1 at 13.

[7] *See West Virginia v. EPA*, 597 U.S. 697, 723 (2022) ("[S]omething more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to clear congressional authorization for the power it claims." (cleaned up).)

[8] *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (The power of Congress over the 'Times, Places and Manner' of congressional elections 'is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, *and no farther*, the regulations effected supersede those of the State which are inconsistent therewith.' " (quoting *Ex parte Siebold*, 100 U. S. 371, 392 (1880) (emphasis added)).

[9] *See, e.g.*, *Pub. Int. Legal Found., Inc. v. Simon*, 774 F. Supp. 3d 1037, 1044-45 (D. Minn. 2025) (discussing distinctions between Congress's election powers and civil rights powers as applied to the NVRA and VRA).

[10] *See* Exhibit 1.

rolls.[11] Although DOJ had no specific evidence of improprieties and Connecticut never conceded that it was deficient or statistically anomalous in any way, Connecticut, nonetheless collaborated with DOJ between 2018 and 2020 to find a solution. The parties negotiated in good faith and agreed upon a reporting plan where Connecticut demonstrated to DOJ its process for reasonable and timely removal of deceased voters.[12] During that two year period, the Secretary implemented new processes to ensure that local officials received death data in a timely manner, so that those officials could more quickly ascertain when deceased registrants needed to be removed.[13] After 2020, DOJ was apparently satisfied with Connecticut's efforts. It took no further steps—and certainly no enforcement action.[14] All of this was accomplished without a demand for or production of Connecticut's VRL. But now, instead of acknowledging that it can pursue relief under the NVRA and HAVA *without* the unredacted voter rolls, DOJ insists that "[l]imiting the Attorney General's ability to anything other than all records would make it nearly impossible for her to carry out the duties assigned to her by Congress."[15] That does not line up with the 2019 MOU and calls into question DOJ's absolutist demands here.

In the absence of any caselaw endorsing its theory that it may invoke with CRA in the absence of discrimination, DOJ points to three consent decrees to justify its position here.[16] They are not persuasive. The 2025 North Carolina Consent Judgment reflects the same novel theories that the Secretary is challenging here, which were never tested in court. The older applications of the CRA, in the 2008 Texas and 2006 Georgia "list maintenance" cases, do not reflect any past

---

[11] Exhibit 1, ¶ 3.

[12] Id., ¶¶ 15-16

[13] *Id.*, ¶¶ 18-19.

[14] *Id.* ¶¶ 28-30; *Id.*, ¶¶ 30-32; "Final Deceased Voters Report to DOJ," dated October 1, 2020 (attached as Exhibit 2).

[15] ECF No. 76 at 31.

[16] *See* ECF No. 76-1, ¶¶ 9-16.

practice like this, either. There is no reason to believe that those cases did not implicate voter discrimination concerns.[17] Even so, "[c]onsent to an injunction . . . is not an admission of past wrongdoing."[18] If anything, these are merely evidence of "compromises in which the parties give up something they might have won in litigation and waive their rights to litigation."[19] These consent decrees have no bearing here.

## II.     This Action is Not Permitted by Any Plausible Construction of the Statutes.

DOJ notes that Title VI of the CRA is directly tied to "to racial discrimination" but argues that because Title III does not use this term, it can be used for any purpose DOJ desires.[20] But DOJ cites literally zero evidence or authority for their position. Voting rights and discrimination are at the heart of the CRA. The CRA of 1960, which included Title III, was a "perfecting amendment" to the CRA of 1957, which was—again—directly tied to racial discrimination in voting.[21] The CRA is a comprehensive statutory scheme to combat voter discrimination and must be read together with *all* its parts.[22] While Congress provided DOJ with the power to remedy voter discrimination under the CRA, it has no application in this case.

DOJ's position flies in the face of the serious concerns the CRA was intended to address.

---

[17] Indeed, there is reason to believe the cases did include voter discrimination concerns. At the time, both states were covered by the pre-clearance requirements of the Voting Rights Act. *See* Civil Rights Division | Jurisdictions Previously Covered By Section 5 (last accessed 3/18/26). Documents in both matters also reflect concerns with voter registration—the first type of "list maintenance" case, traditionally linked with discrimination.

[18] *D.C. Comics, Inc. v. Mini Gift Shop*, 912 F.2d 29, 36 (2d Cir. 1990).

[19] *United States SEC v. Citigroup Glob. Mkts.*, 752 F.3d 285, 295 (2d Cir. 2014) (citing *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 235 (1975)). *See also SEC v. Levine*, 881 F.2d 1165, 1173 (2d Cir. 1989)(citing *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971)) ("the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it").

[20] ECF No. 76 at 19.

[21] *See South Carolina v. Katzenbach*, 383 U.S. 301, 311–13 (1966); see also *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).

[22] *See West Virginia v. EPA*, 597 U.S. at 721 ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.")

Contrary to DOJ's dissonant interpretation the legislative history in its brief,[23] the Fifth Circuit's endorsement of Title III to investigate "possible violations of a Federal statute," apparently referred to a specific statute: the CRA.[24] That court did not mean to authorize DOJ to demand voter data under *any* Federal statute, for *any* reason, as DOJ now argues.[25] DOJ, at least, has not identified any other federal statutes concerning election administration that had been enacted at that time.[26] Nevertheless, in furtherance of this tortured construction of the CRA and NVRA, DOJ rejects any restraint on its investigatory powers in this case, going so far as to argue that no statutory language in Title III "limits the Attorney General's authority to compel records under the CRA."[27] But the disclosure of Connecticut's VRL would implicate constitutionally-protected interests and privacy concerns, and concerns about its disclosure could chill eligible voters from registering, at all.[28] Even DOJ recognizes that "[w]ithout question, voting and registration implicate speech and actions protected under the First Amendment."[29] DOJ's administrative subpoena analogs do not sufficiently protect these interests.

A more appropriate analogy is to *elections investigations* that were traditionally undertaken by the Federal Elections Commission.[30] Critically, where, as here, an investigation implicates

---

[23] *See* ECF No. 76 at 19-20.

[24] *See Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767).

[25] *See* ECF No. 76 at 19-20

[26] *See Husted v. A. Philip Randolph Institute*, 584 U.S. 756, 761 (2018) (until 1993, "Congress left it up to the States to maintain accurate lists of those eligible to vote in federal elections").

[27] ECF No. 76 at 16.

[28] *See Tashjian v. Republican Party*, 479 U.S. 208, 214 (1986) ("The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom") (quoting *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973)); *Buckley v. Valeo*, 424 U.S. 1, 15 (1976) ("The First Amendment protects political association as well as political expression"); *Cotarelo v. Sleepy Hollow Police Dep't*, 460 F.3d 247, 253 (2d Cir. 2006) ("Political party affiliation is protected by the First Amendment"); *Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003) ("Voting on public policy matters coming before a legislative body is an exercise of expression long protected by the First Amendment.").

[29] ECF No. 76 at 40.

[30] *See Fed. Election Com. v. La Rouche Campaign*, 817 F.2d 233, 234 (2d Cir. 1987) (rejecting the deferential *Powell* standard when assessing a subpoena issued as part of an FEC investigation)

constitutional concerns, "the usual deference to the administration agency is not appropriate, and protection of the constitutional liberties of the target of the subpoena calls for a more exacting scrutiny of the justification offered by the agency."[31] In turn, "an administrative agency is not automatically entitled to obtain all material that may in some way be relevant to a proper investigation. Rather, where the disclosure sought will compromise the privacy of individual political associations, and hence risks a chilling of unencumbered associational choices, the agency must make some showing of need for the material sought beyond its mere relevance to a proper investigation."[32]

Contrary to DOJ's assertions about the unrestrained application of Title III, it should be the agency's burden here to demonstrate "that there are governmental interests sufficiently important to outweigh the possibility of infringement [of the exercise of the first amendment rights]."[33] Indeed, in certain cases that scrutiny may appropriately be extended to testing the Court's jurisdiction. For instance, the D.C. Circuit explained that the novel extension of the FEC's investigative authority warranted "extra-careful scrutiny from the court because the activities which the FEC normally investigates differ in terms of their constitutional significance from those which are of concern to other federal administrative agencies whose authority relates to the regulation of corporate, commercial, or labor activities."[34] Because DOJ is attempting a novel

---

[31] *Id.*

[32] *Id.*, 234-35.

[33] *Id.*, 235 (quoting *Buckley v. Valeo*, 424 U.S. 1, 66 (1976)).

[34] *Fed. Election Com. v. Machinists Non-Partisan Political League*, 655 F.2d 380, 387 (D.C. Cir. 1981). The D.C. Circuit further observed that "[w]here regulatory agencies are confronted with new circumstances that create problems which Congress has not yet considered, courts frequently decline to permit expansion of regulatory jurisdiction into the new area. *See Chemehuevi Tribe of Indians v. FPC*, 420 U.S. 395, 422-24 (1975) (technological developments occurring after enactment of a statute do not in themselves justify expansion of jurisdiction of an agency beyond the scope described by Congress); *FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 635-36 (1972) (a newly arisen need for regulation cannot of its own force expand the reach of commission's jurisdiction)." *Machinists Non-Partisan Political League*, 655 F.2d 380, 394 n.28.

extension of its investigative authority (using the CRA to enforce NVRA and HAVA in the absence of voter discrimination), these concerns are especially important for the Court here.[35]

Even if Title III could be used outside of voter discrimination—which it cannot—and even if Congress meant for Title III to be untethered to the Rules of Civil Procedure—which it did not—the Court must still exercise its inherent authority to prevent misuse of judicial process and any of infringement of eligible voters' first amendment rights.

### III.    DOJ Has No Answer to its Apparent Violations of Federal Privacy Law.

Even if the Court credits all of DOJ's other arguments—which it should not—the privacy issues surrounding this action are fatal to DOJ's claim. Rather than comply with federal privacy law or meaningfully address the Secretary's concerns, DOJ mischaracterizes the requirements and applicability of the Privacy Act, the E-Government Act, and the DPPA. But DOJ cannot evade following the law by baselessly concluding that it need not do so. Congress created express requirements in each Act that DOJ follow.[36] Dismissal is warranted because DOJ's failure to comply with federal privacy law is apparent on its face.[37]

DOJ first responds that the Privacy Act's requirement to publish a SORN,[38] is inapplicable because DOJ's Index File SORN[39] extends to its current demand for the "identifying particulars"[40] of millions of voters. DOJ is wrong. As the Secretary detailed in her principal brief,[41] DOJ's Index

---

[35] *See, e.g.*, *id.*, 386.

[36] *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 304 (2017) ("It is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute.").

[37] *See United States v. Weber*, 2026 U.S. Dist. LEXIS 8545, at *47 (C.D. Cal. Jan. 15, 2026).

[38] *See* 5 U.S.C. §§ 552 (e)(3).

[39] DOJ's Index File SORN includes "(1) "'JUSTICE/CRT – 001,' 'Central Civil Rights Division Index File and Associated Records,' 68 Fed. Reg. 47610, 611 (8-11-2003); (2) 70 Fed. Reg. 43904 (7-29-2005); 72 Fed. Reg. 3410 (1-25-2007) (rescinded by 82 FR 24147); and (3) 82 Fed. Reg. 24147 (5-25-2017).

[40] *See* 5 U.S.C. § 552(a)(5)

[41] *See* ECF No. 58-1 at 36-39

File SORN cannot be read to extend so far. The mere fact that DOJ has brought redistricting challenges pursuant to the Voting Rights Act does not change that the novel demand in this case for the sensitive information of millions of voters requires a SORN that provides "fair notice" to voters.[42] After conceding that "[w]ithout question, voting and registration implicate speech and actions protected under the First Amendment,"[43] DOJ next responds that the Privacy Act's requirement to maintain "no record describing" protected First Amendment activity[44] is untenable because it would "foreclose the United States from enforcing federal election laws."[45] But DOJ's past practices demonstrate that it can enforce federal election laws without demanding data that implicate protected First Amendment activity.[46]

DOJ further responds that the E-Government Act does not apply since it is "not . . . contacting individuals for information"[47] based on a subsection of the Act that states that an agency "shall" conduct a Privacy Impact Assessment ("PIA"), if it "initiat[es] a new collection of information that . . . includes any information in an identifiable form permitting the physical or online contacting of a specific individual."[48] But that subsection merely says that a PIA is needed when an agency collects information that *anyone* could use to find a specific individual. It has no bearing on whether the Act applies (it does). DOJ also asserts that, even if the E-Government Act applies (it does), a PIA is unnecessary because it is not establishing "a new system."[49] But the Act's plain text dictates that "each agency *shall* . . . conduct a [PIA]" when it procures or collects

---

[42] ECF No. 76 at 39-40 n. 19.
[43] ECF No. 76 at 40.
[44] 5 U.S.C. § 552 (e)(7).
[45] ECF No. 76 at 40
[46] *See* Cases Raising Claims Under Section 2 of the Voting Rights Act, *https://www.justice.gov/crt/cases-raising-claims-under-section-2-voting-rights-act-0#tx2021* (last accessed Mar. 15, 2026).
[47] ECF No. 76 at 41.
[48] Pub. L. No. 107-347, § 208(b)(1)(A)(ii).
[49] ECF No. 76 at 41.

information technology containing identifiable information.[50] DOJ asserts, without explaining its relevance, that voter data will be stored in the Justice Consolidated Office Network ("JCON").[51] JCON's relevance is particularly puzzling considering that DOJ has created PIAs for information stored on JCON as recently as 2025.[52]  If the statute were not clear on its face, even guidance that DOJ includes on its own website shows that a PIA is required.[53]

Finally, DOJ responds that DPPA "does not allow Secretary Thomas to deny the United States list maintenance data" from motor vehicle records because it "contains exceptions that permit certain government uses."[54] But as the Secretary argued,[55] she has discretion regarding the government-use exception. DOJ does not address this point, conceding the "permissible" nature of the exception.[56] Given DOJ's blatant violations of federal privacy law and misuse of the CRA, there is good reason for the Secretary to use her discretion to deny DOJ personal information from motor vehicle records under DPPA.

## CONCLUSION

For these reasons, and those raised in the Secretary's Motion to Dismiss and Response to the Order to Show Cause, the Court should dismiss this case and deny DOJ's preferred remedy.

---

[50] Pub. L. No. 107-347, § 208(b)(1)(B)(i) (emphasis added).
[51] ECF No. 76, pp. 41, n. 20.
[52] DOJ Privacy Impact Assessments, https://www.justice.gov/opcl/doj-privacy-impact-assessments (last accessed Mar. 15, 2026).
[53] Justice.gov, "E-Government Act of 2002" (last accessed Mar. 18, 2026), https://www.justice.gov/opcl/e-government-act-2002#:~:text=Privacy%20Impact%20Assessments%20(%E2%80%9CPIAs%E2%80%9D,make%20subst antial%20changes%20to%20existing (click on link to "OMB Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002," which states that a PIA is require if, among other scenarios, "agencies systematically incorporate into existing information systems databases of information in identifiable form . . . obtained from . . . public sources" and "when alteration of a business process results in significant new uses or disclosures of information or incorporation into the system of additional items of information" or "when new information in identifiable form added to a collection raises the risks to personal privacy").
[54] ECF No. 76, pp 42.
[55] ECF No. 58-1, pp. 40-41
[56] ECF No. 76, pp. 42.

Respectfully submitted,

DEFENDANT
STEPHANIE THOMAS,

WILLIAM TONG
ATTORNEY GENERAL

By: /s/ *Blake Sullivan*

    Michael Rondon (ct31022)
    Blake Sullivan (ct30289)
    Elizabeth Lewis (ct32141)
    Assistant Attorneys General
    Attorney General's Office, Special Litigation
    165 Capitol Avenue, Suite 5000
    Hartford, CT 06106
    Tel:  (860) 808-5020
    Fax: (860) 808-5347
    Michael.Rondon@ct.gov
    Blake.Sullivan@ct.gov
    Elizabeth.Lewis@ct.gov

**CERTIFICATION**

I hereby certify that a copy of the foregoing was electronically filed and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's system.

/s/ *Michael Rondon*
Michael Rondon (ct31022)
Assistant Attorney General