**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | NO. 3:26-CV-21 (KAD) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHANIE THOMAS, in her Official | ) | |
| Capacity as Secretary of State for the State | ) | JULY 17, 2026 |
| of Connecticut, | ) | |
| *Defendant*. | ) | |

**ORDER DENYING THE UNITED STATES' [9] MOTION TO COMPEL; GRANTING THE COMMON CAUSE INTERVENORS' [60] MOTION TO DISMISS; AND FINDING AS MOOT THE REMAINING [56] and [58] MOTIONS TO DISMISS**

Kari A. Dooley, United States District Judge:

Plaintiff United States of America (hereinafter, the "United States") brings this action against Defendant Stephanie Thomas in her official capacity as Secretary of State for the State of Connecticut, seeking to compel the production by Secretary Thomas of Connecticut's complete and unredacted Statewide Voter Registration List ("SVRL"). The United States purports to seek this record under the authority of Title III of the Civil Rights Act of 1960 ("Title III"), 52 U.S.C. § 20701, *et seq*. Upon service of the Complaint, the United States filed a Motion to Compel the production of the SVRL, which largely mirrors the allegations set forth in the Complaint. Secretary Thomas has since filed a Motion to Dismiss the Complaint on multiple bases, discussed below, as well as a response to the Court's Order to Show Cause (ECF No. 9). Thomas MTD, ECF No. 58; OSC Response, ECF No. 59. Intervenor Defendants SEIU District 1199NE, Connecticut Alliance for Retired Americans, Connecticut Citizen Action Group, and Bette Marafino (the "SEIU Intervenors"), as well as Intervenor Defendants Common Cause and Claire Ewing (the "Common Cause Intervenors") also filed Motions to Dismiss. *See* SEUI MTD, ECF No. 56; Common Cause MTD, ECF No. 60. The Court additionally received amicus briefs from the Democratic National

Committee, "Former Employees Of The U.S. Department Of Justice," and the Brennan Center for Justice and Campaign Legal Center. *See* ECF Nos. 66, 71-1, 79.

For the reasons that follow, the United States' Motion to Compel is **DENIED** and the Common Cause Intervenors' Motion to Dismiss is **GRANTED**, insofar as the records sought by the United States do not fall within the scope of Title III.[1] In light of this determination, the Secretary's Motion to Dismiss, as well as the SEUI Intervenors' Motion to Dismiss, are **MOOT**.[2]

**Allegations**

According to the Complaint, "this proceeding arises from the Attorney General's investigation into Connecticut compliance with federal election law," particularly the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, *et seq.*, and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq.*, which broadly "require States to maintain and preserve certain records and papers that fall within" Title III. *See* Compl., ECF No. 1 at ¶¶ 8–9.

At the outset, 52 U.S.C. § 20701 ("Section 20701") provides that every election officer "shall retain and preserve for a period of twenty-two months from the date of any [federal] election . . . all records and papers which come into [the official's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . ." 52 U.S.C. § 20703 ("Section 20703") provides that records and papers subject to Title III must be "made

---

[1] Following the filing of the United States' Motion to Compel, the Court issued an Order to Show Cause to Secretary Thomas, directing a response to the Motion to Compel. Thereafter, the Court recognized that the parties appeared to disagree as to the appropriate procedural posture of the case, *see* ECF No. 30, and therein (perhaps) unnecessarily injected some confusion as to the proper mechanism by which to invoke the authority of Title III. The Court does not herein resolve the procedural issue previously identified by the Court. The United States opted to proceed by filing a Complaint, followed by a Motion to Compel. The Secretary and the Intervenor Defendants have moved to dismiss as permitted under Rule 12 of the Federal Rules of Civil Procedure. It is within this procedural framework that the merits of the issues raised shall be decided, leaving to another day whether Title III contemplates a more truncated or streamlined invocation of the Court's authority.

[2] The Court does not otherwise grant these remaining Motions to Dismiss, insofar as they do not raise the issue upon which this decision rests, to wit, whether Connecticut's SVRL falls within the scope of Section 20701.

available for inspection, reproduction, and copying," if the Attorney General makes a "demand in writing" that specifies "the basis and the purpose" for the inspection.

The NVRA requires states to, *inter alia*: (1) "designate a State Secretary or employee as the chief State election official to be responsible for coordination of State responsibilities" under the NVRA; (2) "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" the death of the registrant, or "a change in the residence of the registrant"; and (3) maintain "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters . . . ." *Id.* at ¶¶ 10–12 (citing 52 U.S.C. §§ 20507(a)(4), (i)(1), 20509).

HAVA mandates that all states must maintain and administer "a single, uniform, official, centralized, interactive computerized statewide voter registration list" that contains "the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." *Id.* at ¶ 13.

On August 6, 2025, upon review of a 2024 report conducted by the Election Administration and Voting Survey ("EAVS") regarding the states' efforts to keep voter registration lists current and accurate, the Attorney General sent a letter (hereinafter, the "August Letter") to Secretary Thomas, in her official capacity as the chief state election official responsible for coordinating Connecticut's responsibilities under the NVRA, "seeking information regarding Connecticut's compliance with federal election law." *See id.* at ¶¶ 18–20.  In pertinent part, the August Letter requested a copy of Connecticut's SVRL within fourteen days. *Id.* at ¶ 21.  On August 20, 2025, the Secretary provided some responses to the Attorney General's request, but did not provide all of the requested information, and further indicated that the requested data was being gathered and

would be provided as soon as practical. *Id.* at ¶ 23. On December 12, 2025, having received no further response from the Secretary, the Attorney General sent a letter demanding, pursuant to Title III and HAVA, an electronic copy of Connecticut's SVRL, including registrants' full names, dates of birth, residential addresses, and driver's license numbers or last four digits of registrants' social security numbers (hereinafter, the "December Letter"). *Id.* at ¶¶ 24–26. On December 24, 2025, the Secretary informed the Attorney General that she could not comply with the Attorney General's demand, insofar as Connecticut privacy law prohibited the production of the SVRL. *Id.* at ¶ 27.

Thereafter, on January 6, 2026, the United States commenced this civil action based on a belief that the Secretary violated federal law, to wit, Title III, by refusing to produce Connecticut's SVRL in response to the Attorney General's demand. *See generally id.* On these grounds, the United States filed a Motion to Compel the Secretary's production of an electronic copy of Connecticut's SVRL, "to include all fields, including, each registrant's name, date of birth, address, and as required by HAVA, the last four digits of the registrant's social security number, driver's license/state identification number or the unique HAVA identifier." *See* Mot. to Compel, ECF No. 9 at 3.

**Standard of Review**

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting

*Twombly*, 550 U.S. at 557). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678. Nevertheless, when reviewing a motion to dismiss, the court must accept well-pleaded factual allegations as true and draw "all reasonable inferences in the non-movant's favor." *Interworks Sys. Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 699 (2d Cir. 2010).

**Discussion**

This case is one of many brought by the United States seeking voter registration lists maintained by the various states. As has occurred elsewhere, the Secretary and the Intervenor Defendants (collectively, "Defendants") challenge the applicability of Title III to the SVRL; and even if applicable, they challenge whether the United States has complied with the prerequisites set forth in Title III. This Court does not write on a blank slate, and has the benefit of numerous (though non-binding) decisions by sister courts as to many of the issues presented. In short, because the Court concludes that Connecticut's SVRL does not fall within the scope of Title III, the United States is not entitled to its production. The Court does not therefore reach the myriad of other issues raised by the parties.

Title III

Although the parties do not agree on much, there *is* a consensus that the threshold question in this litigation is one of statutory construction. That is, whether the SVRL falls within the scope of the text of Title III. Of course, Defendants argue that it does not, while the United States asserts that it plainly does.

"Statutory interpretation, as we always say, begins with the text." *Ross v. Blake*, 578 U.S. 632, 638 (2016). Courts begin "by examining the language of [the] statute, starting with the common meaning of the words in it." *Puello v. Bureau of Citizenship & Immigr. Servs.*, 511 F.3d

324, 328 (2d Cir. 2007).  And in doing so, the Court's "task is to afford the law's terms their ordinary meaning at the time Congress adopted them." *United States v. Helm*, 58 F.4th 75, 90 (2d Cir. 2023) (quoting *United States v. Bedi*, 15 F.4th 222, 226 (2d Cir. 2021)).  Further, the Court "interpret[s] the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose." *Abramski v. United States*, 573 U.S. 169, 179 (2014).

"When the statutory text is plain and unambiguous, [the Court's] sole function is to enforce it according to its terms." *Bedi*, 15 F.4th at 226 (internal quotation marks and citations omitted). In other words, the Court's "inquiry begins with the plain language of the statute and where the statutory language provides a clear answer, it ends there as well." *Peralta-Taveras v. Att'y Gen.*, 488 F.3d 580, 584 (2d Cir. 2007) (internal quotation marks and citation omitted).  "If the statutory language is ambiguous, however, [courts] resort first to canons of statutory construction, and, if the statutory meaning remains ambiguous, to legislative history, to see if these interpretive clues clearly reveal Congress's intent." *Barbosa da Cunha v. Freden*, 175 F.4th 61, 71 (2d Cir. 2026) (quoting *Mizrahi v. Gonzales*, 492 F.3d 156, 158 (2d Cir. 2007)) (alteration adopted) (internal quotation marks and citation omitted).

"Congress enacted Title III of the Civil Rights Act of 1960 to help end voting discrimination."[3]  *United States v. Benson*, 179 F.4th 470, 474 (6th Cir. 2026); *see also United States v. Weber*, 816 F. Supp. 3d 1168, 1175 (C.D. Cal. 2026) (Title III was passed during the Jim Crow era, in response to concerns that states were thwarting efforts by the federal government to investigate whether states were engaging in a pattern and practice of disenfranchising Black Americans through persistent voter suppression); *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 475 (S.D.N.Y. 2020) (acknowledging that Congress passed the Civil Rights

---

[3] The United States does not contest this general proposition, and argues instead that Title III was not *solely* enacted to counteract voting discrimination.  *See* USA Opp., ECF No. 76 at 26.

Acts of 1960 and 1964 "to address defects litigants encountered in trying to vindicate" the voting rights that the Fifteenth Amendment and the Civil Rights Act of 1957 were meant to protect). "Title III of the Act gave teeth to prior civil-rights legislation by empowering the U.S. Attorney General to obtain certain state voting records so that he could investigate potential violations and enforce federal election law." *Benson*, 179 F.4th at 474. "Back then, the government used this power to ensure that everyone who had the right to vote could freely exercise that right." *Id.*

Section 20701 of Title III provides that every election officer "shall retain and preserve for a period of twenty-two months from the date of any [federal] election . . . all records and papers which come into [the official's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . ." And Section 20703 provides that records and papers subject to Title III must be "made available for inspection, reproduction, and copying" if the Attorney General makes a "demand in writing" that specifies "the basis and the purpose" for the inspection. Also relevant to the Court's decision is 52 U.S.C. § 20702 ("Section 20702"), which provides criminal penalties for "any person . . . who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by [S]ection 20701 of this title to be retained and preserved."

The question then, is whether the SRVL falls within the scope of "all records and papers which come into [the Secretary's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." If the answer is yes, Title III's preservation and production mandates are triggered. If the answer is no, the Secretary has no such obligations.

The SVRL

The basic structure of Connecticut's SVRL, and the state's efforts to comply with the NVRA and HAVA, are not in dispute.  In Connecticut, the Secretary is the state's Chief Election Official, and elections are largely administered on the local level by local officials in each of Connecticut's 169 municipalities.  *See* Thomas MTD at 15.  "Typically, each town has two Registrars of Voters ('ROVs')—one from each major party—and a Registrar of Vital Statistics ('RVS')—typically, a Town Clerk—who together administer elections."  *Id.*  Connecticut implements its NVRA and HAVA requirements through a Centralized Voter Registration System ("CVRS"), which the Secretary has described as "a living database of local voter registration lists maintained by each of the state's 169 municipalities."  OSC Response, ECF No. 59 at 11.  Each and every municipality's ROVs and RVS update their local voter registration list on a continuous basis and input changes directly into the CVRS.  *See id.*  Connecticut maintains the following information about voters in the CVRS:

> (1) name and name history; (2) bona fide residence; (3) mailing address, if any; (4) telephone number, if any; (5) date of birth; (6) previous voting residence in Connecticut, if any; (7) age; (8) party affiliation, if any; (9) previous party affiliation, if any; (10) date of initial voter registration; (11) date of changes to voter registration information, if any; (12) Connecticut motor vehicle operator's license number; and (13) the last twenty voting history records, including polling places, manner of voting, and manner of registration.

Thomas MTD, ECF No. 58-2, Affidavit of Gabe Rosenberg ("Rosenberg Aff.") at ¶ 5.

Local officials continuously update the CVRS throughout the year to maintain accuracy.[4]

*Id.* at ¶ 11.

---

[4]  Insofar as the CVRS "is continuously updated by hundreds of local officials across the state," the Secretary asserts that "it is not technically feasible for [the Secretary] to maintain timestamped historical versions of CVRS every time there is a change to a voter file."  *See* Rosenberg Aff. at ¶ 23.

In their Motion to Dismiss, the Common Cause Intervenors principally argue that Connecticut's SVRL does not fall within the scope of Title III because it is a document *created* by the Secretary (ostensibly using the CVRS), as opposed to a record which "comes into [her] possession." As such, the Common Cause Intervenors contend that the SVRL is not subject to the preservation mandate nor the disclosure mandate of Title III. Conversely, the United States contends that Title III should not be construed so narrowly, and that the Common Cause Intervenors' reading of "come[] into . . . possession" is at odds with what the plain terms of Title III dictate. *See* USA Opp., ECF No. 76 at 23–24. More specifically, the United States urges that "the word 'come' cannot create a carve-out for self-generated documents." *Id.* at 24. Nevertheless, as indicated above, the Court agrees with the Common Cause Intervenors, and the Secretary.[5]

Although the United States has argued that each of the growing number of cases which have reached the same conclusion as the Common Cause Intervenors and the Secretary were wrongly decided, in the Court's view, it is a fairly straightforward reading of Title III that compels this result. The SVRL is a record created by the state. It is not a record that comes into the state's possession at all. And the fact that it is constantly being updated demonstrates conclusively that it does not fall within the scope of the preservation mandate contained in Title III.

On these issues, the Court finds compelling and persuasive the decision of the Sixth Circuit in *Benson*. There, the Sixth Circuit first observed that:

> Title III does not define "come into . . . possession," so we must determine its ordinary meaning. Around the time that Congress enacted Title III, this term meant to "acquire," "obtain," or "receive." *See Honeycutt v. United States*, 581 U.S. 443, 449, 137 S.Ct. 1626, 198 L.Ed.2d 73 (2017); *Come into*, *Webster's Third New International Dictionary* 452 (1966) ("to enter upon or in possession of: acquire

---

[5] Though the Secretary did not advance such an argument in her Motion to Dismiss, the OSC Response makes clear that, in the Secretary's view, the SVRL is not something "which come[s] into [the Secretary's] possession," and that Title III "merely allows the Attorney General to 'determine whether the State is improperly rejecting voter registration applications' [the Secretary] has received—not to audit administrative records she has created." *See* OSC Response at 16–17.

9

esp. as an inheritance"); *Acquire*, *Webster's Third New International Dictionary* 18 (1961) ("to come into possession, control, or power of disposal of"); *Obtain*, 7 *Oxford English Dictionary* 37 (1933) ("to come into the possession or enjoyment of (something)"); *Receive*, *Webster's Third New International Dictionary* 1894 (1961) ("to come into possession of: acquire").

*Benson*, 179 F.4th at 478.

The Sixth Circuit summarily concluded that Michigan Secretary of State Jocelyn Benson "did not acquire, obtain, or receive the qualified voter file from a third party," but rather, Michigan officials created the voter roll themselves. *Id.* So too here. As a factual matter, there is no dispute that the Secretary receives records and data from each of Connecticut's individual municipalities through the CVRS, which the state then uses to create the SVRL. Thus, under the plain language of Title III, the SVRL does not fall within its scope. *See, e.g.*, *United States v. Koski*, No. 26-CV-42 (RCY), 2026 WL 2032532, at \*5 (E.D. Va. July 14, 2026) ("Virginia's SVRL did not 'come into [Defendant's] possession' as that phrase is ordinarily understood."); *United States v. Bd. of Elections of N.Y.*, No. 25-CV-1338 (MAD), 2026 WL 1999921, at \*9 (N.D.N.Y. July 10, 2026) ("[A] voter registration list is not a [Section] 20701 document because it is created by state officials and, therefore, does not come into their possession.") (alteration adopted) (internal quotation marks omitted); *United States v. Scanlan*, No. 25-CV-371 (JL), 2026 WL 1864054, at \*4 (D.N.H. June 29, 2026) (interpreting Title III "as referring only to records that election officials obtain from outside sources—*i.e.*, prospective voters—and not to records that they themselves have created and thus have always possessed"); *United States v. Demarinis*, No. 25-CV-3934 (SAG), 2026 WL 1780586, at \*4 (D. Md. June 18, 2026) ("[T]he SVRL, which is created by state officials, does not 'come into [their] possession.'"); *United States v. Wisconsin Elections Comm'n ("WEC")*, No. 25-CV-1036 (JDP), 2026 WL 1430354, at \*4 (W.D. Wis. May 21, 2026) (Title III "does not encompass records created by state election officials, including voter registration lists"); *United States v.*

*Bellows*, No. 25-CV-468 (LEW), 2026 WL 1430481, at *7 (D. Me. May 21, 2026) ("[T]he United States cannot utilize Title III to compel production of Maine's SVRL because it is not a record that comes into the possession of state officials, but is instead the product of the labors of state officials."); *United States v. Fontes*, No. 26-CV-66 (SMB), 2026 WL 1177244, at *2 (D. Ariz. Apr. 28, 2026) (an SVRL is not a Title III document "because it is created by state officials and is not a document that people submit to the State as part of the voter registration process") (internal quotation marks and alteration omitted).

This conclusion is further compelled by Section 20702, which provides criminal penalties for "any person who . . . alters" a record subject to the preservation and retention obligations contained in Section 20701.  Unavoidably and of necessity, in order to maintain an accurate SVRL as required under the NRVA and the HAVA, the SRVL is constantly being "altered" as information is updated; voters are added; voters are removed; addresses changed; or any of the thousands of datapoints contained in the SVRL otherwise require modification. Section 20702 clearly contemplates that the records subject to Section 20701 are fixed in time when they "come into the possession" of state officials such that they cannot thereafter legally be altered, damaged or destroyed.  *See Benson*, 179 F.4th at 480 ("Title III tells election officials to retain and preserve certain records and papers that come into their possession, and the NVRA and HAVA tell election officials to remove ineligible voters from statewide voter registration lists. We should not adopt a reading that would place election officials in violation of one federal law for trying to comply with others."); *Koski*, 2026 WL 2032532 at *5 ("[C]onstruing [Section] 20701 in a manner that subjects Virginia's SVRL to Title III 'would place Title III on a collision course with the NVRA and HAVA.'") (alteration adopted); *Bd. of Elections of N.Y.*, 2026 WL 1999921 at *9 ("[I]nterpreting [Section] 20701 to include the [SVRL] would not be harmonious with an adjacent provision,

11

[Section] 20702, and would place Title III in conflict with the NVRA and HAVA."); *Demarinis*, 2026 WL 1780586 at \*5 (rejecting the United States' proposed interpretation of Title III because it would "criminalize the same conduct that the NVRA and HAVA require"); *Fontes*, 2026 WL 1177244 at \*5 ("[Section] 20703 provides that the Attorney General may only request those documents states are required to preserve under [Section] 20701.  If the SVRL were deemed such a document, then [Section] 20702 would prohibit the SVRL from being altered.  This conclusion would directly conflict with both the NVRA and the HAVA, which affirmatively requires states to modify its VRLs under certain conditions."); *see also WEC*, 2026 WL 1430354 at \*5 ("Even if [Section] 20702 could conceivably be reconciled with the government's interpretation of Title III, there is still tension in a statutory construction that applies Title III's requirements to non-permanent records like voter registration lists.").

For all of these reasons, the Court concludes that the Connecticut SVRL is not a record that falls within the scope of Title III, and is therefore not subject to the preservation and production requirements contemplated therein.

**Conclusion**

In light of the foregoing, the United States' Motion to Compel is **DENIED**.  The Common Cause Intervenors' Motion to Dismiss is **GRANTED**.  Accordingly, the remaining Motions to Dismiss are **MOOT**.  The Clerk of Court is respectfully directed to enter Judgment in favor of Defendants and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 17th day of July 2026.

 /s/ Kari A. Dooley
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

12